# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LAWRENCE A. LOCKE,<br>individually and on behalf of all others<br>similarly situated,<br><br>                    Plaintiffs,<br><br>    v.<br><br>QUIBIDS, LLC,<br><br>                    Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL NO: **5:10-CV-01277-W**


**JURY TRIAL DEMANDED**


## FIRST AMENDED CLASS ACTION COMPLAINT

TO THE HONORABLE COURT:

Plaintiff Lawrence A. Locke, on behalf of himself and all other persons similarly situated, by the undersigned attorneys, alleges the following against Defendant QuiBids, LLC ("QuiBids"), based on his personal knowledge as to himself and his own acts and on information and belief as to all other matters.

## NATURE OF ACTION

1.      Plaintiff brings a class action arising from QuiBids' operation of QuiBids.com, an interactive website on which consumers are enticed to buy 'bids" for use in on-line auctions of consumer products with the promise of obtaining those consumer products at significant discounts from retail prices.  QuiBids.com offers consumers the chance to bid on a variety of consumer products, including high-ticket items such as high-definition televisions, laptop computers, other electronic equipment, and even automobiles.  At any given time, QuiBids.com is conducting auctions of dozens of these high-ticket items.  QuiBids.com auctions typically last many hours, and each item typically draws numerous bids, with high-ticket items drawing hundreds or even thousands of bids.  Each bid purchased from QuiBids costs $0.60.  In each QuiBids.com auction, each $0.60 bid placed by a consumer raises the purchase price of the item by either $.01 or $.02, depending on the format of the auction.

2.      QuiBids promotes itself (on its website, through widespread internet advertising and emails) as providing an opportunity for consumers to purchase luxury items at significant discounts compared to retail stores and E-Bay, and it claims that its customers typically save 80%-95% compared to retail prices.  In one e-mail promotion, QuiBids cites a customer purchasing a $20,000 Honda Civic automobile for $1,740.78 in a two-cent QuiBids auction. That price means QuiBids sold 87,039 bids which were used in that auction.  At $0.60 per bid,

QuiBids grossed $52,233.40 from the bids alone, an amount that dwarfs not only any savings realized by the winning bidder individually, but the retail cost of the car.  This illustrates the critical difference between QuiBids and E-Bay – losing bidders on E-Bay do not pay anything.

3.      Under the auction system set up by QuiBids, most consumers using the site will not win the majority of auctions for low ticket items on which they bid and will rarely, if ever, win auctions of high-ticket items.  Given this, and given that each losing attempt to win an action costs the consumer money (because each bid costs $.60), QuiBids.com functionally constitutes something more like a gambling website than an auction website.  Consumers spend money to place bets in the hopes of winning a prize – a consumer product at a significant discount.  As is true with traditional gambling, the overwhelming majority of customers who use QuiBids.com will lose money doing so; that is, the total amount they spend between purchasing bids, paying for items in auctions they win and paying for any items they purchase using the "Buy It Now" feature (explained below) will exceed the "Value Prices" as stated on QuiBids.com of the items they receive, if any.

4.      Unlike a gambling website or a casino, however, QuiBids.com does not disclose its true nature.  It does not disclose the very low probability of a customer receiving a financially positive outcome from using the website.  In contrast, the odds of winning a lottery are calculable and publicized.  Likewise, the payback percentages of various casino games are calculable and widely available.  Indeed, slot machines are regulated as to the percentage of money put into them that they will pay back.  Nowhere on QuiBids' site, however, does it provide information on what percentage of the money spent by its customers is returned to the customers as merchandise, nor does QuiBids provide any basis for calculating same.

5.      QuiBids' failure to disclose the fact that the overwhelming majority of customers will lose money by using the site and the percentage of money returned constitutes violations of the Oklahoma Consumer Protection Act and common law fraud by omission under Oklahoma law.  Plaintiff seeks to represent a class of all persons who lost money using QuiBids.com; that is, a class of all customers for whom the total amount spent between purchasing bids, paying for any auction items won and paying for items purchased using the "Buy It Now" feature exceeded the "Value Prices" as stated on QuiBids.com of the items they received, if any.

6.      QuiBids additionally fails to disclose material facts about bidding on high-ticket items (items with a retail value of $100 or more).  In the bidding on any high-ticket item, multiple bids will always be made during the last 20 seconds of the time originally set for bidding by QuiBids.  This is true for two reasons: (1) because it is a wise bidding strategy adopted by many bidders, and (2) because QuiBids.com has a "Bid-O-Matic" feature whereby customers can have the site automatically bid for them on virtually all auctions of high-ticket items, and the Bid-O-Matic feature only bids when there are 20 seconds or less left in the auction.  As a consequence, on a high-ticket item, any bid placed before the last 20 seconds originally set for bidding by QuiBids will never succeed in winning the auction and is a complete and utter waste of money.  Notably, QuiBids.com does not disclose that any bid placed on a high-ticket item prior to the last 20 seconds originally set for bidding by QuiBids is inevitably a waste of money.

7.      QuiBids' failure to disclose on the website that placing bids on high-ticket items before the last 20 seconds it originally set for bidding is a complete waste of money is a violation of the Oklahoma Consumer Protection Act and constitutes common law fraud by omission under Oklahoma law.  On behalf of the proposed class, Plaintiff asserts this additional claim.

8.      When a potential new customer of QuiBids visits QuiBids.com, the customer sees a large number of attractive auction items.  When a customer registers with QuiBids.com, it places cookies on the customer's computer.  When the customer goes back to QuiBids.com, the cookies direct the customer to a different part of the website that offers less auction items than the website shows to persons visiting the site who have not registered with the Site and, thus, do not have the cookies on their computer.  If a customer clears the cookies before going to the website, the customer sees the website as seen by an unregistered potential customer.  However, even then, if the customer logs into the website, he or she is directed to a portion of the website that offers less auction items than the number of auction items shown to persons without cookies on their computer who have not logged in.  Nowhere on its website does QuiBids disclose that registered customers will be directed to a part of the website that offers less auction items than the number of auction items shown to potential customers who are not registered with QuiBids, a classic "bait and switch" tactic.

9.      QuiBids' failure to disclose on the website that registered users will be directed to portions of the website that offer less auction items than the auction items shown on the website when visited by unregistered potential customers is a violation of the Oklahoma Consumer Protection Act and constitutes common law fraud by omission under Oklahoma law.  On behalf of the proposed class, Plaintiff asserts this additional claim.

## JURISDICTION AND VENUE

10.     Pursuant to 28 U.S.C. § 1332(d)(2)(A), this Court has jurisdiction over this action because it is filed as a class action, the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and members of the class are citizens of states other than QuiBids' state of citizenship.  Pursuant to 28 U.S.C. § 1332(d)(2)(A), if any member of a

putative class of plaintiffs is a citizen of a State different from any defendant, jurisdiction exists. QuiBids.com states that it has in excess of $1,600,000 "registered users" and that it provides service in the 50 states, Washington, D.C., Guam, the U.S. Virgin Islands and Puerto Rico. Upon information and belief, class members are citizens of all 54 jurisdictions.  QuiBids, LLC, was founded in late 2009 by Matt Beckham, an Oklahoma citizen.  It is highly unlikely that QuiBids, LLC, has members in multiple states, much less all 54 jurisdictions in which putative class members likely have citizenship.  Upon information and belief, therefore, QuiBids, LLC, does not have citizenship in every state in which members of the Class have citizenship.

11.     QuiBids provides in the "Terms & Conditions" posted on QuiBids.com that any legal action or proceeding related to the QuiBids.com website shall be brought exclusively in a federal or state court sitting in Oklahoma and that a consumer's use of QuiBids.com shall be governed by the laws of the United States of America and the State of Oklahoma without regard to Oklahoma's conflicts of law principles.  Venue also lies in this District pursuant to 28 U.S.C. § 1391, because QuiBids resides in this Judicial District and a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

## PARTIES

12.     Plaintiff Lawrence A. Locke ("Locke" or "Plaintiff") is and was at all relevant times domiciled in Tigard, Oregon, and is and was at all relevant times a citizen of Oregon.

13.     Defendant QuiBids, LLC ("QuiBids") is an Oklahoma limited liability company which has its principal place of business in Oklahoma City, Oklahoma.  QuiBids has already been served with process through its registered agent for service of process, Matt Beckham, at 1601 N.W. Expressway, Suite 1500, Oklahoma City, Oklahoma 73118.

## FACTUAL ALLEGATIONS.

14.     QuiBids purports to be an online auction company.   At QuiBids' website, QuiBids.com (the "Site"), QuiBids offers an interactive service through which customers purchase bids and attempt to win various consumer goods, including items such as iPods, Macbooks, PS3s, and other high-ticket items.   QuiBids has operated the Site since at least October 2009.

15.     Before a customer can place bids on the Site, he or she must first register an account on the Site.   Only one account per customer is permitted.   Upon information and belief, QuiBids keeps electronic records of all activity within each account, including all purchases of bids, all auctions in which bids were placed, all auction items won and purchased and all items purchased using the "Buy It Now" feature.   Once the account has been confirmed, the next step for the customer is to buy bids, which are sold in "packs" of varying number.   There are five different sizes of bid packs to buy from QuiBids, and for all of them, the cost per bid is $.60.[1] What the customer is purchasing is the right to place bids on particular auction items.   The purchase of bids is not a guarantee that the customer will win any auction.

16.     The Site's home page provides an "Ending Auctions" section that lists the auctions purportedly closest to ending.   A link is provided to numerous additional auctions which are further away from ending.   Each of these auctions has a time, a price, a bidder name, a picture of the product, and a colored banner with a cent number displayed in the upper right corner.

---

[1] Customers may also obtain bids by participating in auctions of bid packs called "Vouchers" and the price per "Voucher" bid for customers winning such auctions may be less than $.60 per bid.

17.     Whenever a customer bids during the last 20 seconds of an auction, additional time is added to the auction by QuiBids.  Initially, another 20 seconds is added.  At some point, QuiBids may decide to reduce the amount of time added by an additional bid to 15 seconds.  After that, QuiBids may decide to add only an additional 10 seconds for each additional bid.  Ten seconds will be added for every additional bid made until, finally, no more bids are made in the last 10 seconds.  The last bidder "wins" the auction and the right to purchase the item.

18.     Each auction has a specific amount by which the purchase price of the item increases when a bid is placed.  In a one-cent auction, the purchase price will increase by $0.01 each time a bid is placed.  Each $1.00 increase in price in a one-cent auction results in $60.00 additional revenue to QuiBids. In a two-cent auction, the purchase price will increase by $0.02 each time a bid is placed.  Each $1.00 increase in price in a two-cent auction results in $30.00 additional revenue to QuiBids. The purchase price represents what the consumer who wins the auction will have to pay to obtain the product if the auction were to end at that point.  An auction winner ends up paying the cost of all the bids he or she placed on the item, the purchase price of the item and shipping costs.

19.     For a losing bidder, QuiBids offers a "Buy It Now" feature pursuant to which the product can be purchased at the "Value Price" stated on the Site for up to two hours after the end of the auction.  The losing bidder gets a credit towards the purchase price for the cost of the losing bids he or she expended.[2]  The Site represents that "The 'Value Price' reflects the price you would find the item at other retailers."  That price is typically higher than the best price for which the item could be purchased on the internet or in retail stores.  In fact, for Apple products,

---

[2] Credit is not given for "Voucher" bids won in auctions.

which are probably the most popular and common high-ticket items, the "Value Price" is always higher than the price for the item on Apple's website.

20.     Unlike traditional auctions, when a QuiBids consumer bids on an item, the consumer pays $0.60 for each bid, regardless of whether or not the consumer actually wins the item.  For example, in a traditional auction, a consumer who bids $1.00 on an item but loses the auction does not pay the $1.00 losing bid.  Under QuiBids' scheme, however, a consumer may bid multiple times on an item and ultimately lose the auction but will have lost the price of the losing bids.  For example, QuiBids may be in the process of conducting a one-cent auction for an item which stands at $10.00 with 60 seconds left on the timer.  If a customer A places one $0.60 bid on the item, the price will be raised to $10.01, and customer A will have paid $0.60.  A dozen subsequent bids could be made on the item by customers B-M, which will raise the price to $10.13 and eliminate customers A-L as high bidders, but customers A-L will each have paid the amount of their bids, and QuiBids will have collected an additional $7.80.

21.     The most savvy QuiBids customers wait until the final 20 seconds originally set for bidding by QuiBids to bid on high-ticket items (items with a retail value of $100 or more).  Auctions of high-ticket items open with many hours to bid, and many customers purchase and place bids in the hours before the final 20 seconds originally set for bidding by QuiBids, completely unaware that these bids have no chance of winning and that the money spent on those bids is an utter waste.  The Site offers consumers the option on virtually all high-ticket items to have the Site bid automatically for them pursuant to pre-set parameters by using the Bid-O-Matic feature.  Recognizing that bids made in the final 20 seconds it originally set for bidding of an auction of a high-ticket item are the only bids with any chance of winning, QuiBids has designed this feature so that it will only place bids within that time frame.  Thus, the Site itself, through

the Bid-O-Matic feature, is designed so as to make bidding on high-ticket items before the final 20 seconds originally set for bidding by QuiBids a complete waste of time and money. Yet, this fact is nowhere disclosed on the Site. The failure to disclose this fact is unfair, deceptive and fraudulent.

22.     Unfortunately, the unfairness, deception and fraudulent nature of the Site goes far beyond wasted bids placed on auctions of high-ticket items before the last 20 seconds originally set for bidding by QuiBids. The true nature of the Site is not disclosed, much to the detriment of the overwhelming majority of its users. QuiBids offers nothing more to its customers than a very low probability of purchasing merchandise at a discount. Those customers will not win the majority of the auctions in which they participate and will win very few, if any, auctions on high-ticket items (items with a retail value of $100 or greater). Consequently, for the overwhelming majority of customers who play QuiBids' game, the money they will spend to purchase bids and pay for any items which they are lucky enough to win will greatly exceed the retail value of any items they win and purchase.

23.     The existence of the "Buy It Now" feature does not change this fact. Even customers who regularly use the feature will end up paying more between the cost of the bids, the purchase prices and shipping costs of any items won in auctions and the purchase prices and shipping costs of any items purchased using the "Buy It Now" feature than even the inflated "Value Prices" as stated on QuiBids.com of the merchandise they receive. Crucially, unlike games of chance played in a casino, which may only be operated under specific statutory authority, QuiBids provides no information to its customers of their odds of winning or what percentage the "house" keeps. In truth, QuiBids is offering something akin to a raffle or some other type of gambling, despite purporting to operate an "auction." Nowhere on the Site does

QuiBids disclose the very low probability of benefitting financially from using the Site.  Its failure to do so is unfair, deceptive and fraudulent.

24.     When a prospective QuiBids customer first visits the Site, he or she is shown a large number of auctions occurring, including a variety of highly desirable high-ticket items. However, once a customer registers with QuiBids, cookies are placed by the Site on the customer's computer.  When the customer goes back to the Site, the cookies direct the customer to a portion of the Site that offers less auction items to bid upon than the portion of the Site seen by unregistered potential customers.  If a registered user clears the cookie from the computer, he or she is directed to the main site seen by unregistered potential customers.  However, if the registered customer then logs in, he or she is directed to a portion of the Site that offers less auction items than are shown on the portion of the Site seen by unregistered potential customers. Nowhere on the Site does QuiBids disclose that registered users will be directed to a portion of the Site that offers less auction items to bid upon than the portion of the Site seen by unregistered potential customers.  Its failure to do so is unfair, deceptive and fraudulent.

25.     QuiBids has also been accused in a lawsuit of engaging in a variety of false advertising and false affirmative representations on the Site.  *See* First Amended Counterclaim of 1524948 Alberta Ltd., d/b/a Terra Marketing Group, Against QuiBids, LLC for False Advertising, Defamation, Copyright Infringement, Deceptive Trade Practices, Unfair Competition, and Injunctive and Declaratory Relief ¶¶ 33-44, a copy of which is attached hereto as Exhibit A.  Furthermore, the same lawsuit accuses the founder and CEO of QuiBids, Matt Beckham, with having engaged in similar conduct in connection with the sale of weight loss products.  *See* Exhibit A ¶ 33.  QuiBids has admitted a number of the allegations relating to false

advertising.  *See* Plaintiff/Counter-Defendants' Answer to First Amended Counterclaim ¶¶ 36-38, a copy of which is attached hereto as Exhibit B.

## FACTS SPECIFIC TO NAMED PLAINTIFF

26.     Plaintiff is an Oregon citizen who learned about QuiBids.com by reading publicly-available news and magazine features in early-to-mid 2010.  These sources emphasized that consumers could save an average of 80%, and up to 95%, on consumer products on QuiBids.com compared to the fair retail prices of those consumer products.

27.     Plaintiff first visited QuiBids.com on July 18, 2010.  What stood out to Plaintiff while on the Site was its statements emphasizing that all items would be sold at extremely low prices, with huge savings compared to retail prices.

28.     On the same day, Plaintiff purchased the "Beginner Bid Pack" for $45.00.  In return, he received 75 bids.  Plaintiff also bid on three bid packs called "25-bid Vouchers."  Plaintiff won two of the three Vouchers he bid on, and he paid a total of $6.11 for them.  All told, Plaintiff spent $51.11 to purchase 125 bids or $.41 per bid.

29.     Plaintiff bid for several consumer products advertised on the Site on July 18, 2010, and July 19, 2010, but he won none of them despite using all his bids.  Plaintiff's $51.11 was spent on nothing more than a chance to win—he received nothing of value in return.  That is more like gambling than a traditional auction in which the losing bidders pay nothing.

30.     More specifically, on July 18, 2010, Plaintiff placed losing bids for consumer products on the Site as follows:

> 9 bids on a Nikon camera (high-ticket item), and

> 6 bids on an external hard drive.

31.     On July 19, 2010, Plaintiff placed losing bids for consumer products on the Site as follows:

> 1 bid on an HDMI cable;
>
> 10 bids on an HP Printer (high-ticket item);
>
> 64 bids on an LG 55" HDTV (high-ticket item); and
>
> 1 bid on a Nikon camera (high-ticket item).

32.     Plaintiff made a number of bids on the high-ticket items before the final 20 seconds originally set for bidding by QuiBids.

33.     In the one-cent LG 55" HDTV auction, the TV sold for $228.99, which means ultimately 22,859 bids were placed, 64 by Plaintiff personally.  For the winning bidder, this price likely represented a significant discount from the retail price, which was probably at least $1,500.00.  However, the amount paid to QuiBids for the bids placed on the Site is staggering in comparison -- 22,859 bids at $0.60 each amounts to $13,715.40.  If QuiBids in fact paid the retail cost to acquire the television, QuiBids grossed over $12,000.00 on that one auction.  Even so, since one consumer purchased the television at $228.59, QuiBids brags that the consumer saved 85% compared to the retail price, never mentioning that the rest of its customers spent as much as $14,000 on that auction and received nothing in return.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff seeks to represent the following class:

> All persons in the United States (the 50 states, Washington, D.C., Guam, the U.S. Virgin Islands and Puerto Rico) who spent more money on QuiBids.com than the value of the goods they received, if any – persons for whom the total amount spent on purchasing bids, on paying for any auction items they won (including shipping costs) and paying for items using the "Buy It Now" feature (including shipping costs) exceeded the "Value Prices" as listed on QuiBids.com of the goods they received (the "Class").

35.     This action has been brought and may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).

36.     The members of the Class are so numerous that joinder of all members is impracticable.  The exact number of members in the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery.  However, QuiBids claims on the Site that it has in excess of 1,600,000 "registered users."  Because customers of the Site have to provide email addresses in order to register and have to provide mailing addresses in order to purchase bids and merchandise using credit cards, Plaintiff believes that QuiBids has the information necessary to allow notice to be sent individually to each member of the Class.

37.     Common questions of law and fact exist as to all members of the Class.  Among others, these common questions include, but are not limited to:

      a.      whether QuiBids' conduct constituted violations of the Oklahoma Consumer Protection Act;

      b.      whether QuiBids' conduct constituted common law fraud by omission under Oklahoma law;

      c.      whether QuiBids should, in equity and good conscience, refund to the members of the Class their losses pursuant to Oklahoma's cause of action for money had and received;

      d.      whether QuiBids should refund the losses of the members of the Class pursuant to the Oklahoma cause of action for unjust enrichment; and

      e.      whether, as a result of violations of the Oklahoma Consumer Protection Act herein, Plaintiff and the members of the Class are entitled to

injunctive relief or other remedies, in addition to damages, and, if so, the nature of such relief.

38.     These common questions predominate over any questions affecting only individual members of the Class.

39.     Plaintiff's claims are typical of the claims of the members of the Class, as he and all the members of the Class were similarly affected by QuiBids' wrongful uniform conduct and assert the same legal theories.  Plaintiff has no interests antagonistic to the interests of the other members of the Class.  Plaintiff and all members of the Class have sustained similar economic injuries arising out of QuiBids' violations of common and statutory law as alleged herein.

40.     Plaintiff is an adequate representative of the Class because his interests and those of his counsel do not conflict with the interests of the members of the Class he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously.  Plaintiff and his counsel will fairly and adequately protect the interests of all of the members of the Class.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of these controversies since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members will be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this class action, whereas individualized litigation presents the potential for inconsistent or contradictory judgments.  A class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, comprehensive supervision by a single court and the conservation of scarce judicial resources.

## COUNT I

## VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT BY DECEPTIVE TRADE PRACTICES

42.     Plaintiff incorporates all of the allegations of Paragraphs 1 through 41 into Count I as if they were fully set forth here verbatim.

43.     QuiBids is a "person" within the meaning of the Oklahoma Consumer Protection Act. 15 O.S. ANN. § 752(1).  Plaintiff and all the members of the Class are "consumers" as that term is used in 15 O.S. ANN. § 761.1(A).  Plaintiff and the other members of the Class and QuiBids were engaged in "consumer transactions" within the meaning of the Act.  *Id.* at § 752(2).

44.     QuiBids failed to inform its customers:  (a) that the overwhelming majority of customers using the Site would lose money by doing so, (b) of the percentage of the money spent by customers on the Site that is returned to customers in the form of merchandise; (c) that with respect to auctions of high-ticket items (items with a retail value of $100 or more), bids placed on QuiBids.com for those items before the last 20 seconds originally set for bidding by QuiBids will inevitably be unsuccessful and, thus, a waste of money; and (d) that registered users of the Site will be directed to a part of the Site that offers less auction items to bid upon than the portion of the Site accessed by unregistered potential customers.  These failures to disclose constituted the commission of acts or practices declared to be a violation of the Act pursuant to Section 753(20), in that they constituted deceptive trade practices as defined in Section 752 of the Act.  *Id.* at §§ 753(20) & 752(13).  Specifically, QuiBids' omissions constituted omissions that deceived Plaintiff and the members of the Class or that could reasonably be expected to deceive or mislead a person to the detriment of that person.

45.     As a result of QuiBids' violations, Plaintiff and the other members of the Class have sustained actual damages equal to the amounts they have lost using QuiBids.com – the amount by which the total dollars they paid for bids, plus the total dollars they paid to purchase items won during auctions (including shipping costs), plus the total dollars they paid to purchase items using the "Buy It Now" feature (including shipping costs) exceeded the total "Value Prices" as stated on QuiBids.com of the merchandise they received.  Alternatively, as a result of QuiBids' violations, Plaintiff and the other members of the Class have sustained actual damages equal to the amounts they paid for the losing bids they made on high-ticket items on QuiBids.com before the last 20 seconds originally set for bidding by QuiBids.

46.     QuiBids is liable to Plaintiff and the other members of the Class for those actual damages caused by QuiBids' violation of Act and for their reasonable costs and attorneys' fees. *Id.* at § 761.1(A).   In addition, pursuant to Section 761.1(C) of the Act, Plaintiff seeks an injunction requiring QuiBids to disclose the omitted information on the Site.

## COUNT II

## VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT BY UNFAIR TRADE PRACTICES

47.     Plaintiff incorporates all of the allegations of Paragraphs 1 through 46 into Count II as if they were fully set forth here verbatim.

48.     QuiBids is a "person" within the meaning of the Oklahoma Consumer Protection Act.  15 O.S. ANN. § 752(1).  Plaintiff and all the members of the Class are "consumers" as that term is used in 15 O.S. ANN. § 761.1(A).  Plaintiff and the other members of the Class and QuiBids were engaged in "consumer transactions" within the meaning of the Act.  *Id.* at § 752(2).

49.     QuiBids failed to inform its customers:  (a) that the overwhelming majority of customers using the Site would lose money by doing so, (b) of the percentage of the money spent by customers on the Site that is returned to customers in the form of merchandise; and (c) that with respect to auctions of high-ticket items (items with a retail value of $100 or more), bids placed on QuiBids.com for those items before the last 20 seconds originally set for bidding by QuiBids will inevitably be unsuccessful and, thus, a waste of money; and (d) that registered users of the Site will be directed to a part of the Site that offers less auction items to bid upon than the portion of the Site accessed by unregistered potential customers.  These failures to disclose constituted the commission of acts or practices declared to be a violation of the Act pursuant to Section 753(20), in that they constituted unfair trade practices as defined in Section 752 of the Act.  *Id.* at §§ 753(20) & 752(4).  Specifically, QuiBids' omissions constituted practices which offend public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, because they caused Plaintiff and the members of the Class to waste their money.

50.     As a result of QuiBids' violations, Plaintiff and the other members of the Class have sustained actual damages equal to the amounts they have lost using QuiBids.com – the amount by which the total dollars they paid for bids, plus the total dollars they paid to purchase items won during auctions (including shipping costs), plus the total dollars they paid to purchase items using the "Buy It Now" feature (including shipping costs) exceeded the total "Value Prices" as stated on QuiBids.com of the merchandise they received.  Alternatively, as a result of QuiBids' violations, Plaintiff and the other members of the Class have sustained actual damages equal to the amounts they paid for the losing bids they made on high-ticket items on QuiBids.com before the last 20 seconds originally set for bidding by QuiBids.

51.     QuiBids is liable to Plaintiff and the other members of the Class for those actual damages caused by QuiBids' violation of Act and for their reasonable costs and attorneys' fees. *Id.* at § 761.1(A).   In addition, pursuant to Section 761.1(C) of the Act, Plaintiff seeks an injunction requiring QuiBids to disclose the omitted information on the Site.

## COUNT III

## COMMON LAW FRAUD BY OMISSION

52.     Plaintiff incorporates all of the allegations of Paragraphs 1 through 51 into Count III as if they were fully set forth here verbatim.

53.     QuiBids omitted to disclose material facts to its customers:   (1) that the overwhelming majority of customers using the Site would lose money doing so, (2) the percentage of the money spent by customers that is returned to customers in the form of merchandise, (3) that with respect to auctions of high-ticket items (items with a retail value of $100 or more), bids placed on QuiBids.com for those items before the last 20 seconds originally set for bidding by QuiBids will inevitably be unsuccessful and, thus, a waste of money; and (4) that registered users of the Site will be directed to a part of the Site that offers less auction items to bid upon than the portion of the Site accessed by unregistered potential customers.  Such facts are material in that a reasonable consumer would have considered them important in deciding whether and when to spend the money to use the QuiBids website.  QuiBids omitted to disclose these facts with the intent that its customers would use the website.  Because QuiBids' omissions to disclose are material, it is presumed that Plaintiff and all the other members of the Class reasonably relied upon the omissions.

54.     QuiBids' omissions proximately caused actual damages to Plaintiff and the other members of the Class in the amount they lost using the Site – the amount by which the money

they paid for the bids, plus the money they paid to purchase the items won in auctions (including shipping costs), plus the money they paid to purchase items using the "Buy It Now" feature (including shipping costs) exceeded the total retail "Value Prices" as stated on QuiBids.com of the merchandise received.   Alternatively, QuiBids' omissions proximately caused actual damages to Plaintiff and the other members of the Class in the amount they paid for the losing bids they made on high-ticket items on QuiBids.com before the last 20 seconds originally set for bidding by QuiBids.

## COUNT IV

## MONEY HAD AND RECEIVED

55.     Plaintiff incorporates all of the allegations of Paragraphs 1 through 54 into Count IV as if they were fully set forth here verbatim.

56.     The money lost by Plaintiff and the members of the Class using the Site – the amount by which the money they paid for the bids, plus the money they paid to purchase the items won in auctions (including shipping costs), plus the money they paid to purchase items using the "Buy-It-Now" feature (including shipping costs) exceeded the total "Value Prices" as stated on QuiBids.com of the merchandise they received – constitutes money in QuiBids' possession which, in equity and good conscience, should be returned by QuiBids to Plaintiff and the members of the Class.

57.     Alternatively, the money spent by Plaintiff and the members of the Class on losing bids placed before the last 20 seconds originally set for bidding by QuiBids in auctions of high-ticket items (items with a retail value of $100 or more) constitutes money in QuiBids' possession which, in equity and good conscience, should be returned to Plaintiff and the members of the Class.

## COUNT V

## UNJUST ENRICHMENT

58.     Plaintiff incorporates all of the allegations of Paragraphs 1 through 57 into Count V as if they were fully set forth here verbatim.

59.     The money lost by the Plaintiff and members of the Class using the Site – the amount by which the money they paid for the bids, plus the money they paid to purchase the items won in auctions (including shipping costs), plus the money they paid to purchase items using the "Buy-It-Now" feature (including shipping costs) exceeded the total "Value Prices" as stated on QuiBids.com of the merchandise received – constitutes a benefit conferred upon QuiBids by Plaintiff and the Class.  Under the circumstances, and as a matter of equity, QuiBids was unjustly enriched by its receipt of that money and it should return that money to Plaintiff and the members of the Class.

60.     Alternatively, the money spent by Plaintiff and the members of the Class on losing bids placed before the last 20 seconds originally set for bidding by QuiBids in auctions of high-ticket items (items with a retail value of $100 or more) constitutes a benefit conferred by members of the Class on QuiBids.  Under the circumstances, and as a matter of equity, QuiBids was unjustly enriched by its receipt of that money, and it should return that money to Plaintiff and the members of the Class.

## REQUEST FOR RELIEF

Individually, and on behalf of the Class, Plaintiff respectfully requests the Court to award the following relief:

a.    An order certifying the proposed Class under Fed. R. Civ. P. 23(b)(3) and appointing Plaintiff and Plaintiff's counsel to represent the Class;

b.    A judgment finding that QuiBids is liable under all legal claims asserted herein;

c.    A judgment awarding actual damages to Class members as set forth above;

d.    A judgment awarding a permanent injunction as set forth above;

e.    A judgment awarding attorneys' fees and litigation costs;

f.    A judgment awarding pre-judgment and post-judgment interest at the maximum rates allowable at law or in equity; and

g.    A judgment awarding all such other legal or equitable relief as justice requires.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: December 17, 2010

/s/ Roger L. Mandel
Roger L. Mandel
rmandel@beckham-mandel.com
Blake L. Beckham
bbeckham@beckham-mandel.com
Jose M. Portela
c2coast@aol.com
Sarita A. Smithee
ssmithee@beckham-mandel.com
**BECKHAM & MANDEL**
3400 Carlisle Street, Suite 550
Dallas, Texas 75204
Telephone:  (214) 965-9300
Facsimile:   (214) 965-9301

Edward L. White
ed@edwhitelaw.com
**EDWARD L. WHITE, P.C.**
13924 Quail Pointe Drive, Suite B
Oklahoma City, OK 75134
Telephone:  (405) 810-8188
Facsimile:   (405) 608-0971

Andrew Kierstead
kiersteadlaw@aol.com
**LAW OFFICE OF ANDREW S. KIERSTEAD**
1001 SW Fifth Ave., Suite 1100
Portland, OR 97204
Telephone:  (508) 224-6246
Facsimile:   (508) 224-4356

Attorneys for Plaintiff and the Class

## Certificate of Service

On the 17th day of December, 2010, I electronically filed the foregoing First Amended Class Action Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

In addition, because Defendant, QuiBids, LLC, has not yet appeared in this action, a copy of this document is being served on its registered agent for service of process, set forth below, via certified mail, return receipt requested:

Matt Beckham
1601 N.W. Expressway, Suite 1500
Oklahoma City, Oklahoma 73118


/s/ Roger L. Mandel
Roger L. Mandel

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

QUIBIDS, LLC, an Oklahoma limited
liability company,

     Plaintiff and Counter-Defendant,

                                CASE NO. 5:10-CV-00639-R

vs.

1524948 ALBERTA LTD., an Alberta,
Canada corporation d/b/a Terra Marketing
Group,

     Defendant and Counter-Plaintiff.

---

### FIRST AMENDED COUNTERCLAIM OF 1524948 ALBERTA LTD., d/b/a TERRA MARKETING GROUP, AGAINST QUIBIDS, LLC FOR FALSE ADVERTISING, DEFAMATION, COPYRIGHT INFRINGEMENT, DECEPTIVE TRADE PRACTICES, UNFAIR COMPETITION, AND INJUNCTIVE AND DECLARATORY RELIEF

Defendant and Counter-Plaintiff 1524948 ALBERTA LTD. d/b/a Terra Marketing

Group ("Terra Marketing"), through its attorneys, alleges this First Amended

Counterclaim against Plaintiff and Counter-Defendant QUIBIDS, LLC ("Quibids"), as

follows:

### <u>Introduction</u>

1.    In its Complaint against Terra Marketing, QuiBids has made allegations of

trademark infringement, false advertising, unfair and deceptive trade practices, and other

claims.  As set forth in Terra Marketing's Answer, Terra Marketing denies each and every one of those allegations, stated or implied.  This First Amended Counterclaim is filed to allege the true facts from which this dispute arises, and to assert Terra Marketing's claims against QuiBids for what actually a sustained effort by QuiBids to inflict the very same wrongs against Terra Marketing that QuiBids accuses Terra Marketing of doing.

2.     This First Amended Counterclaim arises out of the theft and subsequent wrongful and illegal use of Terra Marketing's trademarks, copyrighted creative materials, and website elements owned by Terra Marketing, by Counter-Defendant QuiBids, LLC and its president Matt Beckham, and QuiBids's national campaign of false advertising involving completely fabricated news stories, stolen trademark,[1] fake customer testimonials and the wrongful misappropriation of the image of a French television news anchor.

### Jurisdiction

3.     This Court has subject matter jurisdiction over the federal claims herein (Claims I, II, and III) under 28 U.S.C. §1331 and 28 U.S.C. §1338(a).  This Court has

---

[1] Quibids and its CEO, Matt Beckham, have been identified as Doe defendants (John Doe 3), related to their ownership, control and use of the domain name consumertipsdigest.org in a trademark infringement, cyberpiracy, and unfair competition lawsuit filed by Consumers Digest Communications, LLC in the United States District Court for the Northern District of Illinois (1:10-cv-02698).  The suit alleges that Quibids and Matt Beckham, as Doe defendants owning the domain name and website at consumertipsdigest.org, unlawfully used the famous "Consumers Digest" mark of the plaintiff in Quibids's and Beckham's domain name and website.  The content of that website is also at issue in the present case.

supplemental jurisdiction over the Oklahoma common law and statutory claims (Claims IV, V, and VI) and the declaratory relief claim (Claim VII) under 28 U.S.C. §1367.

4.    This Court has personal jurisdiction over Counter-Defendant QUIBIDS LLC because, pursuant to Oklahoma's Long Arm Statute, 12 Okla. Stat. §2004(F), all claims for relief in this action arise from the following acts of QuiBids, which occurred in Oklahoma:

a.   QuiBids's principal place of business is located in Oklahoma; it maintains substantial property, assets, accounts, employees, and other capital in Oklahoma; and it conducts all or a substantial portion of its business in Oklahoma;

b.   QuiBids owns, operates, and controls certain interactive websites and online fora that directly solicit content and commerce from Oklahoma residents about Oklahoma businesses and vendors in online auctions. The websites and fora enable users to participate in, and post content about, online auctions and other commercial activities from locations in Oklahoma and about businesses and vendors located in Oklahoma; and

c.   QuiBids has transacted business within the state of Oklahoma to supply online auction services within the state of Oklahoma and to residents of Oklahoma, and has derived substantial revenue from services rendered in Oklahoma.

//

//

## Venue

5.     Venue is proper in this District because QuiBids's principal place of business is in this District, and accordingly, under 28 U.S.C. §1400(a), venue is proper in this District because the claims asserted against QuiBids herein are based at least in part on violations of the copyright laws of the United States.

## 1524948 Alberta Ltd. d/b/a Terra Marketing Group

6.     Defendant and Counter-Plaintiff 1524948 ALBERTA LTD., an Alberta, Canada corporation d/b/a Terra Marketing Group is a corporation organized and existing under the laws of the Province of Alberta, Canada, and maintains an office in Calgary, Alberta, Canada.  Terra Marketing is the creator and owner of the website located at the domain name SwipeBids.com, an online auction website.

## QuiBids, LLC

7.     On information and belief, Counter-Defendant QUIBIDS, LLC is a limited liability corporation organized and existing under the laws of the State of Oklahoma, and maintains its principal place of business in Oklahoma City, Oklahoma.  QuiBids is the registrant and owner of the domain name QuiBids.com and, on information and belief, QuiBids and/or its principal Matt Beckham is or are the registrant(s) and/or owner(s) of the domain name consumertipsdigest.org.  Upon information and belief, QuiBids is also the creator, owner, administrator, and/or other party responsible for the creation and/or maintenance of a Facebook group entitled "Swipebids.com-is-a-Bloody-SCAM," in which group defamatory statements, discussions, and other postings regarding SwipeBids.com have been posted.

4

### DOE Counter-Defendants

8.      This First Amended Counterclaim shall be amended to substitute names of individual or business entities for "Doe" counter-defendants in due course, upon the identification of additional defendants through discovery.

### Terra Marketing's Business and Marks

9.      Terra Marketing is the owner and operator of a website located at the domain name SwipeBids.com ("SwipeBids") which is an online auction facility that allows users to register and participate in auctions for consumer goods at typically substantial discounts from ordinary retail prices.   Terra Marketing has operated SwipeBids continuously since December 2009.   To market the SwipeBids.com online auction site, Terra Marketing has invested heavily in its service mark SwipeBids (the "Mark").   Terra Marketing has continuously used and conducted business under the Mark in interstate and international commerce since December 2009, and has advertised in connection with the Mark throughout the country and the world, principally through advertising on the Internet.

10.      Through Terra Marketing's continuous and exclusive use of the Mark, the Mark has acquired secondary meaning and goodwill as consumers have come to associate the Mark with Terra Marketing and its services.

11.      Since Terra Marketing began using the Mark, Terra Marketing's services sold in connection with the Mark have generated millions of dollars in revenue.   Terra Marketing has devoted and continues to devote considerable time, effort, and money in promoting and marketing its services offered in connection with the Mark.

5

12.    Terra Marketing has filed an application with the United States Patent and Trademark Office for the registration of the Mark. As of the filing of this First Amended Counterclaim, that application was still pending.

### QuiBids's and Beckham's Wrongful Acts and Conduct

13.    QuiBids and its president Beckham have engaged in a variety of wrongful misconduct. First, Beckham, acting on behalf of QuiBids and in an effort to advance QuiBids's interests, signed up as an "affiliate publisher" with COPEAC, which is an advertising vendor of Terra Marketing. QuiBids and/or Beckham then used this special access through COPEAC in order to steal copyrighted material from Terra Marketing. Thereafter, QuiBids and/or Beckham created virtually identical copies of Terra Marketing's copyrighted materials and used them as the primary marketing materials for QuiBids, generating hundreds of thousands if not millions of dollars from such stolen copyrighted materials. QuiBids and Beckham committed these acts over and over again for a number of months without Terra Marketing becoming aware of them until late July 2010. Copies of Terra Marketing's copyrighted materials in side-by-side comparison with those copies created therefrom by QuiBids and Beckham are attached hereto for the sake of illustration as Exhibit 1.

14.    Second, QuiBids has engaged in a sophisticated campaign of false advertising using a variety of methods. QuiBids has and currently is marketing its product through the use of a fake blog at consumertipsdigest.org that purports to be a consumer protection/awareness blog created by an investigative reporter; however, the blog is, on information and belief, entirely fake and a mere shill site for QuiBids. The

creation, maintenance, and operation of such fake blogs are hallmarks of fraudulent marketing. QuiBids has routinely engaged in those activities; conversely, Terra Marketing has never owned, operated, or created any fake blogs. As with QuiBids's misappropriation of Terra Marketing's intellectual property, QuiBids's false advertising continued for months before Terra Marketing became aware of it.

15. QuiBids has also engaged in a massive national advertising campaign using advertisements containing Mélissa Theuriau, a news anchor from a prominent French television station, who is portrayed by QuiBids in the advertisements as having "investigated" and approved or sponsored QuiBids's products. On information and belief, these statements are false, and QuiBids does not have permission to use Ms. Theuriau's image.

16. On information and belief, QuiBids is the registrant and/or owner of the domain name <consumertipsdigest.org>.

17. Alternatively, on information and belief, Quibids's principal, Matt Beckham, is the registrant and/or owner of the domain name <consumertipsdigest.org>.

18. On information and belief, Quibids's principal, Matt Beckham, registered the domain name <consumertipsdigest.org>.

19. On information and belief, Quibids has control over the website located at the domain name <consumertipsdigest.org>.

20. Alternatively, on information and belief, Quibids's principal, Matt Beckham, has control over the website located at the domain name <consumertipsdigest.org>.

7

21.    Quibids has authorized the placement of advertising promoting Quibids to appear on the website located at the domain name consumertipsdigest.org.

22.    On information and belief, neither Quibids nor Quibids's Matt Beckham has authorization to use any registered trademarks containing the words, "CONSUMERS DIGEST."

23.    On information and belief, neither Quibids nor Quibids's Matt Beckham has authorization to use any registered trademarks owned by Consumers Digest Communications, LLC.

24.    On information and belief, Quibids has generated over $100,000 in revenues through the use of the domain name <consumertipsdigest.org>.

25.    On information and belief, Quibids has generated over $1 million in revenues through the use of the domain name <consumertipsdigest.org>.

26.    On <consumertipsdigest.org>, Quibids and/or Matt Beckham displayed the following graphic:



27.    Quibids's principal Matt Beckham personally controls the website located at <consumertipsdigest.org>, as reflected in his control of such domain name's domain name server (beckham-enterprises2.com), from March 16, 2010 to August 2, 2010.

28.    Quibids and Quibids's principal, Matt Beckham, have actual knowledge of two registered trademarks of Consumers Digest Communications, LLC, namely, registered marks numbered 1,642,060 and 1,378,360.

A.    **Theft of Copyrighted Materials and Infringement**

29.     Terra Marketing has invested heavily into the development of its sales materials for its product, and the graphics, wording and other elements of it sales pages have been thoroughly tested, at great expense, to determine the optimal version to maximize the conversion of users to paying customers. Terra Marketing uses multiple affiliate marketing advertising networks to sell its product. When an advertiser, such as Terra Marketing, engages an advertising network, it places links with the advertising network to sales materials and landing pages that are not publically available other than to customers who are targets of the marketing. The advertising networks have hundreds and often thousands of independent "affiliate publishers" who will use the advertiser's marketing materials to promote the advertiser, and the advertiser pays the affiliate network for all sales resulting for such marketing. The advertising network takes a commission on the sale, and passes the balance on to the affiliate publisher. The identities of affiliate publishers are strictly confidential; otherwise, advertisers could circumvent the advertising networks and contract directly with affiliate publishers.

30.     In this matter, QuiBids and/or Beckham entered a contract with advertising network COPEAC for the general purpose of being an "affiliate publisher" for COPEAC and for the specific purpose of identifying and stealing Terra Marketing's valuable copyrighted marketing materials. Upon contracting with COPEAC, QuiBids and/or Beckham were given COPEAC Affiliate ID 20578. Thereafter, QuiBids and/or Beckham, due to their access as an affiliate publisher of COPEAC, identified and stole

graphics belonging to SwipeBids by making copies of Terra Marketing's key sales pages, which are protected by a registered copyright.

31.     On information and belief, QuiBids and/or Beckham, despite that fact that QuiBids is a direct competitor with Terra Marketing, proceeded to promote Terra Marketing's product, SwipeBids.com, with a fake blog created by QuiBids, which included fake customer testimonials, fake user comments and the unauthorized use of photographs of people whom QuiBids purports to be news reporters.  As a result of QuiBids's promotion of Terra Marketing's products, at least 1469 clicks and 54 sales were generated.   This misconduct not only was in violation of QuiBids's and/or Beckham's contract with COPEAC, which prohibits the use of their system for unlawful reasons, but the misconduct was, at its core, highly deceptive and fraudulent marketing that violated a variety of state and federal laws, subjecting Terra Marketing to potential liability to third parties.

32.     As shown in Exhibit 1 and in other instances, QuiBids also used the copyrighted materials stolen from Terra Marketing to create substantially similar or virtually identical marketing materials for QuiBids's own product at QuiBids.com. Importantly, Terra Marketing's testing of its marketing materials has demonstrated to Terra Marketing that certain wording and certain placement of offer points and graphics lead to significantly greater sales than alternative wording and placement.  As a sophisticated affiliate marketer and a competitor in the same industry as Terra Marketing, QuiBids is well aware of how specific wording and placement of media within advertising can make the difference between profitable and unprofitable advertising

campaigns.   With this knowledge, QuiBids proceeded to copy all of the key sales materials and use such materials in its marketing for its products.   This use was unauthorized, without privilege and unlawful.

**B.**   **False Advertising by QuiBids**

33.   QuiBids engaged, and continues to engage, in a significant amount of marketing that is not just false but virtually completely fabricated.   As background, Beckham has a long history before his work with QuiBids in promoting products with fabricated or "fake" blogs in the realm of açai berry products and other weight loss products.   For example, Beckham, on information and belief, created the fake blogs that were formerly located at <shirleysdietjournal.com> and <abbysdietjournal.com> to promote weight loss products, and these, and his other blogs, were complete fabrications, containing fake names, fake testimonials, fake user comments and using photographs of people without authorization (or using stock photography and passing it off as the fake person created in the blog).   Beckham used these same unlawful techniques to create the marketing materials for QuiBids.

34.   Specifically, QuiBids, in its marketing materials, has used two photographs of women claiming that they are news reporters reporting, or who have reported, about the QuiBids product and its supposed success.   The use of both pictures is highly deceptive.   First, QuiBids uses a picture of a woman appearing to be a reporter on a newsroom set, with the word, "Featured," above her head, and the words, "Investigating QuiBids.com – A new auction site on the web," next to the photograph.   The photograph

and the words clearly convey the idea that she a real news reporter, working for an actual news outlet, who has investigated and/or reported about the QuiBids product.



35.     However, this is false.  In fact, the photograph is of a French journalist and anchor for the French channel M6, Mélissa Theuriau, who, on information and belief, has never reported on QuiBids, nor has she ever mentioned QuiBids in any sort of media, video, print, web or otherwise.  On information and belief, QuiBids stole this photograph from this web page, containing many photographs of Ms. Theuriau, including the one stolen by QuiBids:   http://www.yousaytoo.com/Anwar/the-worst-most-beautiful-news-reporter/8845.   The actual photograph that was stolen and manipulated appears as follows:

//

//

//

//

//

//

//



36.     On information and belief, neither Quibids nor Quibids principal Matt Beckham have authorization to use the image of Ms. Theuriau.

37.     On information and belief, neither Quibids nor Quibids principal Matt Beckham have authorization to use the copyrights associated with any photographs of Ms. Theuriau.

38.     On information and belief, Ms. Theuriau has never endorsed Quibids or reported about Quibids.

39.     The second deceptive use of a photograph of a purported female reporter involves a picture of a woman holding a microphone with the caption, "Julie's our Consumer Tips Investigator Reporting on New Shopping Trends." The photograph and caption clearly convey the message that there is a reporter who works for the website "Consumer Tips Digest" named Julie, and that she, an investigative reporter, is involved in the publication of a purported consumer protection/consumer awareness website. This is all false. The photograph is a stock photograph licensed from the website, www.istockphoto.com, and, on information and belief, her name is not Julie, and she does not work for the "Consumer Tips Digest" website. Below are the photo from QuiBids's website and a photo from the stock photography website.



Julie's our Consumer
Tips Investigator
Reporting on New
Shopping Trends



Add to Lightbox | Download a comp

40.     In addition to making false statements about real news reporters "investigating" or "reporting" on QuiBids, QuiBids filled its fake blogs with fake testimonials and fake user comments. Comparing QuiBids's two fake blog websites at http://www.consumertipsdigest.org/penny_auctions/vt/index.php and at

14

http://www.consumertipsdigest.org/penny_auctions/as/index2.php, it is clear that QuiBids fabricated customer testimonials and user comments, based on how QuiBids changed the customer names and photographs, as well as changed the user names in the user comments sections, for each of their two fake blogs.[2] Thus, it is clear that certain customer testimonials and user comments are fabricated; further, on information and belief, other testimonials and user comments --perhaps all of them—are fake.

| http://www.consumertipsdigest.org/penny_auctions/vt/index.php<br><br>(Note the time elapsed since posting does not change, despite the implication that the posts are fresh and posted the same day as viewing) | http://www.consumertipsdigest.org/penny_auctions/as/index2.php |
| --- | --- |
| By Kellie Hawkins *posted 8 hr(s) 53 minutes ago*<br>What determines when an auction ends? It seems like the timer is reset back to 10 seconds as people continue to bid, then suddenly the auction is over and the item is SOLD even though people are still bidding, right!? So, at some point, does the auction just end regardless of whether bids are still be entered? Thanks.<br><br>By Jill@QuiBids *posted 8 hr(s) 22 minutes ago*<br>The timer is reset each time a person bids, therefore, an auction ends when no one else bids. It never ends when people are still bidding. We want | Sissydad says: Thu Jul 08, 2010 9:50 AM<br><br>What determines when an auction ends? It seems like the timer is reset back to 10 seconds as people continue to bid, then suddenly the auction is over and the item is SOLD even though people are still bidding, right!? So, at some point, does the auction just end regardless of whether bids are still be entered? Thanks.<br><br>Jill@QuiBids says: Thu Jul 08, 2010 6:33 PM<br><br>The timer is reset each time a person bids, therefore, an auction ends when no one else bids. It never ends when |

---

[2]   As stated above, Beckham personally controls the website located at <consumertipsdigest.org>, as reflected in his control of such domain name's domain name server (beckham-enterprises2.com), from March 16, 2010 to August 2, 2010.

| everyone to have a fair chance. | people are still bidding. We want everyone to have a fair chance. |
|---|---|
| By Alexandra Thurber *posted 7 hr(s) 1 minute ago*<br>Thanks for the info. I just got registered and I already won my first auction!<br>By Jill@QuiBids *posted 6 hr(s) 24 minutes ago*<br>Congratulations! Isn't winning fun?! | Mikey says: Thu Jul 08, 2010 8:54 PM<br><br>Thanks for the info. I just got registered and I already won my first auction!<br><br>Jill@QuiBids says: Sat Jul 10, 2010 2:24 PM<br>Congratulations! Isn't winning fun?! |
| By Abigail Wright *posted 6 hr(s) 11 minutes ago*<br>are the items we purchase brand new? open box items? refurbished items? If defective, can they be returned to the manufacturer under warranty?<br><br>By Jill@QuiBids *posted 5 hr(s) 1 minute ago*<br>All products we purchase should be new and factory sealed. If you ever get a defective item, let us know immediately and we'll work out the issue - new product or a refund. | Cathy says: Sat Jul 10, 2010 3:16 PM<br><br>are the items we purchase brand new? open box items? refurbished items? If defective, can they be returned to the manufacturer under warranty?<br><br>Jill@QuiBids says: Sat Jul 10, 2010 6:05 PM<br><br>All products we purchase should be new and factory sealed. If you ever get a defective item, let us know immediately and we'll work out the issue - new product or a refund. |
| By James *posted 1 hr(s) 17 minutes ago*<br>So, if I bid when the timer says 08 seconds left, and no one else bids before the timer reaches 00, then I win the bid? I mean there is no minimum number of seconds for your bid to be listed before the biding ends?<br><br>By Jill@QuiBids *posted 1 hr(s) 17* | A.C. says: Fri Jul 16, 2010 12:08 PM<br><br>So, if I bid when the timer says 08 seconds left, and no one else bids before the timer reaches 00, then I win the bid? I mean there is no minimum number of seconds for your bid to be listed before the biding ends? |

| | |
|---|---|
| *minutes ago*<br>If you bid and no one else does, then yes, you've won the auction. Everyone has the same/fair chance to bid. So if they all just choose to not bid, then that works in your favor. | Jill@QuiBids says: Sat Jul 17, 2010 12:13 PM<br><br>If you bid and no one else does, then yes, you've won the auction. Everyone has the same/fair chance to bid. So if they all just choose to not bid, then that works in your favor. |
|  Blake talks about all the deals he's found on QuiBids.com |  "Like many others I was skeptical at first too, but after I decided to start bidding, I soon started winning. When the first item I won finally came in the mail within two days of winning it, I was hooked!! Not only does QuiBids have cool stuff, but it's actually FUN to bid too. I continued my "QuiBids journey" and ended up winning this awesome Olympus Tough 8000 camera. Did I mention it's WATERPROOF? It's awesome! Thanks QuiBids!"<br>-Shaun / Virginia |

41.     Interestingly, QuiBids has stated to the public that, "All our testimonials are real people who use and received their products from us [QuiBids]." (Posted on complaintsboard.com by admitted employee of QuiBids). This is itself another instance of false advertising because, as stated and illustrated above, it is clear that QuiBids has fabricated customer testimonials and user comments in its marketing.

42.     QuiBids did not limit their false advertising to fake blogs. In fact, QuiBids has flooded the Internet with numerous versions of advertisements that fraudulently feature Mélissa Theuriau. As with the use of Ms. Theuriau's image on QuiBids's fake

blog websites, it is highly doubtful that Ms. Theuriau has any idea that her image has

been hijacked by QuiBids and used to hawk laptops, iPads, cameras and many other

products on advertisements being run on hundreds if not thousands of websites all over

the Internet.  Some of examples of just two of the many versions of QuiBids's fraudulent

advertising are below:





43.   In addition to QuiBids's fake blogs and fraudulent use of Ms. Theuriau's image in a nationwide advertising campaign, QuiBids has also made many false statements about Terra Marketing.  QuiBids, on information and belief, has created, itself and in conjunction with its agents, a page on the social networking website Facebook.com entitled, "Swipebidscom-is-a-Bloody-SCAM."   This page asserts that Terra Marketing is a "fraudulent company" that takes money from customers' bank accounts without proper authorization.   QuiBids has also, on information and belief, stated to the public, "[S]wipebids actually steals content off Quibids all the time" (posted on complaintsboard.com by agent of Quibids), and "[t]hey [Swipebids] have blatantly stolen our promoters, our own testimonials, TV news piece, etc. to benefit themselves," (posted on associatedcontent.com by admitted employee of QuiBids).  These statements are false, defamatory and have inflicted damage on Terra Marketing.

44.   Quibids's actual website is also filled with false statements.   Such false statements include:

 a.   Quibids has only auctioned off one automobile (a Honda Civic), but its website states that there were two different winners (usernames omega28 and merkmerk), and three different final prices ($2,368.00, $2,958.78, and $1,740.78); accordingly, these statements are false.

 b.   Quibids states throughout its website that its service is "FREE."  However, it is impossible to register and participate in any auctions on the Quibids.com website without paying a fee.  Thus, Quibids's assertions that

its services are "FREE" are false, in addition to being in violation of FTC

guidelines regarding use of the word "FREE."

c.  Quibids claims to be the "#1 penny auction." This statement, however, is

false, because using any rational criteria such as Internet traffic volume,

Alexa ranking, number of auctions ending daily, or BBB rating, Quibids is

not the "#1 penny auction." Thus, this statement is false.

d.  Quibids states that there "over 1,000 winners every day" on its website;

however, such statement is false, as Quibids does not even have that many

active bidders on any calendar day.

## General Allegations as to Copyright Claims

45.   "SwipeBids.com" and the creative elements thereof fall within the category

of "pictorial, graphic and sculptural works" as defined in 17 U.S.C. §101 and are an

original work of authorship subject to copyright protection pursuant to 17 U.S.C.

§102(a)(5).

46.   Terra Marketing is the author of the website located at "SwipeBids.com"

and the elements thereof and is the owner of the copyright therein pursuant to 17 U.S.C.

§201.

47.   On the date of first publication of the "SwipeBids.com" website and the

elements thereof, Terra Marketing was a national and domiciliary of a treaty party (to

wit: Canada) and thus the website located at "SwipeBids.com" is subject to copyright

protection pursuant to 17 U.S.C. §104(b).

48.     As the owner of the copyright in the website located at "SwipeBids.com," Terra Marketing has the exclusive rights provided in 17 U.S.C. §106, which include but are not limited to the right to reproduce the copyrighted work, the right to distribute copies of the copyrighted work to the public, the right to prepare derivative works based upon the copyrighted work, and the right to display the copyrighted work publicly.

49.     In addition and pursuant to 17 U.S.C. §113, Terra Marketing has the exclusive right to reproduce the website located at "SwipeBids.com" in or on any kind of article, whether useful or otherwise.

50.     On July 6, 2010, Terra Marketing submitted to the Copyright Office the required application and fee for the registration of its copyright in the website located at "SwipeBids.com."   Accordingly, under 17 U.S.C. §410(d), the effective date of the copyright registration is July 6, 2010.

## Count I
## Copyright Infringement

51.     Terra Marketing restates and incorporates the allegations set forth in paragraphs 1 through 50 as though fully rewritten herein.

52.     The actions of QuiBids as alleged herein have violated and continue to violate Terra Marketing's exclusive rights, including the rights to copy, reproduce, distribute and display publicly its original work of the website located at SwipeBids website and the creative elements and design thereof.

53.     The actions of QuiBids as alleged herein constitute infringement of Terra Marketing's exclusive rights protected under the Copyright Act, 17 U.S.C. §101 et seq.

21

54.     The infringing acts of QuiBids as alleged herein have been willful, intentional and in disregard of and with indifference to the rights of Terra Marketing.

55.     The infringing acts of QuiBids are ongoing and will continue unless QuiBids is enjoined and restrained from continuing such conduct.  Terra Marketing has no adequate remedy at law to prevent the ongoing and continuous infringement of its exclusive rights by QuiBids, and is otherwise statutorily entitled to injunctive relief to prevent such infringement.

56.     Pursuant to 17 U.S.C. §§502 and 503, Terra Marketing is entitled to injunctive relief to prohibit, enjoin and restrain QuiBids from further infringing its copyright and to an order against QuiBids, and as to all persons acting on its behalf and/or under its direction requiring the impoundment, destruction, erasure, and takedown of any and all copies of the elements of the website located at SwipeBids.com and/or any website or other online material derived therefrom and/or containing or using infringing materials in violation of Terra Marketing's exclusive rights, and requiring the cessation and prevention of all means by which such infringement may be conducted (including but not limited to QuiBids's affiliate account with COPEAC).

57.     Pursuant to 17 U.S.C. §§504 and 505, Terra Marketing is entitled to an award against QuiBids of Terra Marketing's actual damages and the profits of QuiBids, as well as its court costs.

//

//

//

## Count II
## Trade Libel under Section 43(a) of the Lanham Act

58.     Terra Marketing restates and incorporates the allegations set forth in paragraphs 1 through 57 above as though fully rewritten herein.

59.     The statements and representations made by QuiBids of and concerning Terra Marketing included, but were not limited to, advertising, publishing, disseminating and communicating false and misleading statements and unfounded misrepresentations about the business, goodwill, and reputation of Terra Marketing.

60.     The aforementioned false statements and representations of and concerning Terra Marketing were published, disseminated, or otherwise communicated by QuiBids.

61.     The aforementioned false statements and representations made by QuiBids of and concerning Terra Marketing were published, disseminated, or otherwise communicated by QuiBids across state and national borders and in interstate and international commerce.

62.     The aforementioned false statements and representations made by QuiBids of and concerning Terra Marketing were statements and representations of a commercial nature and constituted commercial speech since they were published, disseminated, or otherwise communicated with the intent of increasing QuiBids's sales and/or decreasing Terra Marketing's sales.

63.     As a direct and proximate result of QuiBids's conduct as alleged herein, Terra Marketing is entitled to recover damages from QuiBids in an amount to be determined at trial.

## Count III
### False Advertising under Section 43(a) of the Lanham Act

64.     Terra Marketing restates and incorporates the allegations set forth in paragraphs 1 through 63 above as though fully rewritten herein.

65.     The aforementioned false statements and representations of and concerning Terra Marketing and QuiBids were published, disseminated, or otherwise communicated by QuiBids about QuiBids's and Terra Marketing's goods, services, and/or commercial activity.

66.     The aforementioned false statements and representations deceive, or have the potential to deceive, a substantial portion of their targeted audience.

67.     The deception caused by the aforementioned false statements and representations is likely to affect the purchasing decisions of the audience to which those false statements and representations were directed.

68.     The aforementioned false statements and representations, and the advertising materials in which they were used, involve goods or services in interstate and international commerce.

69.     The deception caused by the aforementioned false statements and representations resulted in, or is likely to result in, injury to Terra Marketing.

70.     As a direct and proximate result of QuiBids's conduct as alleged herein, Terra Marketing is entitled to recover damages from QuiBids in an amount to be determined at trial.

//

### Count IV
### Common Law Defamation

71.    Terra Marketing restates and incorporates the allegations set forth in paragraphs 1 through 70 above as though fully rewritten herein.

72.    QuiBids has made false statements regarding Terra Marketing as identified hereinabove.

73.    All of these statements are false, and QuiBids Beckham knew or should have known they were false when it published them as alleged herein.

74.    QuiBids's statements constitute defamation per se, in that they defame Terra Marketing in its trade.

75.    QuiBids published these statements without any privilege to do so.

76.    As a proximate result of the foregoing acts, QuiBids has caused actual harm to Terra Marketing, and Terra Marketing has been damaged and will continue to be damaged.

### Count V
### Deceptive Trade Practices under Oklahoma Law

77.    Terra Marketing restates and incorporates the allegations set forth in paragraphs 1 through 76 above as though fully rewritten herein.

78.    QuiBids made knowingly false representations of fact as to the characteristics, ingredients, uses, benefits or quantities of the goods or services depicted or referred to in the advertisements and other statements alleged above, and/or made knowingly false representations of fact that those goods or services were of a particular standard, quality, or grade, including without limitation the following:

a. QuiBids made false claims that two users won automobiles on its site, but has only auctioned off one automobile (a Honda Civic), and gives three different final prices ($2,368.00, $2,958.78, and $1,740.78) for the automobile;

b. Quibids states throughout its website that its service is "FREE," which is not true, as it is impossible to register and participate in any auctions on the Quibids.com website without paying a fee;

c. Quibids made false claims that it is the "#1 penny auction," which is false under any rational criteria; and

d. Quibids made false claims that there are "over 1,000 winners every day" on its website, knowing that Quibids does not even have that many active bidders on any calendar day.

79.    QuiBids made knowingly false representations of fact regarding the sponsorship, approval, affiliation, connection, association with or certification by Terra Marketing and others as to the products and/or services which were the subject of those representations; engaged in efforts to pass off the statements, depictions, media, and other materials contained in those representations as being those of others; and attempted to capitalize and trade upon the goodwill of Terra Marketing and others in those respects. Specifically, and without limitation, QuiBids:

a. used the image of Ms. Thériau without her authorization or knowledge and without any basis in fact to show that Ms. Thériau had endorsed, investigated, or reported on QuiBids.com;

b. used falsified consumer endorsements on its own site and others to create the impression that users and consumers had approved of QuiBids.com;

c. made false representations on its own site and others that stated, for example, that QuiBids users had won automobile auctions, that QuiBids's website was "free," that QuiBids was the "#1 penny auction," and that QuiBids had over 1,000 winners every day; and

d. used the Consumers Digest mark and related marks on the QuiBids website and the consumertipsdigest.org website without authorization and in a manner that not only infringed directly upon the trademark and other rights held by Consumers Digest in those marks, but created the false impression that QuiBids's goods and services were sponsored by, approved by, affiliated with, connected to, associated with, or certified by Consumers Digest,

80.    QuiBids also disparaged the goods, services, or business of Terra Marketing and others through the use of false or misleading representations of fact, including without limitation the following:

a. QuiBids represented that it was the "#1 penny auction" when in fact QuiBids does not outperform Terra Marketing's penny auction site by any appropriate and objective measure;

27

b. QuiBids used and infringed upon the Consumers Digest marks so as to create the impression that QuiBids's goods and services were sponsored by, approved by, affiliated with, connected to, associated with, or certified by Consumers Digest;

c. QuiBids represented that its website was "free," which when compared to Terra Marketing's penny auction site, created the impression that consumers could use QuiBids's site for less than Terra Marketing's site, which in fact was not true;

d. QuiBids made representations on its own site and other sites in the form of falsified consumer testimonials and statements that SwipeBids was a "scam," that those alleged consumers approved of QuiBids and its goods and services and that they were preferable and of better quality than those of Terra Marketing; and

e. QuiBids portrayed its site as having over 1,000 winners every day, when in fact that was not the case, and which would reasonably lead consumers to believe that QuiBids had a higher volume of sales and/or traffic than SwipeBids and to perceive QuiBids as being of higher quality, popularity, and/or value than SwipeBids.

81.    QuiBids's making of such representations, its efforts to pass off and trade upon the goodwill of Terra Marketing and others, and its disparagement of the goods, services, and/or business of Terra Marketing and others as alleged herein, were done with

the intent to injure competitors (including without limitation Terra Marketing) and to destroy or substantially lessen competition.

82.     QuiBids's making of such representations, its efforts to pass off and trade upon the goodwill of Terra Marketing and others, and its disparagement of the goods, services, and/or business of Terra Marketing and others as alleged herein, constituted unfair and deceptive trade practices as set forth in 78 Okla. Stat. §53.

83.     QuiBids's unfair and deceptive trade practices as alleged herein have caused and will continue to cause irreparable harm to Terra Marketing unless restrained by this Court.

84.     QuiBids willfully engaged in the deceptive trade practices alleged herein with the intent to injure Terra Marketing and other competitors, thereby injuring Terra Marketing and other competitors, and has acted in bad faith and in a conscious and reckless disregard for the rights of Terra Marketing and others.  Terra Marketing is thus entitled to recover an award of damages and attorney's fees against QuiBids, pursuant to 78 Okla. Stat. §53.

### Count VI
### Common-Law Unfair Competition under Oklahoma Law

85.     Terra Marketing restates and incorporates the allegations set forth in paragraphs 1 through 84 above as though fully rewritten herein.

86.     QuiBids committed acts of unfair competition against Terra Marketing in violation of Oklahoma common law in a number of ways, including without limitation the following:

a.  QuiBids made false claims that two users won automobiles on its site, but has only auctioned off one automobile (a Honda Civic), and gives three different final prices ($2,368.00, $2,958.78, and $1,740.78) for the automobile;

b.  Quibids stated throughout its website that its service is "FREE," which is not true, as it is impossible to register and participate in any auctions on the Quibids.com website without paying a fee;

c.  Quibids made false claims that it is the "#1 penny auction," which is false under any rational criteria;

d.  Quibids made false claims that there are "over 1,000 winners every day" on its website, knowing that Quibids does not even have that many active bidders on any calendar day;

e.  QuiBids used the image of Ms. Thériau without her authorization or knowledge and without any basis in fact to show that Ms. Thériau had endorsed, investigated, or reported on QuiBids.com;

f.  QuiBids used falsified consumer endorsements on its own site and others to create the impression that users and consumers had approved of QuiBids.com; and

g.  QuiBids used the Consumers Digest mark and related marks on the QuiBids website and the consumertipsdigest.org website without authorization and in a manner that not only infringed directly upon the trademark and other rights held by Consumers Digest in those marks, but

created the false impression that QuiBids's goods and services were sponsored by, approved by, affiliated with, connected to, associated with, or certified by Consumers Digest; and

h. QuiBids made representations on its own site and other sites in the form of falsified consumer testimonials and statements that SwipeBids was a "scam," that those alleged consumers approved of QuiBids and its goods and services and that they were preferable and of better quality than those of Terra Marketing.

87.    QuiBids's commission of acts of unfair competition were done intentionally, knowingly, willfully, and in bad faith, and evidenced QuiBids's conscious and reckless disregard for the rights of Terra Marketing.  Terra Marketing is thus entitled to recover an award of damages and attorney's fees against QuiBids.

88.    Terra Marketing will suffer irreparable harm and detriment should QuiBids's acts of unfair competition be permitted to continue.  Terra Marketing is thus entitled to a preliminary injunction and a permanent injunction against QuiBids to enjoin the commission of further acts of unfair competition by QuiBids.

## Count VII
### Declaratory Relief – 28 U.S.C. 2201

89.    Terra Marketing restates and incorporates the allegations set forth in paragraphs 1 through 88 above as though fully rewritten herein.

90.    An actual controversy has arisen and now exists between Terra Marketing on the one hand and QuiBids on the other concerning the parties' respective rights and

duties, as alleged herein and in the First Amended Complaint filed by QuiBids against Terra Marketing.  Specifically, and without limitation, Terra Marketing alleges (a) that QuiBids has infringed upon Terra Marketing's copyright and/or other rights in creative materials and/or other works relating to the website located at SwipeBids.com; (b) that the interests alleged by Terra Marketing to have been infringed upon by QuiBids were protected by copyright or other rights and/or were infringed upon by QuiBids; (c) that Terra Marketing did not infringe upon any copyright or other legally protected interest of QuiBids and is not liable to QuiBids in any respect; and (d) that QuiBids infringed upon the trademarks and other rights of Terra Marketing, Consumer Digest, and others as alleged herein.

91.     The respective interests of the parties will be materially affected by this action.

92.     Terra Marketing desires, and is entitled to, a judicial determination under 28 U.S.C. §2201 of the parties' respective rights and duties as alleged herein


## PRAYER FOR RELIEF

**WHEREFORE**, Defendant and Counter-Plaintiff 1524948 Alberta Ltd., d/b/a Terra Marketing Group, respectfully requests judgment as follows:

1.     That the Court enter judgment against QuiBids that it has made false and misleading representations of fact in commercial advertising, in violation of 15 U.S.C. §1125(a).

2.     That the Court enter a judgment against QuiBids that it has defamed Terra Marketing in violation of Oklahoma common law.

3.     That the Court order a public retraction by QuiBids of the published statements that defame Terra Marketing, and corrective advertising as to QuiBids's false statements and misrepresentations of and concerning QuiBids and Terra Marketing, all as identified herein and to be supplemented as discovered.

4.     That the Court issue injunctive relief against QuiBids and its officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with QuiBids (including but not limited to Beckham), enjoining and restraining them from using in any manner the SwipeBids service mark, or other service marks of Terra Marketing, alone or in combination with any other words or symbols, or any foreign derivatives or equivalents that are likely to cause confusion, deception or mistake, on or in connection with the advertising, offering for sale, or sale of any product or service that is not Terra Marketing's or not authorized by Terra Marketing to be sold in connection with that service mark; further enjoining and restraining them from using false advertising of the varieties alleged herein, including but not limited to the use of fake news blogs, the use of fake testimonials, the false and unauthorized use of photos and videos of persons such as Mélissa Thériau in such advertisements and testimonials, and the unauthorized use of the registered CONSUMERS DIGEST trademarks of Consumers Digest Communications, LLC, as alleged herein; and further enjoining and compelling QuiBids and Beckham, to deactivate

33

and delete all affiliate accounts that QuiBids and/or Beckham hold with COPEAC, and to cease all acts of unfair competition and deceptive trade practices as alleged herein.

5.     That the Court enter a judgment against QuiBids declaring, without limitation, that QuiBids has infringed upon Terra Marketing's copyright and/or other rights in creative materials and/or other works relating to the website located at SwipeBids.com; that the interests alleged by Terra Marketing to have been infringed upon by QuiBids were protected by copyright or other rights and/or were infringed upon by QuiBids, including in part through the use of the facilities of COPEAC; that QuiBids engaged in the unauthorized use of the registered CONSUMERS DIGEST trademarks of Consumers Digest Communications, LLC; and that Terra Marketing did not infringe upon any copyright or other legally protected interest of QuiBids and is not liable to QuiBids in any respect.

6.     That the Court order QuiBids to pay Terra Marketing's general, special, and actual and statutory damages as follows:

   a)     Terra Marketing's compensatory damages in an amount according to proof;

   b)     Punitive damages in an amount to be determined, but in no case less than treble Terra Marketing's damages;

   c)     Terra Marketing's damages and QuiBids's profits pursuant to 15 U.S.C. §1117(a);

   d)     Such other damages as the Court shall deem to be within the provisions of the Lanham Act; and

e)      Interest, including prejudgment interest, on the foregoing sums.

7.      That the Court order QuiBids to pay to Terra Marketing both the costs of this action and the reasonable attorneys' fees incurred by Terra Marketing in prosecuting this action.

8.      That the Court order such other relief to which Terra Marketing may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

## REQUEST FOR JURY TRIAL

Terra Marketing hereby demands a trial of this action by jury, on all issues so triable.

Dated the 14th of October, 2010.            Respectfully submitted,

By: s/Karl S. Kronenberger

KRONENBERGER BURGOYNE, LLP
Karl S. Kronenberger (admitted *pro hac vice*)
Attorneys for Defendant and Counter-Plaintiff
     1524948 ALBERTA LTD., d/b/a Terra
     Marketing Group
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
Email: Karl@KBInternetLaw.com

*Certificate of Service*

☑ I hereby certify that on (date) _October 14, 2010_____, I electronically transmitted the

attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on

file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants: (insert names)

ATTORNEYS FOR QUIBIDS, LLC

Michael D. McClintock
Anthony L. Rahhal
Ryan L. Lobato
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, OK 73102

☐ I hereby certify that on (date) _____, I served the attached document by

(service method) _____ on the

following, who are not registered participants of the ECF System: (insert names and addresses)

s/ Karl S. Kronenberger
_____

s/ Attorney Name

# Exhibit 1



SwipeBids.com Screen Capture



QuiBids.com Screen Capture



SwipeBids.com Screen Capture



QuiBids.com Screen Capture



QuiBids.com Screen Capture

SwipeBids.com Screen Capture

Case 5:10-cv-00639-R   Document 28-1   Filed 10/14/10   Page 5 of 8



SwipeBids.com Screen Capture



QuiBids.com Screen Capture



SwipeBids.com Screen Capture



QuiBids.com Screen Capture



QuiBids.com Screen Capture



SwipeBids.com Screen Capture

There Are Over 1,000 Winners Everyday At SwipeBids.com

SwipeBids.com Screen Capture

There are over 1,000 Winners Everday on QuiBids.com

QuiBids.com Screen Capture

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| QUIBIDS, L.L.C., an Oklahoma<br>limited liability company, | ) | |
| | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 5:10-cv-00639-R |
| | ) | |
| 1524948 ALBERTA LTD., d/b/a | ) | |
| TERRA MARKETING GROUP, | ) | |
| a Canadian entity, represented by | ) | |
| counsel for SWIPEBIDS.com to | ) | |
| be the owner of the domain name | ) | |
| swipebids.com, | ) | |
| | ) | |
| Defendant and Counter-Plaintiff. | ) | |

### PLAINTIFF/COUNTER-DEFENDANT'S ANSWER TO
### FIRST AMENDED COUNTERCLAIM

Plaintiff/Counter-Defendant QuiBids, LLC ("QuiBids"), for its Answer and

Defenses to the First Amended Counterclaim (Doc # 28) of 1524948 Alberta Ltd. d/b/a/

Terra Marketing Group Against QuiBids, LLC for False Advertising, Defamation,

Copyright Infringement, and Injunctive and Declaratory Relief (the "First Amended

Counterclaim") alleges and states as follows:

### ANSWER TO FIRST AMENDED COUNTERCLAIM

### INTRODUCTION

1.      QuiBids admits that Terra Marketing filed an answer denying the

allegations of QuiBids' Complaint but denies that Terra Marketing has a legitimate basis

for doing so and denies the remaining allegations in Paragraph 1 of the First Amended

Counterclaim.

2.     QuiBids denies the allegations contained in Paragraph 2 of the First Amended Counterclaim.

### JURISDICTION

3.     QuiBids admits that this Court has subject-matter jurisdiction over this dispute.

4.     QuiBids admits that this Court has personal jurisdiction over QuiBids

### VENUE

5.     QuiBids admits that venue is proper in this District.  QuiBids denies any violation of the copyright laws of the United States.

### 1524948 ALBERTA LTD. D/B/A TERRA MARKETING GROUP

6.     QuiBids is without knowledge to admit or deny the allegations contained in Paragraph 6 of the First Amended Counterclaim, and on that basis denies same.

### QUIBIDS, LLC

7.     QuiBids admits the allegations contained in the first two sentences of Paragraph 7 of the First Amended Counterclaim.   QuiBids denies the remaining allegations therein.

### DOE COUNTER-DEFENDANTS

8.     Paragraph 8 of the First Amended Counterclaim contains no factual allegations such that no response is needed thereto.  To the extent that a response is required, QuiBids denies Paragraph 8.

### TERRA MARKETING'S BUSINESS AND MARKS

9.     QuiBids is without knowledge to admit or deny the allegations contained in

2

Paragraph 9 of the First Amended Counterclaim, and on that basis denies same.

10.    QuiBids denies the allegations contained in Paragraph 10 of the First Amended Counterclaim.

11.    QuiBids is without knowledge to admit or deny the allegations contained in Paragraph 11 of the First Amended Counterclaim, and on that basis denies same.

12.    QuiBids is without knowledge to admit or deny the allegations contained in Paragraph 12 of the First Amended Counterclaim, and on that basis denies same.

### QUIBIDS' AND BECKHAM'S WRONGFUL ACTS AND CONDUCT

13.    QuiBids is without knowledge to admit or deny when Terra Marketing first became aware of its alleged infringement claim, and on that basis denies same.  QuiBids denies the remaining allegations contained in paragraph 13.

14.    QuiBids denies all allegations contained in Paragraph 14 of the First Amended Counterclaim.

15.    QuiBids admits having used an image of Melissa Theuriau in its advertisements but denies any wrongdoing associated with use of her image.  QuiBids denies the remaining allegations contained in Paragraph 15 of the First Amended Counterclaim.

16.    QuiBids admits that it is the owner of the domain name <consumertipsdigest.org> and denies the remaining allegations contained in Paragraph 16 of the First Amended Counterclaim.

17.    QuiBids denies the allegations contained in Paragraph 17 of the First Amended Counterclaim.

18.     QuiBids denies the allegations contained in Paragraph 18 of the First Amended Counterclaim.

19.     QuiBids admits the allegations contained in Paragraph 19 of the First Amended Counterclaim.

20.     QuiBids denies the allegations contained in Paragraph 20 of the First Amended Counterclaim.

21.     QuiBids admits the allegations contained in Paragraph 21 of the First Amended Counterclaim.

22.     QuiBids admits the allegations contained in Paragraph 22 of the First Amended Counterclaim.

23.     QuiBids admits the allegations contained in Paragraph 23 of the First Amended Counterclaim.

24.     QuiBids admits the allegations contained in Paragraph 24 of the First Amended Counterclaim.

25.     QuiBids admits the allegations contained in Paragraph 25 of the First Amended Counterclaim.

26.     QuiBids admits that the referenced graphic has appeared on <consumertipsdigest.org> and denies the remaining allegations contained in Paragraph 26 of the First Amended Counterclaim.

27.     QuiBids denies the allegations contained in Paragraph 27 of the First Amended Counterclaim.

28.     QuiBids denies the allegations contained in Paragraph 28 of the First

4

Amended Counterclaim.

## A. T̲h̲e̲f̲t̲ ̲o̲f̲ ̲C̲o̲p̲y̲r̲i̲g̲h̲t̲e̲d̲ ̲M̲a̲t̲e̲r̲i̲a̲l̲s̲ ̲a̲n̲d̲ ̲I̲n̲f̲r̲i̲n̲g̲e̲m̲e̲n̲t̲

29.    QuiBids is without knowledge to admit or deny the allegations contained in Paragraph 29 of the First Amended Counterclaim, and on that basis denies same.

30.    QuiBids denies the allegation in Paragraph 30 of the First Amended Counterclaim.

31.    QuiBids denies the allegations contained in Paragraph 31 of the First Amended Counterclaim.

32.    QuiBids admits that it is a competitor in the same industry as Terra Marketing and has knowledge that the placement of wording and media within advertising have an impact on the profitability of advertising campaigns.  QuiBids is without knowledge to admit or deny the allegations pertaining to Terra Marketing's testing of marketing materials contained in Paragraph 32 of the First Amended Counterclaim, and on that basis denies same.  QuiBids denies the remaining allegations contained in Paragraph 19.

## B. F̲a̲l̲s̲e̲ ̲A̲d̲v̲e̲r̲t̲i̲s̲i̲n̲g̲ ̲b̲y̲ ̲Q̲u̲i̲B̲i̲d̲s̲

33.    QuiBids denies the allegations contained in Paragraph 33 of the First Amended Counterclaim.

34.    QuiBids admits using photographs of female news reporters in its marketing materials.  QuiBids denies the remaining allegations contained in Paragraph 34 of the First Amended Counterclaim.

35.    QuiBids denies the allegations contained in Paragraph 35 of the First

5

Amended Counterclaim.

36.    QuiBids admits the allegations contained in Paragraph 36 of the First Amended Counterclaim.

37.    QuiBids admits the allegations contained in Paragraph 37 of the First Amended Counterclaim.

38.    QuiBids admits the allegations contained in Paragraph 38 of the First Amended Counterclaim.

39.    QuiBids admits using photographs of female news reporters in its marketing materials.  QuiBids denies Defendant's excerpts are an accurate depiction of its advertisements.  QuiBids denies the remaining allegations contained in Paragraph 39 of the First Amended Counterclaim.

40.    QuiBids admits it has utilized pseudonyms regarding published customer comments and testimonials.  QuiBids denies the remaining allegations contained in Paragraph 40 of the First Amended Counterclaim.

41.    QuiBids admits stating to the public that all testimonials are real people who use and receive products from QuiBids.  QuiBids denies the remaining allegations contained in Paragraph 41 of the First Amended Counterclaim.

42.    QuiBids admits the "Consumer Alerts" advertisement for ConsumerTipsDigest.org depicted in Paragraph 42 of the First Amended Counterclaim appears to be an authentic QuiBids advertisement. QuiBids denies the remaining allegations contained in Paragraph 42 of the First Amended Counterclaim.

43.    QuiBids admits an employee posted a comment on the social networking

6

website Facebook.com. QuiBids is without knowledge to admit or deny any allegations concerning the content of the Facebook page. QuiBids denies the remaining allegations contained in Paragraph 43.

44.    QuiBids denies the allegations contained in Paragraph 44 of the First Amended Counterclaim.

## GENERAL ALLEGATIONS AS TO COPYRIGHT CLAIMS

45.    Paragraph 45 of the First Amended Counterclaim contains a legal conclusion to which no response is needed. To the extent a response is required, QuiBids denies the allegations contained in Paragraph 45 of the First Amended Counterclaim.

46.    QuiBids is without knowledge to admit or deny the allegations contained in Paragraph 46 of the First Amended Counterclaim, and on that basis denies same.

47.    QuiBids is without knowledge to admit or deny the allegations of Terra Marketing's nationality and domiciliary, and on that basis denies same. The remaining allegations in Paragraph 47 contain a legal conclusion to which no response is needed. To the extent a response is required, QuiBids denies the allegation contained in Paragraph 47.

48.    The allegations in Paragraph 48 of the First Amended Counterclaim contain legal conclusions to which no response is needed. To the extent a response is required, QuiBids denies the allegation contained in Paragraph 48.

49.    The allegations in Paragraph 49 of the First Amended Counterclaim contain legal conclusions to which no response is needed. To the extent a response is required, QuiBids denies the allegation contained in Paragraph 49.

50.    QuiBids is without knowledge to admit or deny the allegation regarding Terra Marketing's submitting an application and fee to the Copyright Office, and on that basis denies same.  The remaining allegations in Paragraph 50 of the First Amended Counterclaim contain a legal conclusion to which no response is needed.  To the extent a response is required, QuiBids denies the allegation contained in Paragraph 50.

### COUNT I – COPYRIGHT INFRINGEMENT

51.    QuiBids fully restates and incorporates its responses to Paragraphs 1-50 herein.

52.    QuiBids denies the allegations contained in Paragraph 52 of the First Amended Counterclaim.

53.    QuiBids denies the allegations contained in Paragraph 53 of the First Amended Counterclaim.

54.    QuiBids denies the allegations contained in Paragraph 54 of the First Amended Counterclaim.

55.    QuiBids denies the allegations contained in Paragraph 55 of the First Amended Counterclaim.

56.    The allegations of Paragraph 40 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegation contained in Paragraph 56.

57.    The allegations of Paragraph 41 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegation contained in Paragraph 57.

## COUNT II – TRADE LIBEL UNDER SECTION 43(A) OF THE LANHAM ACT

58.     QuiBids fully restates and incorporates its responses to Paragraphs 1-57 herein.

59.     QuiBids denies the allegations contained in Paragraph 59 of the First Amended Counterclaim.

60.     QuiBids denies the allegations contained in Paragraph 60 of the First Amended Counterclaim.

61.     QuiBids denies the allegations contained in Paragraph 61 of the First Amended Counterclaim.

62.     QuiBids denies the allegations contained in Paragraph 62 of the First Amended Counterclaim.

63.     The allegations of Paragraph 63 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegation contained in Paragraph 63.

## COUNT III – FALSE ADVERTISING UNDER SECTION 43(A) OF THE LANHAM ACT

64.     QuiBids fully restates and incorporates its responses to Paragraphs 1-63 herein.

65.     QuiBids denies the allegations contained in Paragraph 65 of the First Amended Counterclaim.

66.     QuiBids denies the allegations contained in Paragraph 66 of the First Amended Counterclaim.

67.     QuiBids denies the allegations contained in Paragraph 67 of the First

9

Amended Counterclaim.

68.    QuiBids denies the allegations contained in Paragraph 68 of the First Amended Counterclaim.

69.    QuiBids denies the allegations contained in Paragraph 69 of the First Amended Counterclaim.

70.    The allegations of Paragraph 54 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegation contained in Paragraph 70.

### COUNT IV – COMMON LAW DEFAMATION

71.    QuiBids fully restates and incorporates its responses to Paragraphs 1-70 herein.

72.    QuiBids denies the allegations contained in Paragraph 72 of the First Amended Counterclaim.

73.    QuiBids denies the allegations contained in Paragraph 73 of the First Amended Counterclaim.

74.    The allegations of Paragraph 58 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegation contained in Paragraph 74.

75.    QuiBids denies the allegations contained in Paragraph 75 of the First Amended Counterclaim.

76.    The allegations of Paragraph 60 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required,

QuiBids denies the allegation contained in Paragraph 76.

### COUNT V – DECEPTIVE TRADE PRACTICES UNDER OKLAHOMA LAW

77.    QuiBids fully restates and incorporates its responses to Paragraphs 1-76 herein.

78.    The allegations in Paragraph 78 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 78.

79.    The allegations in Paragraph 79 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 79.

80.    The allegations in Paragraph 80 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 80.

81.    QuiBids denies the allegations contained in Paragraph 81 of the First Amended Counterclaim.

82.    The allegations in Paragraph 82 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 82.

83.    The allegations in Paragraph 83 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 83.

84.    The allegations in Paragraph 84 of the First Amended Counterclaim contain

legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 84.

## COUNT VI – COMMON-LAW UNFAIR COMPETITION UNDER OKLAHOMA LAW

85.     QuiBids fully restates and incorporates its responses to Paragraphs 1-84 herein.

86.     The allegations in Paragraph 86 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 86.

87.     The allegations in Paragraph 87 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 87.

88.     The allegations in Paragraph 88 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 88 and denies that Terra Marketing is entitled to injunctive relief.

## COUNT VII – DECLARATORY RELIEF – 28 U.S.C. 2201

89.     QuiBids fully restates and incorporates its responses to Paragraphs 1-88 herein.

90.     The allegations in Paragraph 90 of the First Amended Counterclaim contain legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 90.

91.     The allegations in Paragraph 91 of the First Amended Counterclaim contain

legal conclusions to which no response is needed.  To the extent a response is required, QuiBids denies the allegations contained in Paragraph 91.

92.    QuiBids denies that Terra Marketing is entitled to a judicial declaration.

### PRAYER FOR RELIEF

QuiBids denies that Counter-plaintiff is entitled to the relief set forth in its prayer for relief.

### DEFENSES

By pleading the following defenses, QuiBids does not concede that each of the matters covered by the numbered defenses have to be proven by QuiBids.  QuiBids reserves its position that Counter-plaintiff retains the burden of proof on all matters necessary to state the claims asserted in the First Amended Counterclaim.

1.    Counter-plaintiff has failed to state a cause of action upon which relief may be granted, as it has failed to plead facts to support the prima facie elements of its asserted claims.

2.    Counter-plaintiff's claims are barred in whole or in part, because Counter-plaintiff does not hold a copyright in the materials identified in the First Amended Counterclaim and, thus, lacks standing to assert the copyright infringement claim.

3.    Counter-plaintiff's claims are barred in whole or in part for failure to join a necessary and/or indispensable party who holds an interest in the copyright to the materials identified in the First Amended Counterclaim.

4.    Counter-plaintiff's claims are barred in whole or in part for lack of originality, as Counter-plaintiff did not create the material to which it claims a copyright.

13

5.     Counter-plaintiff's claims are barred in whole or in part to the extent that the claims are based on alleged infringement of registered marks owned by Consumers Digest Communications, LLC, because Counter-plaintiff is unqualified and/or lacks standing to bring a claim on behalf of Consumers Digest Communications, LLC, as upon information and belief Counter-plaintiff is not an assignee of those marks with rights to bring suit nor does it have an exclusive license in those marks with rights to bring suit.

6.     Counter-plaintiff's claims are barred in whole or in part because, QuiBids actions, if any, constituted an innocent infringement.

7.     Counter-plaintiff's claims are barred in whole or in part because, QuiBids actions, if any, constituted use expressive of QuiBids' own products and services.

8.     Counter-plaintiff's claim purportedly brought under Oklahoma's Consumer Protection Act is barred because counter-plaintiff does not qualify as an aggrieved consumer within the meaning of that act.

9.     Counter-plaintiff's claims are barred, in whole or in part, by the doctrines of unclean hands attributable to Counter-plaintiff's fraudulent, unethical, unlawful, and/or illegal conduct with respect to the subject of this action, as fully alleged in QuiBids' Complaint.

10.     Counter-plaintiff's claims are barred, in whole or in part, by the doctrines of ratification, estoppel, failure of consideration, unjust enrichment, waiver and/or mistake.

11.     Counter-plaintiff's own actions and/or inaction caused and/or contributed to any damage sustained by Counter-plaintiffs.

14

12.    QuiBids reserves the right to supplement its defenses upon substantial completion of discovery.

### CONCLUSION

WHEREFORE, Plaintiff/Counter-Defendant QuiBids requests Counter-plaintiff be denied any recovery against QuiBids and that judgment be entered in QuiBids' favor on Counter-plaintiff's claims, that QuiBids be awarded costs of suit, attorneys' fees as appropriate and provided for by law, and that QuiBids be granted any and all such further relief as the Court may deem proper.

Respectfully submitted,

/s/ Michael D. McClintock
Michael D. McClintock, OBA #18105
Anthony L. Rahhal, OBA #14799
Tamara Schiffner Pullin, OBA #21462
Ryan L. Lobato, OBA #22211
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, OK  73102
Telephone:    (405) 235-9621
Facsimile:     (405) 235-0439
michael.mcclintock@mcafeetaft.com
anthony.rahhal@mcafeetaft.com
tamara.pullin@mcafeetaft.com
ryan.lobato@mcafeetaft.com

**ATTORNEYS FOR QUIBIDS, LLC**

15

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2010, I electronically transmitted the attached

document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to ECF registrants in this matter as follows:

Anton J. Rupert
Drew T. Palmer
Crowe & Dunlevy
20 N. Broadway Ave., Suite 1800
Oklahoma City, OK 73102
**ruperta@crowedunlevy.com**
**drew.palmer@crowedunlevy.com**

Margaret S. Millikin
Crowe & Dunlevy
321 S. Boston Ave., Suite 500
Tulsa, OK 74103
**margaret.millikin@crowedunlevy.com**

Karl S. Kronenberger
Kronenberger Burgoyne, LLP
150 Post Street, Suite 520
San Francisco, CA  94104
**karl@kbinternetlaw.com**

**ATTORNEYS FOR
DEFENDANT/COUNTER-CLAIMANT
1524948 ALBERTA LTD**

*/s/  Michael D. McClintock*