# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

LAWRENCE A. LOCKE, individually and   )
on behalf of all others similarly situated,   )
   )
                Plaintiff,   )
   )
v.   )      Case No. 5:10-cv-01277-F
   )
QUIBIDS, LLC,   )
   )
              Defendant.   )

---

## MOTION TO DISMISS WITH BRIEF IN SUPPORT

---

DATED:  February 4, 2011

Reid Robison, OBA #7692
Michael D. McClintock, OBA #18105
Tamara Schiffner Pullin, OBA #21462
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, OK  73102
Telephone:   (405) 235-9621
Facsimile:   (405) 235-0439

**ATTORNEYS FOR QUIBIDS, LLC**

# TABLE OF CONTENTS

MOTION TO DISMISS ...................................................................................................... 1

BRIEF IN SUPPORT OF MOTION TO DISMISS ............................................................ 1

INTRODUCTION.................................................................................................................. 1

FACTUAL BACKGROUND................................................................................................. 2

ARGUMENT AND AUTHORITY ....................................................................................... 5

    A.    The Site Disproves the Pivotal Allegations of Plaintiff's Claims. .................5

        1.    The Court may consider the Site in ruling on this motion. ........................................................................................5

        2.    Plaintiff is bound by QuiBids' Terms & Conditions. ...........................7

        3.    The Terms & Conditions, along with other information on the Site, disclose all information Plaintiff claims was omitted. .........................................................................................9

            a.    General allegations disproved by information on the Site.......................................................................9

            b.    The Site disproves the purported omissions. ...........................14

               (i)    The Site discloses that users may lose money. ........................15

               (ii)    QuiBids cannot perform the calculation that forms the second alleged omission. ...........................17

               (iii)   The Site discloses that it is best to bid in the last 20 seconds. ...........................................................18

               (iv)   The Site discloses that QuiBids controls the auctions shown to each user.....................................20

    B.    QuiBids Was Under No Duty to Disclose the Missing Information. ...........21

    C.    Injunctive Relief Is Not Available Under the OCPA....................................23

    D.    The Unjust Enrichment and Money Had and Received Claims are Derivative of Counts I, II, and III and, Accordingly, Should be Dismissed. ....................................................................................................24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT

Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) ........................................................... 5
Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ........................................ 5

## UNITED STATES CIRCUIT COURTS OF APPEAL

Daniels-Hall v. National Educ. Ass'n, 2010 WL 5141247 (9th Cir. Dec. 20, 2010).......... 7
Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956 (10th Cir. 2001).......................... 5
GFF Corp. v. Assoc. Wholesale Grocers, Inc., 130 F.3d 1381 (10th Cir. 1997) ............... 5
Indust. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44F.3d 40 (1st Cir. 1995) ...................... 23
Kellogg Square P'ship v. Prudential Ins. Co. of Am., 63F.3d 699 (8th Cir. 1995).......... 23
Long v. Hewlett-Packard Co., 316Fed. Appx. 585 (9th Cir. 2009) .................................. 23
Monus v. Colorado Baseball 1993, Inc., 103 F.3d 145 (10thCir. 1996) .......................... 25
O'Toole v. Northrop Grumman Corp., 499 F.3d 1218 (10th Cir. 2007) ........................... 6
Pace v. Swerdlow, 519 F.3d 1067 (10th Cir. 2008) ......................................................... 5
Register.com, Inc. v. Verio, Inc., 356 F.3d 393 (2d Cir. 2004) ....................................... 9
Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008). ................................................. 5
Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249 (10th Cir. 2005)................ 6

## UNITED STATES DISTRICT COURTS

Alvarez v. Ins. Co. of North Am., 2006 WL 3702641 (E.D. Pa. Dec. 12, 2006) ............. 23
Berger v. Allstate Ins. Co., 667 F.Supp.2d 738 (E.D. Mich. 2009) ................................. 23
Burcham v. Expedia, Inc., 2009 WL 586513 (E.D. Mo. Mar. 6, 2009).......................... 7,8
County of Santa Clara v. Astra USA, Inc., 401 F.Supp.2d 1022 (N.D. Cal. 2005) ............ 7
In re Amgen Inc. Sec. Litig., 544 F.Supp.2d 1009 (C.D. Cal. 2008)................................. 7
In re Enron Corp. Sec. Derivative & "ERISA" Litig.,
    511 F. Supp.2d 742 (S.D. Tex. 2005)........................................................................... 23
Martino-Catt v. E.I. DuPont de Nemours & Co., 213 F.R.D. 308 (S.D. Iowa 2003) ......... 9
Parks v. AT&T Mobility, LLC, 2010 WL 830000 (W.D. Okla. Mar. 4, 2010)........... 21,22
Smallwood v. NCSoft Corp., 2010 WL 3064474 (D. Hi. Aug. 4, 2010)........................ 6,8
United Food & Comm. Workers Union v. Chesapeake Energy Corp.,
    2010 WL 3527596 (W.D. Okla. Sept. 2, 2010)........................................................... 21
Virgilio v. Ryland, 2009 WL 1606494 (M.D. Fla. June 8, 2009) .................................... 23

## STATE CASES

Brill v. Walt Disney Co., 2010 WL 5011594 (Okla. Civ. App. Aug. 23, 2010)...............25

Harvell v. Goodyear Tire & Rubber Co., 164 P.3d 1028 (Okla. 2006) ...........................25

Major v. McCallister, 302 S.W.3d 227 (Mo. App. 2009) ....................................................8

Sholer v. State ex rel. Dept. of Public Safety, 945 P.2d 469 (Okla. 1995) .......................25

Tibbetts v. Sight n' Sound Appliance Centers, Inc., 77 P.3d 1042 (Okla. 2003) .............24

## STATE STATUTES

15 OKLA. STAT. § 756.1(A)(2) ...........................................................................................24

15 OKLA. STAT. § 756.1(D)................................................................................................24

15 OKLA. STAT. § 761.1(A)................................................................................................24

## FEDERAL RULES

Federal Rule of Civil Procedure 8 ..................................................................................1,5

Federal Rule of Civil Procedure 12 ..........................................................................1, 5,9,

Federal Rule of Evidence 201        ……………………………………………………..6

6562999_2.DOCX

## MOTION TO DISMISS

Defendant QuiBids, LLC respectfully submits this Motion to Dismiss the First Amended Complaint ("FAC") (doc. #13), pursuant to Fed. R. of Civ. P. 8(a) and 12(b)(6). In support of this motion, QuiBids submits the following brief.

## BRIEF IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

QuiBids operates an interactive penny auction website, www.quibids.com (the "Site"), that sells popular consumer products through two formats:  an auction format; and direct purchase through the "Buy It Now" feature.  The plaintiff, Lawrence A. Locke, a 1989 graduate of Yale Law School, filed this lawsuit against QuiBids seeking to pursue claims on behalf of a putative nation-wide class defined by the plaintiff as consisting of any person in the United States "who spent more money on the Site than the value of the goods he received, if any ...."  Specifically, Plaintiff asserts that certain information is missing from the Site.  On the basis of the alleged omissions, Plaintiff attempts to state claims for deceptive and unfair trade practices in violation of the Oklahoma Consumer Protection Act ("OCPA"), common law fraud by omission, money had and received, and unjust enrichment.

Contrary to Plaintiff's allegations:  (1) by participating in the Site's auctions, Plaintiff agreed to the Terms & Conditions published on the Site, many of which directly contradict the alleged omissions on which all claims are based; (2) in addition to the disclosures in the Terms & Conditions, the Site repeatedly educates customers and discloses the type of information that Plaintiff claims is missing; (3) injunctive relief is not available to private plaintiffs under the OCPA as a matter of law; and (4) Plaintiff cannot state a claim for money had and received or unjust enrichment because Plaintiff received the benefit of his bargain and has not alleged facts to show that QuiBids has been unjustly enriched.

1

**FACTUAL BACKGROUND**

Plaintiff's claims are based on QuiBids' alleged "failure[s] to disclose" (see, e.g., FAC ¶¶ 4-9) certain information that allegedly appears "nowhere on QuiBids' site" (see, e.g., FAC ¶¶ 4, 9).  In making these claims, Plaintiff ignores that the alleged omitted matters are fully addressed on the Site in:

- the Terms & Conditions, a binding contract between Plaintiff and QuiBids, which a customer must affirmatively agree before completing registration and before using the Site by moving the cursor over a button and clicking "I agree" (See Exhibit 1, Declaration of Geurts, at ¶ 2, Ex. A);

- QuiBids 101, "an information portal built by QuiBids to help educate our users on not only how our auction model works, but [also] how to have the best chance of winning" (Exh. B to Geurts Decl.); and

- the 9 pages of Frequently Asked Questions ("FAQ") (Exh. C to Geurts Decl.).

As demonstrated herein, the Terms & Conditions, QuiBids 101 and the FAQ explain how the bidding process works, explain how to buy products directly through the Buy It Now feature, give hints on how to be most successful in the auctions, and caution against mistakes new users sometimes make.

Plaintiff understands how the auction process works, as explained in the FAC:

- "[A] customer … must first register an account on the Site."  FAC at ¶ 15.

- "[T]he next step for the customer is to buy bids, which are sold in 'packs' of varying numbers.  There are five different sizes of bid packs … and for all of them, the cost per bid is $.60.  What the customer is purchasing is the right to place bids on particular auction items."  FAC at ¶ 15.

- The Site displays ongoing auctions, each of which shows "a time, a price, a bidder name, a picture of the product, and a colored banner with a cent number displayed in the upper right corner."  FAC at ¶ 16.

- "Each auction has a specific amount by which the purchase price of the item increases when a bid is placed.  In a one-cent auction, the purchase price will increase by $0.01 each time a bid is placed."  FAC at ¶ 18.

2

- "[W]hen a QuiBids customer bids on an item, the consumer pays $0.60 for each bid, regardless of whether or not the consumer actually wins the item." FAC at ¶ 20.  In other words, each bid placed in an auction deducts one bid from the pack of previously purchased bids.

- "Whenever a customer bids during the last 20 seconds of an auction, additional time is added to the auction by QuiBids.  Initially, another 20 seconds is added.  At some point, QuiBids may decide to reduce the amount of time … added for every additional bid made until, finally, no more bids are made in the last 10 seconds."  FAC at ¶ 17.

- "The last bidder 'wins' the auction and the right to purchase the item" at the ending auction price.  FAC at ¶ 17.

The FAC demonstrates that this is <u>not</u> a case where the consumer read the Site and alleges that the information thereon was intentionally misleading, incorrect, confusing or incomplete.  Rather, this is a lawsuit apparently brought by a consumer who jumped into bidding without reading the available information, and made the types of mistakes about which QuiBids specifically cautions its new users:

> *New users to our site make judgments and decisions that affect their success on our site.  We here at QuiBids hate for any new user to fall into a pitfall and not win on our site.  So, we've decided to write this article to help all new users up their chances of winning on our site.  Here, we give a few scenarios of typical new site users and discuss the three biggest mistakes that they make on our site.*
>
> ***
>
> **Scenario 2**:  Jane Doe stumbles upon the QuiBids site and is intrigued at the amazing low prices that QuiBids products sell for.  She says to herself, "I'm not familiar with the structure of penny auctions, but how hard can it be?  Plus, it can't be that different from eBay.  I'm gonna get in on the fun."  Due to not taking the time to understand the QuiBids' model, she buys bids and immediately starts participating in an auction.  It's not until she's down $10 that she realizes auctions don't count to just zero seconds and end, but repeat in the final seconds until everyone stops bidding.  Jane Doe now says, "This isn't how eBay works!  I can't believe I spent my money for nothing.  I'm done with this site!"

3

(Exh. B at The 3 Biggest Mistakes Beginners Make).   Scenario 2 above reads strikingly similar to the experience Plaintiff alleges in the FAC:  that on the day he registered with QuiBids and the day immediately following, he "spent $51.11 to purchase 125 bids or $.41 per bid" on the Site and "bid for several consumer products advertised on the Site … but he won none of them despite using all his bids."  FAC at ¶¶ 28-29.  As he readily admits in the FAC, however, QuiBids never guaranteed that he would win an auction:

- "QuiBids.com offers consumers the chance to bid on a variety of consumer products . . . ."  FAC at ¶ 1.

- "QuiBids promotes itself … as **providing an opportunity** for consumers to win luxury items at significant discounts … and claims that **winning bidders** on QuiBids.com **typically** save 80%-95% compared to retail prices."  FAC at ¶ 2 (emphasis added).

- "The purchase of bids **is not a guarantee that the customer will win any auction**."  FAC at ¶ 15 (emphasis added).

Plaintiff apparently failed to exercise the "Buy It Now" feature for any of the items he was attempting to purchase through auction, even though the FAC demonstrates that he understood this option:

> For a losing bidder, QuiBids offers a "Buy It Now" feature pursuant to which the product can be purchased at the "Value Price" stated on the Site for up to two hours after the end of the auction.  The losing bidder gets a credit towards the purchase price for the cost of the losing bids he or she expended.

FAC at ¶ 19.  QuiBids offers this feature "so that you can come to QuiBids and not lose any money and come away with the item you want."  (Exh. B to Geurts Decl., at "Buy It Now Explained").   In addition, QuiBids will refund purchased unused bids upon customer request.  (Exh. B at "Time-Saver Tips") ("Keep in mind we refund any unused bids.").

<u>**A**RGUMENT AND **A**UTHORITY</u>

Fed. R. of Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." This "requires a 'showing,' rather than a blanket assertion, of entitlement to relief," such that "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 556 n. 3 and at 555.

Rather than showing the mere <u>possibility</u> of relief, a plaintiff must "state a claim to relief that is plausible on its face" and provide "[f]actual allegations [that are] enough to raise a right to relief above the speculative level." <u>Iqbal</u>, 129 S.Ct. at 1949; <u>Twombly</u>, 550 U.S. at 570. Thus, "[t]he burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1247 (10th Cir. 2008). "Where the well-pled facts do not permit the court to infer more than the <u>mere possibility</u> of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" <u>Iqbal</u>, 129 S.Ct. at 1950 (citations omitted) (emphasis added). Plaintiff has failed to meet his pleading burdon.

**A.**     **The Site Disproves the Pivotal Allegations of Plaintiff's Claims.**

**1.**     **The Court may consider the Site in ruling on this motion.**

While a Rule 12(b)(6) motion normally takes as true all allegations in a complaint without looking to evidence outside of the pleading, "[i]t is accepted practice that, if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." <u>Dean Witter Reynolds, Inc. v. Howsam</u>, 261 F.3d 956, 961 (10th Cir. 2001) (quoting <u>GFF Corp. v. Assoc. Wholesale Grocers, Inc.</u>, 130 F.3d 1381, 1384 (10th Cir. 1997)). <u>See also</u>, <u>Pace v. Swerdlow</u>, 519 F.3d 1067, 1072 (10th Cir. 2008) (holding district

court correctly considered matters referred to in complaint without converting motion into summary judgment); Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1253-54 (10th Cir. 2005) ("a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute").

In addition, the Court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The Tenth Circuit has noted, "It is not uncommon for courts to take judicial notice of factual information found on the world wide web."  O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1224-25 (10th Cir. 2007) (taking judicial notice of financial information found on party's website).

Plaintiff repeatedly references the Site throughout the FAC and relies upon the Site as an integral basis for his claims.  Each of the claims alleged in the FAC turns on sufficiency of disclosures found on the Site.  Most paragraphs in the FAC reference "QuiBids.com," the "website," or the "site" (all interchangeable terms having the same meaning within the FAC).  The FAC specifically references the "Terms & Conditions posted on QuiBids.com."  FAC, ¶ 11.  Yet, Plaintiff fails to attach to the FAC any content from the Site.

QuiBids submits as Exhibits hereto an authentic copy of the entirety of the following sections of the Site:  Terms & Conditions (Exh. A to Geurts Decl.); QuiBids 101 (Exh. B to Geurts Decl.); and Frequently Asked Questions ("FAQ") (Exh. C to Geurts Decl.).  QuiBids requests that the Court consider Exhibits A-C and/or take judicial notice of same in considering this Motion to Dismiss.[1]  See Smallwood v. NCSoft Corp., __ F. Supp.2d __, 2010 WL 3064474 (D. Hi. Aug. 4, 2010) (considered website user agreement submitted

---

[1]

with motion to dismiss where agreement was referenced in complaint); <u>Burcham v. Expedia, Inc.</u>, 2009 WL 586513, *1 n. 2 (E.D. Mo. Mar. 6, 2009) (considered website terms and conditions submitted with motion to dismiss where referenced in complaint); <u>Daniels-Hall v. National Educ. Ass'n</u>, __ F.3d __, 2010 WL 5141247, *4 (9th Cir. Dec. 20, 2010) (taking notice of information posted on internet); <u>In re Amgen Inc. Sec. Litig.</u>, 544 F.Supp.2d 1009, 1023-24 (C.D. Cal. 2008) (taking notice of information posted on internet); <u>County of Santa Clara v. Astra USA, Inc.</u>, 401 F.Supp.2d 1022, 1024 (N.D. Cal. 2005) (taking notice of information posted on internet).

## 2.   Plaintiff is bound by QuiBids' Terms & Conditions.

"Before a customer can place bids on the Site, he or she must first register an account on the Site."   FAC ¶ 15.   A customer may not complete registration without clicking a button that affirmatively represents that the customer agrees to the Terms & Conditions. (Decl. of Geurts at ¶ 2.)   QuiBids' Terms & Conditions state that a customer agrees to same by using the Site:

> The following Terms & Conditions **shall apply** to the relationship between QuiBids LLC, <u>www.quibids.com</u> ("QuiBids"), and the end use ("You" or "Your").   **By using QuiBids' services, You accept the following Terms & Conditions, as well as the manner in which QuiBids operates. . . .**

(Exh. A at General/Overview) (emphasis added).

> If you do not agree to the Terms & Conditions, do not use QuiBids. If you access, use, or download in any way, any service from QuiBids, **You agree to and are bound** by these Terms & Conditions.

(Exh. A at Acceptance of Terms & Conditions).

> You have the right to terminate Your account at any time.   You may do so either by not returning or by closing your account ….

(Exh. A at Account Termination) (emphasis added).

The Terms & Conditions (or user agreement) of a website constitute a binding and enforceable agreement, even if the plaintiff claims that he or she failed to read or understand same.  For instance, the court in <u>Burcham v. Expedia, Inc.</u>, reasoned:

> Expedia offers its services on condition that the user agrees to Expedia's terms.  The undisputed facts show that [plaintiff] used the website, and he did so using an account that bore his own name.  Expedia is not required to prove anything more to show that [plaintiff] assented to the terms of the website.  That [plaintiff] either didn't read the agreement or didn't see it may be unfortunate for him, but it does not change the outcome.  [Plaintiff] is bound by the terms of the website's user agreement.

2009 WL 586513, *4 (E.D. Mo. Mar. 6, 2009) (dismissing suit that alleged Expedia made false representations on its website).   <u>See also</u> <u>Smallwood</u>, 2010 WL 3064474 at *11 (finding user agreement valid and enforceable where plaintiff was required to click "I agree" and had an opportunity to cease using the website's services if he disagreed with the user agreement).

Because Plaintiff references QuiBids' Terms & Conditions in the FAC (at ¶ 11), presumably he read same.[2]  Even if not, "[f]ailure to read an enforceable online agreement, as with any binding contract, will not excuse compliance with its terms.  A customer on notice of contract terms available on the internet is bound by those terms."   <u>Major v. McCallister</u>, 302 S.W.3d 227, 230 (Mo. App. 2009).

> "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.  It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree."

---

[2]   Given that Plaintiff is an attorney, it would seem unlikely (but not impossible) that he will contend that he failed to understand the Terms & Conditions.

Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004).   Thus, Plaintiff is charged with the conditions and disclosures stated in the Terms & Conditions, many of which directly contradict the alleged omissions and/or misrepresentations on which Plaintiff bases his claims in this Lawsuit (as explained below).

        **3.**       **The Terms & Conditions, along with other information on the Site, disclose all information Plaintiff claims was omitted.**

"Although the Court must give the nonmoving plaintiff the benefit of all reasonable inferences on a 12(b)(6) motion to dismiss, allegations of fraud cannot rest on the thin reed of a mere failure to include whatever disclaimers a plaintiff can imagine, particularly when substantive information to the same effect has already been provided" via disclosures on defendants' website.   Martino-Catt v. E.I. DuPont de Nemours & Co., 213 F.R.D. 308, 321 (S.D. Iowa 2003) (finding statement in the frequently asked questions portion of defendants' website "belies the allegation" of an omission and/or partial disclosure, and that information "posted on the Website contained the precise disclosure claimed to have been omitted").   A review of QuiBids' Site shows that QuiBids has addressed all alleged omissions.

        **a.**       **General allegations disproved by information on the Site.**

Contrary to the allegation that the Site offers a "promise of obtaining consumer products at significant discounts from retail prices" (FAC at ¶ 1), the Site discloses:

- "While you can receive some smashing deals, and this is certainly our desire, you should be willing to pay at least 1/4 of the item's retail cost.   Yes, there are times when you see someone win a high-priced item for a couple bucks, however, ***this is not the norm***, and we don't want you to get frustrated." (Exh. B at "5 Commandments to Winning") (emphasis added).[3]

---

[3]   Contrary to the allegations that QuiBids promises that "customers typically save 80%-95%" (FAC at ¶ 2) or on "average [save] 80%, and up to 95%," (FAC at ¶ 26), the Site actually discloses, "Every day QuiBids sells products at 60-90% below their retail prices."   (Exh. B at "How Does QuiBids Offer Such Low Prices?").   That QuiBids sells products every day at such a discount is quite different from Plaintiff's allegation that QuiBids promised that *all* customers *typically* or on *average* save that much.

- "Usually any participant who is willing to spend 1/3 of the value of the item in bids has a great shot of winning the item."  (Exh. B at "The 3 Biggest Mistakes Beginners Make").

Plaintiff did not heed this advice, as he alleges that he spent:  $3.96 bidding on a Nikon camera; $2.46 on an external hard drive; $0.41 on an HDMI cable; $4.10 on an HP Printer; $26.24 on a 55-inch HDTV; and $0.41 on a Nikon camera.  Compare FAC at ¶ 28 (stating Plaintiff paid $0.41 per bid) with ¶¶ 30-31 (setting out number of bids placed on specific items).  Plaintiff did not spend a quarter of the retail value in bidding on any of the listed items.

Plaintiff alleges that "the true nature of the Site is not disclosed," (FAC at ¶¶ 4, 22), but the Site explains the auction process step-by-step in the FAQ (Exh. C) and in QuiBids 101 (Exh. B at "How Does QuiBids Work"):



> **How Does QuiBids Work?**
>
> Each bid costs just $0.60 and available in Bid Packs. These bids are pre-paid and placed in your Bids Account. Each time you place a bid, your bids Account is deducted one bid. Once a bid is placed the auction price will go up in increments of 1,2,5,10,15, or 20 cents. . A maximum of 20 seconds is added to the timer every time someone bids. This gives enough time for someone else to make the decision to bid if they're interested. This is similar to the "Going once...Going twice...SOLD!" approach of traditional auctions.
>
> If you are the top bidder when the timer reaches zero, you win!  You will then pay the ending auction price as well as the cost of shipping.  If you do not win, you lose your bids that have been placed; however, we offer a Buy It Now feature on all auctions. When you use our "Buy It Now" feature, we subtract the cash value of the bids you've placed (excluding voucher bids) from the value price of the item, and you only have to pay the difference.
>
> Let's say you spend 30 bids trying to win a $30 valued product, but you don't win. Your 30 bids are worth $18 (30 x $0.60), so if you choose to use the "Buy It Now", you will pay $12 plus shipping for the product.  *Please note that this offer applies to real bids only, and that voucher bids to do not apply to the Buy It Now option.
>
> This feature limits the risk in participating in our auctions as we offer the Buy It Now feature for the majority of our auctions.

In addition, the following "Buy It Now" information appears at the bottom of every single auction on QuiBids' website, and a frame above and to the right regarding how bidding works that appears periodically during auctions, give customers who may not understand the process the opportunity to easily click and learn more:



Directly addressing the bidding mistakes Plaintiff made and complains about in this lawsuit, QuiBids 101 (Exh. B at "The 3 Biggest Mistakes Beginners Make," emphasis added) warns of the three biggest pitfalls new customers may experience:

> **1) Setting Unrealistic Expectations**
> We can't stress this enough, but users need to set realistic goals when participating in auctions.  If someone is new to an online auction, he/she shouldn't expect to win a MacBook on his/her first auction with the cheapest bid pack there is.  Not saying it couldn't happen... it could and it has... but it is highly improbable and more than likely it won't happen.  Odds will be against you at that point.  Instead, we encourage new users  to start using the site by participating in smaller auctions.  The beginner's auctions are a perfect place to start because not only are they smaller items, but they're easier to win!  Start small and go from there.
>
> **2) Setting Your Sights Too High**
> It wouldn't be wise to come in and immediately go after the most popular item on our site.  Yes, these are the more "sexy" products, but there are more competitors for these products, not to mention some of our more skilled 'in-it-to-win-it' veterans.  Once acquainted with the site and knowing how it all works, if you then decide to go for those sexy products, know that you need to be committed to that one specific auction and should highly consider buying the item through our "Buy it Now" option if you don't win.  Don't spread yourself too thin when bidding on the big ticket items.  Make sure to devote a little bit more time and money.  Usually any participant who is willing to spend 1/3 of the value of the item in bids has a great shot of winning the item.
>
> **3) Not Taking Time to Familiarize Oneself with the Site.**  As with anything, do some research before you jump into the world of QuiBids penny auctions.  Each penny auction is going to be different from the next.  With QuiBids, read through and know our Terms & Conditions, know about the "Buy it Now" option, the BidOMatic tool, our pricing structure and even sit back to watch other auctions.  This will give you a much better understanding of "the nature of the business" as well as what we strive to accomplish with our site.  If you don't know what's offered, you very well could set yourself up for a disadvantage in auctions.

QuiBids 101 (Exh. B) gives additional tips "to help you win an auction for a good deal" under "5 Commandments to Winning."  The FAQ section (Exh. C, emphasis added) also gives tips for success:

11



Contrary to the suggestion that QuiBids purports to be similar to E-Bay (FAC at ¶¶ 2, 20), QuiBids 101 fully discloses "QuiBids isn't your basic online auction model" (Exh. B at "How Does QuiBids Work") and specifies that it differs from an E-bay-like auction process (Exh. B at "How Does QuiBids Offer Such Low Prices?"):



Plaintiff alleges (FAC ¶¶ 2, 18-20, 33) that QuiBids fails to explain that it may make money from customers who place losing bids, but QuiBids 101 (Exh. B at "How Does QuiBids Work?") discloses, "We are able to give such great deals because we collect bid

revenue every time a bid is placed.  Thus, the cost of an item is distributed over multiple bidders competing for the item."  QuiBids 101 (Exh. B at "How Does QuiBids Offer Such Low Prices?") also explains the mathematics of this:

> QuiBids purchases the Amazon Kindle for $259.00.  It then schedules an auction for the Kindle to end sometime in the near future.  Each auction has a banner in the upper left corner that indicates what cent increment the auction is.  That number can be $.01, $.02, $.05, $.10, or $.20.  It represents how much the final sales price will increase each time a bid is placed.
>
> So an auction is scheduled for the Amazon Kindle as a $.02 auction and as the timer counts down bids begin to be placed by users who are competing for a chance to win.  Eventually, the bidding ends at the price of $8.70.  Because it was a $.02 auction that means that there were a total of 435 bids placed during the course of the auction.

> 435 bids x $.60 bid = $261.00
>
> Cost for QuiBids to Purchase the Amazon Kindle = $259.00
>
> Cost for the Auction Winner to Purchase the Amazon Kindle = $8.70
>
> The bidding in this auction paid for QuiBids cost to buy the product.  As a result the winner of the auction was able to win a Kindle at a 90% discount to its retail price.
>
> But what about the users that didn't win?  In order to make our auction model as fair as possible, QuiBids offers every user that placed bids on this auction the ability to redeem the value of their bids towards a "Buy it Now".  When a user chooses to execute a "Buy it Now" QuiBids applies the value of all the bids placed in that auction towards the cost to purchase a second Kindle.  The user pays the remainder of what it costs QuiBids to purchase the second Kindle.  This way there is no bid that is ever wasted on QuiBids.

Plaintiff references information disseminated "through widespread internet advertising and emails" (FAC, ¶ 2) and "publicly-available news and magazine features" (FAC, ¶ 26).  However, the Terms & Conditions specify that they "constitute the entire agreement between QuiBids and You, and supersede and replace all prior … representations."   (Exh. A at General/Overview, Entire Agreement).   The Terms & Conditions further advise, "At no time should the opinions, views or statements provided by advertisers, content providers, users, guests, independent writers or experts be relied upon for important personal decisions without independent verification."  Exh. A (at Disclaimer of Warranty and Liability Regarding Use of QuiBids).  Thus, to the extent that Plaintiff's claims are based upon allegations that his experience on the Site was different than the expectation created by these other materials, the Terms & Conditions specify (and Plaintiff contractually agreed) not to rely on same.

The Site also addresses the FAC's suggestion that QuiBids makes an excessive profit (FAC at ¶¶ 2, 18, 33):

> One of the largest misconceptions that we face as a company is that we are taking large and excessive profits on the auctions that we run.  Currently, we run a net profit margin of around 5%-10% each day.
>
> ***
>
> The most common misunderstanding about our site is that only one product is won through the auction. . . .  The reason that some auctions look like they have made larger profits is because of the "Buy It Now."  Although offering the ability to "Buy It Now" to our customers leads to much lower profit margins for QuiBids, we are committed to providing this [feature].
>
> ***
>
> QuiBids takes a loss on around 50% of the auctions run each day. … [W]e do take very real and material losses when auctions do not receive many bids.  Much of the profit from the profitable auctions goes towards covering the losses from the unprofitable auctions.

(Exh. B at "Does QuiBids Make Excessive Profit on their Auctions?") (explaining that additional costs of business include marketing, office rent and customer support).  This is also a customer question that QuiBids answered on the Site:



### b.      The Site disproves the purported omissions.

Counts I, II, and III explicitly rely on the same four purported omissions, namely that QuiBids allegedly failed to inform customers:

> **[i]** that the overwhelming majority of customers using the Site would lose money by doing so, **[ii]** of the percentage of the money spent by customers on the Site that is returned to customers in the form of merchandise; **[iii]** that with respect to auctions of high-

14

ticket items (items with a retail value of $100 or more), bids placed on QuiBids.com for those items before the last 20 seconds originally set for bidding by QuiBids will inevitably be unsuccessful and, thus, a waste of money; and **[iv]** that registered users of the Site will be directed to a part of the Site that offers less auction items to bid upon than the portion of the Site accessed by unregistered potential customers.

FAC at ¶¶ 44, 49, 53.  In addition to the excerpts from the Site set out above, which disprove information Plaintiff alleges was missing, the Terms & Conditions, QuiBids 101 and FAQ also disprove the four (4) specific purported alleged omissions.

### (i)      The Site discloses that users may lose money.

As alleged and understood by the Plaintiff, the nature of an auction is that there is one winner, and "[t]he last bidder 'wins' the auction and the right to purchase the item" at the ending auction price.  FAC at ¶ 17.  QuiBids 101 discloses that participants who do not win the auction will lose money, such as this example:



(Exh. B at "The 3 Biggest Mistakes Beginners Make").[4]  The Terms & Conditions (Exh. A) also advise:

> **Note:**
> Placing bids online at www.QuiBids.com frequently or repeatedly can incur high costs.  We would like to advise all users to monitor their bidding practices.  Therefore, users should pay attention to their bidding practices and check their charges regularly.

---

[4]  As discussed later in this brief, QuiBids has no duty (and the FAC alleges no such duty) to make the particular disclosure plaintiff has incorrectly alleged was omitted.

The alleged "will lose money" omission extends to customers who purchased products through the Buy It Now feature.  For instance, the FAC alleges that the "Value Price" at which a consumer may exercise the "Buy it Now" feature "is typically higher than the best price for which the item could be purchased" elsewhere. FAC at ¶ 19.  However, QuiBids 101 (Exh. B at "Does QuiBids Make Excessive Profit on their Auctions") discloses this fact:

> **jmvenn Says:**                                 Friday June 11, 2010, 10:15 am
>
> As suggested, I've done my homework and now I have a question. It appears that your "retail market value" prices on a large number of products are typically higher than can be found if the identical item is purchased from a "retail" (not discount or auction) e-store. Please explain how QuiBids arrives at the retail market value. Thank you for the forum to ask questions and your commitment to transparency with your customers.
>
> **Erin@QuiBids Says:**
>
> The retail value of our items is determined by the cost of obtaining these products. We do not purchase our products wholesale or in bulk. All of our items are ordered through vendors (such as Amazon); because of this there are times when we have to apply a slight markup in order to cover ordering costs. In larger auction (auctions for pricier items) many users choose to use the Buy It Now option so that their bids do not go to waste. We do not profit from 'Buy it Nows', as our profit is earned through bid revenue. This markup, therefore, helps to cover these ordering costs. If we did not do this we would not be able to maintain our operations, or provide such amazing deals on products.

Plaintiff does not allege that QuiBids guaranteed that he would win an auction or save money by using the Site.  Indeed, QuiBids explicitly does <u>not</u> guarantee that bidders will win auctions, and reminds consumers:   "Remember, when purchasing bids you are buying the right to place bids and each bid is worth $0.60.   Purchasing bids doesn't guarantee you'll win …." (Exh. B at "How Does QuiBids Work").



> **Have Realistic Expectations**
>
> First, go into an auction with realistic expectations.  It is important to understand that the most expensive items also have the most competition.  Items that are over $1,000 in cost will often generate a lot of interest and bidding.  It is not uncommon for these items to have over 100 people bid on them during the life of the auction.  These auctions are high risk/high reward and they should be treated that way.  Winning these auctions with a small number of bids is possible and happens every day.  Recently, user SHILE06 won a Nikon D90 12.3MP DSLR Camera + Lenses with only 4 bids placed!  This is not the norm however.  Most users that win more expensive items have placed a significant number of bids before winning.  Feel free to try your hand at winning with only a few bids placed, but do so with the knowledge that the odds are small of successfully winning.

The FAQ section (Exh. C) advises that everyone can be a winner by exercising the "Buy it Now" feature and never having to pay more than the stated Value Price, but clearly states, "Not everyone, however, will win the auction at a large bargain."

> (ii)    **No one can know in advance the odds of winning an auction.**

In the elements of his claims, Plaintiff characterizes the second omission by alleging that QuiBids failed to disclose "the percentage of money spent by customers on the Site that is returned to customers in the form of merchandise."[5]  FAC, ¶¶ 44, 49, 53.  Elsewhere in the FAC, Plaintiff characterizes this alleged omission as failing to disclose the odds of winning an auction.  FAC, ¶¶ 4, 5, 22, 23.  While it is true that the Site does not state the percentage of money spent versus money returned to customers, the Terms & Conditions directly disclose that no one can calculate the odds of winning:

> **Odds of Winning Auctions**
> Every auction is unique and the results of all auctions offered on QuiBids depend on the number of users participating in such auctions and the skill of the users participating in the auctions; precise odds of winning are therefore unavailable.

Exh. A.  The Terms & Conditions also provide:

> You agree that use of QuiBids is at Your sole risk. . . . QuiBids makes ***no warranty as to the results*** that may be obtained from the use of QuiBids.  .  .  .  QUIBIDS MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND … AS TO … THE RESULTS THAT MAY BE OBTAINED FROM USE OF QUIBIDS."

Id. (under Disclaimer of Warranty and Liability Regarding Use of QuiBids).

While QuiBids is unable to calculate the odds of winning any particular auction, the Site reveals:  "About 30% of our new customers get a win within the first few days of using the site.  That number changes often, but we're striving to keep that percentage as high as

---

[5]  As discussed later in this brief, even if QuiBids were able to perform this calculation, QuiBids has no duty (and the FAC alleges no such duty) to make this particular disclosure.

possible."  (Exh. B at "How Does QuiBids Differ From Other Online Auctions").  The Site further advises:

- "Most users that win more expensive items have placed a significant number of bids before winning.  Feel free to try your hand at winning with only a few bids placed, but do so with the knowledge that ***the odds are small of successfully winning***."  (Exh. B at "Going After the 'Big One'") (emphasis added).

- "Although it is possible for someone to win the Apple Macbook with $20 in bids, it's ***highly unlikely***.  This is an ***unrealistic expectation*** that certain customers have.  We encourage everyone to set a realistic expectation of how much time and financial investment is necessary to win a big ticket item." (Exh. B at "How Do I Win More Auctions") (emphasis added).

Despite these disclosures, Plaintiff placed a few bids on various high-ticket items (FAC at ¶¶ 30-31), having been warned that his odds of succeeding were small.

### (iii)   The Site discloses that it is best to bid in the last 20 seconds.

Plaintiff complains that QuiBids fails to explain that it is most advantageous to bid in the final 20 seconds of auction for "high-ticket items."[6]  FAC at ¶ 6-7, 20, 44, 49, 53.  To the contrary, QuiBids 101 (Exh. B at "Does QuiBids Make Excessive Profit" and "How Does QuiBids Work?") makes this precise disclosure:



This fact is revealed in the FAQ section (Exh. C) as well:

---

[6]   As discussed later in this brief, QuiBids has no duty (and the FAC alleges no such duty) to make this disclosure.

> **What is the Best Way to Win an Auction?**
>
> Everyone wants to know how to improve their chances of winning an auction on QuiBids. There's not a guaranteed winning strategy, but here are a few tips to help you get started as well as a few tips on what not to do in an auction.
>
> Tips:
>
> ***Place your bid within the last 15 seconds***
> - Watch the timer and try to place your bid in the final seconds. By placing a bid in the last few seconds, you know the time will reset with you as the last bidder. If someone else bids, time will be added and you will have another chance to bid.

QuiBids 101 (Exh. B at "How Does QuiBids Work?") details how the clock works:

> **The Timer**
>
> The timer counts down consecutively until it gets below 0:20 seconds. From that point on the timer will reset to 0:20 seconds giving other bidders the chance to decide to make a final bid. At first the timer will reset to 0:20 seconds each time a user bids on the auction. If the auction is still going after a certain number of bids, we drop the timer to where it will reset to 0:15 seconds each time a user bids on the auction. Finally, if we feel the auction is going on for too long, we'll drop the timer to where it will reset to 0:10 seconds each time a user bids on the auction. When the timer reaches 0:00 the auction ends and the last person to place a bid wins the right to purchase the item for the final price.

> **Jill@QuiBids Says:**
>
> We add time to the clock when each bid is placed for a few reasons. First, without a timer reset, we would never collect enough bids back to cover our costs and therefore wouldn't be able to provide great deals to you and other users like we are currently able to. In addition, we want to give each user enough time to make a decision to bid instead of it being an impulse decision where there isn't enough time to think through their decision.
>
> **buzzyng Says:**                                    Thursday December 31, 2009, 9:39 am
>
> While at first it seems like just a way for Quibids to make more money by adding more time on the clock, it's actually a great way to have the bidders 'put some skin in the game'. Alot of people want things dirt cheap without risk or time ... the I want it now and not have to do anything syndrome. By having to be present and monitoring, we (the bidders) have to give of our time but in return, they (Quibids) provide us with great discounted products.
>
> **Jill@QuiBids Says:**
>
> We definitely want to give everyone a fair chance to bid on an item. That's the reason for the countdown, until a bidder bids, which then adds a little bit of time. As mentioned in our 'New to QuiBids section,' it's similar to the Going once...Twice... SOLD model. There's also more info on why time is added in the 'Auctions' section. Thanks for writing in. Happy Bidding!

Also contrary to the allegation in Paragraph 21 of the FAC, QuiBids 101 discloses, "One Bid-O-Matic bid will be used each time the timer drops below 20 seconds. The bid will be used somewhere between 0 seconds and 20 seconds." (Exh. B at "Bid-O-Matic: Revealed Even More"). This is also disclosed in the FAQ section (Exh. C at "How Does Bid-O-Matic Work?).

In addition to these disclosures, the Terms & Conditions note Plaintiff's agreement that, "By using QuiBids' services, You accept … the manner in which QuiBids operates" and that, "QuiBids makes no warranty as to the results that may be obtained from the use of QuiBids."   Exh. A (under General/Overview and under Disclaimer of Warranty and Liability Regarding Use of QuiBids).

### (iv)    The Site discloses that QuiBids controls the number and type of auctions shown to each user.

Plaintiff alleges that QuiBids failed to disclose that users could be directed to portions of the website that offer fewer or different auctions than are shown to other users.[7] FAC, ¶¶ 8, 9, 24, 44, 49, 53.  The Terms & Conditions, however, state:

> QuiBids reserves the right to show additional auctions to You at QuiBids sole discretion.

Exh. A (under Special Promotions).   Related to this issue, not only does QuiBids disclose that users could be directed to portions of the Site that offer fewer or different auctions, QuiBids further discloses (and users like Plaintiff accept in the Terms & Conditions) that QuiBids has the right, generally, to limit each user's auction activity:

> QuiBids reserves the right to limit the number of user accounts per household and the number of won auctions per user account. … QuiBids limits the number of auctions that a single user account can win in a 28 day period to a maximum of eight, excluding bid voucher auctions.  In addition, a single user account may only win or be winning a maximum of three auctions per 24 hour period. QuiBids also limits the number of times a user account can win an item over $285 in value during a 28 day period to one per item.  In addition, a user account may only win one item over $999.99 in a 28 day period.

Exh. A (under Eligibility).

---

[7]   As discussed later in this brief, QuiBids has no duty (and the FAC alleges no such duty) to make this disclosure.

**Summary.**  The foregoing catalogue of disclosures and information readily available on the Site belies the alleged failures to disclose on which Plaintiff bases each and every claim asserted in the FAC.   Because the alleged omissions and/or representations are contradicted by the Terms & Conditions and other information available on the Site, dismissal of all claims is appropriate.

### B.   QuiBids Was Under No Duty to Disclose the Alleged Missing Information.

A claim based on fraud or misrepresentation by omission, such as Counts I, II, and III in this lawsuit, requires that the Defendant be under a duty to disclose the information allegedly omitted.  See, e.g., United Food & Commercial Workers Union v. Chesapeake Energy Corp., 2010 WL 3527596, *5 (W.D. Okla. Sept. 2, 2010) ("To state a claim based on an omission of a material fact … a plaintiff must allege either an affirmative statement made misleading by virtue of an omission or omitted information which the defendant was legally obligated to disclose.").

Here, Plaintiff has not alleged, and is unable to show, that QuiBids was under any affirmative duty to disclose the allegedly omitted matters.  This Court recently dismissed for failure to state a claim a putative class action based on alleged common law fraud, deceptive trade practices and unfair trade practices arising from alleged omissions.  In Parks v. AT&T Mobility, LLC, No. CIV-09-212, 2010 WL 830000 (W.D. Okla. Mar. 4, 2010) (DeGiusti, J.), the plaintiff alleged that defendants advertised and sold him a computer at a significant discount on condition that the plaintiff subscribe to an AT&T data plan under a two-year contract.  The plaintiff alleged that the data plan was advertised at a rate of $60 per month, but that his charges actually were thousands more and it was impossible for the average consumer to determine what the additional charges would be.  The defendants moved to dismiss, attaching copies of the agreements and data plan referenced in the Complaint,

which showed that the plaintiff was given documentation that clearly stated additional charges would apply (even if the calculation of such additional charges was not clearly stated).

In analyzing the plaintiff's claims, the Court noted that a fraud claim "based on a nondisclosure of information requires the existence of a duty to disclose the information due to the peculiar circumstances of a particular case." Id. at *3 (citing numerous Oklahoma cases). The court dismissed the fraud claim because "the Complaint fails to allege sufficient facts to conclude that Defendants had a duty to disclose [the] rate plan structure to Plaintiff." Id. at *4. Similarly, this Court should dismiss Plaintiff's common law fraud claim (Count III) because Plaintiff has not alleged any facts from which this Court can conclude that QuiBids was under any duty to disclose the facts he claims were omitted.

With respect to the OCPA claims, the court in Parks found that the Complaint failed to allege facts showing any unethical or oppressive conduct and thus failed to state a claim for unfair trade practices. Id. The court likewise held that that Complaint failed to state a claim for deceptive trade practices because it had not sufficiently alleged an actionable omission or facts to suggest conduct that would reasonably be expected to deceive a customer. Id.

Similarly, in the present case, Plaintiff alleges no facts to support the allegation that "QuiBids' omissions … offend public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers" (FAC ¶ 49). Nor does Plaintiff allege any facts in support of the conclusory allegation that "QuiBids' omissions … deceived Plaintiff and the members of the Class or that could reasonably be expected to deceive or mislead a person to the detriment of that person" (FAC ¶ 44). Thus, this Court should dismiss Counts I and II for failure to state a claim.

Oklahoma courts have not addressed whether an OCPA claim arising from an alleged

omission must affirmatively plead a duty to disclose. However, courts in other jurisdictions have held, under comparable consumer protection acts, that "in order to support [an] unlawful trade practice claim on the basis of a failure to disclose, a plaintiff must show an affirmative duty to disclose." Alvarez v. Ins. Co. of North Am., 2006 WL 3702641 (E.D. Pa. Dec. 12, 2006) (dismissing claim under Rule 12(b)(6), without leave to amend, in absence of a duty to disclose).[8] Thus, it is well established that a plaintiff is required to allege facts showing a duty to disclose the alleged omissions that form the basis of a consumer protection act claim, which should apply to OCPA claims (as is the case for the fraud claim). Therefore, it is respectfully submitted that this Court should dismiss the OCPA claims due to Plaintiff's failure to allege any facts to suggest that such a duty exists.

### C.   Injunctive Relief Is Not Available Under the OCPA.

Counts I and II "seek[] an injunction requiring QuiBids to disclose the omitted information on the Site." (FAC at ¶¶ 46, 51). Counts I and II are the only counts alleged in the FAC that seek injunctive relief and both are brought under the OCPA.

---

[8]   See also Long v. Hewlett-Packard Co., 316 Fed. Appx. 585 (9th Cir. 2009) (affirming district court's dismissal of putative class action brought under California's consumer protection act because Defendant "owed Plaintiff no independent duty to disclose information about the elevated failure rate of laptops, absent a special relationship or affirmative misrepresentatives" and "Plaintiffs have alleged no special relationship"); Indust. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 46 (1st Cir. 1995) (reversing judgment for plaintiff, holding that "Because there was no fiduciary relationship, no duty to disclose existed and thus no cause of action lies under" the Massachusetts unfair trade practices statute where such claim was predicated on an alleged omission); Kellogg Square Partnership v. Prudential Ins. Co. of Am., 63 F.3d 699, 703 (8th Cir. 1995) ("The absence of a duty to disclose also dooms [plaintiff's] Uniform Deceptive Trade Practices Act claim," which claim was based on an alleged omission); Virgilio v. Ryland Group, Inc., 2009 WL 1606494, *6 (M.D. Fla. June 8, 2009) (dismissing deceptive and unfair trade practices claim under Rule 12(b)(6) based on alleged omission given that defendants were under no duty to disclose); Berger v. Allstate Ins. Co., 667 F.Supp.2d 738, 743 (E.D. Mich. 2009) (granting summary judgment on unfair trade practices claim based on omission, finding that the specification in the unfair trade practices act of a duty not to misrepresent did not create a duty to disclose; absent a duty to disclose, could not maintain claim for unfair trade practice based on non-disclosure); In re Enron Corp Sec. Derivative & "ERISA" Litig., 511 F. Supp.2d 742, 833 (S.D. Tex. 2005) (noting claim brought under Connecticut consumer protection act based on omission must allege a duty to disclose).

23

It is well established that the OCPA does not provide private litigants a right to seek injunctive relief.   It reserves that right to the Attorney General and district attorneys. Compare 15 OKLA. STAT. § 756.1(A)(2) (specifying that "[t]he Attorney General or a district attorney may bring an action: … to enjoin, or to obtain a restraining order against a person who has violated, is violating, or is likely to violate the [OCPA]"); with 15 OKLA. STAT. § 761.1(A) (specifying that "the aggrieved consumer shall have a private right of action *for damages ….*") (emphasis added).   The OCPA never references any private right of action other than one specifically for damages.   Conversely, the OCPA specifies that in "any action brought by the Attorney General or a district attorney, the court may:  (1) make such orders or judgments as may be necessary to prevent … a violation of the [OCPA]; … [and] (6) enjoin any person from engaging in business in this state …"  15 OKLA. STAT. § 756.1(D).   No similar provision of the OCPA empowers the district court to enter injunctions to prevent violations of the OCPA when a private action is commenced by a consumer.

The Oklahoma Supreme Court has recognized that "under the OCPA it is the Oklahoma Attorney General or a district attorney that may seek coercive relief, such as an injunction, to vindicate public rights to see to it that companies do not violate the provisions of the OCPA."  Tibbetts v. Sight n' Sound Appliance Centers, Inc., 2003 OK 72, ¶ 21, 77 P.3d 1042.  Because the OCPA does not provide private litigants with the right to injunctive relief, Plaintiff's request for injunctive relief, which arises solely from his OCPA claims, should be dismissed.

**D.    The Unjust Enrichment and Money Had and Received Claims are Derivative of Counts I, II, and III and, Accordingly, Should be Dismissed.**

Under Oklahoma law, unjust enrichment "is a condition which results from the failure of a party to make restitution in circumstances where it is inequitable; i.e., the party

has money in its hands that, in equity and good conscience, it should not be allowed to retain." Harvell v. Goodyear Tire & Rubber Co., 164 P.3d 1028, 1032 (Okla. 2006). Similarly, an action for "money had and received" "arises when one has received money which in equity and good conscience should be paid to another." Sholer v. State ex rel. Dept. of Public Safety, 945 P.2d 469, 475 (Okla. 1995). Such a claim that is derivative of other claims that have been summarily disposed of should likewise fail. See, e.g., Brill v. Walt Disney Co., 2010 WL 5011594, *5 (Okla. Civ. App. Aug. 23, 2010) (noting unjust enrichment claim was "merely derivative" of OCPA claim and "inasmuch as [plaintiff] cannot establish those claims as a matter of law, his derivative claims likewise fail").

Here, Counts IV (money had and received) and V (unjust enrichment) are derivative of Counts I, II, and III in that the alleged inequitable element is based on alleged omissions that were deceptive, unfair or fraudulent. As demonstrated above, there were no omissions. Thus, Counts IV and V likewise fail.

In addition, Plaintiff knowingly entered into a contract with QuiBids by agreeing to the Terms & Conditions explicitly stated on the Site, with full disclosure of how the auction process works. Plaintiff participated in the auction process and even won two auctions for voucher bid packs. FAC at ¶ 28. Plaintiff received the benefit of his bargain. "Having received the benefit of the bargain he agreed to, plaintiff has made no showing that there are inequitable circumstances justifying his claim of unjust enrichment." Monus v. Colorado Baseball 1993, Inc., 103 F.3d 145 (10th Cir. 1996) (table citation). Thus, these claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's First Amended Complaint should be dismissed.

Respectfully submitted,


*/s/ Michael D. McClintock*
Reid Robison, OBA #7692
Michael D. McClintock, OBA #18105
Tamara Schiffner Pullin, OBA #21462
McAfee & Taft A Professional Corporation
10th Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, OK  73102
Telephone:    (405) 235-9621
Facsimile:    (405) 235-0439

**ATTORNEYS FOR QUIBIDS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2011 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

**EDWARD L. WHITE, P.C.**
9301 Cedar Lake Ave., Suite 200
Oklahoma City, OK  73114
Telephone:   (405) 810-8188
Facsimile:   (405) 608-0971
Email:         ed@edwhitelaw.com

Roger L. Mandel
Blake L. Beckham
Jose M. Portela
Sarita A. Smithee
**BECKHAM & MANDEL**
3400 Carlisle Street, Suite 550
Dallas, TX  75204
rmandel@beckham-mandel.com
bbeckham@beckham-mandel.com
c2coast@aol.com
ssmithee@beckham-mandel.com

*s/ Michael D. McClintock*