## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

LAWRENCE A. LOCKE, individually  )
on behalf of all others similarly situated,  )
  )
               Plaintiff,  )
  )
-vs-  )    Case No.  CIV-10-1277-F
  )
QUIBIDS, LLC,  )
  )
             Defendant.  )

### ORDER

Before the court is the Motion to Dismiss (doc. no. 20) and the Motion to Strike (doc. no. 21), filed by defendant, QuiBids, LLC.  Also before the court is Plaintiff's Motion for Leave to File Second Amended Complaint (doc. no. 31).  Upon due consideration of the parties' submissions, the court makes its determination.

Introduction

Defendant, QuiBids, LLC, operates an interactive penny auction website that sells popular consumer products through two formats: an auction and a "Buy It Now" feature.  Plaintiff, Lawrence A. Locke, brings this action individually and on behalf of similarly situated individuals who lost money using defendant's website.  Specifically, plaintiff seeks to represent "a class of all customers for whom the total amount spent between purchasing bids, paying for any auction items won and paying for items purchased using the 'Buy It Now' feature exceeded the 'Value Prices' as stated on QuiBids.com of the items they received, if any."  First Amended Class Action Complaint, doc. no. 13, ¶ 5.  In the First Amended Class Action Complaint (herein sometimes: FAC), plaintiff alleges claims against defendant for violations of the Oklahoma Consumer Protection Act ("OCPA"), 15 O.S. § 751, *et. seq*., common

law fraud, money had and received and unjust enrichment.  Plaintiff's claims are premised upon defendant's alleged failure to disclose certain material facts on the website.  Plaintiff also seeks injunctive relief under the OCPA requiring defendant to disclose the alleged omitted information on its website.  Defendant, in its motion, seeks dismissal of the First Amended Class Action Complaint pursuant to Rule 12(b)(6) and Rule 8(a), Fed. R. Civ. P.

Standard of Review

The inquiry under Rule 12(b)(6), Fed. R. Civ. P., is whether the First Amended Class Action Complaint "'contains enough facts to state a claim for relief that is plausible on its face.'"  Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  To survive a motion to dismiss, plaintiff must nudge his claims across the line from conceivable to plausible.  Id.  The mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the First Amended Class Action Complaint must give the court reason to believe that plaintiff has a reasonable likelihood of mustering factual support for his claims.  Ridge at Red Hawk, 493 F.3d at 1177.  The court assumes the truth of plaintiff's well-pleaded factual allegations and views them in the light most favorable to plaintiff.  Id.  Pleadings that are no more than legal conclusions are not entitled to the assumption of truth; while legal conclusions can provide the framework of the First Amended Class Action Complaint, they must be supported by factual allegations.  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009).  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.  Id.

2

Under Rule 8(a)(2), Fed. R. Civ. P., a plaintiff's complaint must "show[] that the pleader is entitled to relief." This means that the plaintiff must allege enough factual matter, taken as true, to make his "claim to relief . . . plausible on its face." Bryson v. Gonzales, 534 F.3d 1282, 1286 (10th Cir. 2008) (quoting Twombly, 550 U.S. at 570.)

Summary of Plaintiff's Factual Allegations

Plaintiff alleges the following facts in the First Amended Class Action Complaint, which, as previously stated, the court assumes for present purposes to be true, viewing them in a light most favorable to plaintiff. Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177. Accordingly, the allegations summarized from this page to page 8 of this order are taken as true.

At its website, defendant offers an interactive service through which customers purchase bids and attempt to win various consumer goods, including high-ticket items (items with a retail value of $100 or greater) such as high-definition televisions, laptop computers, other electronic equipment and even automobiles. Defendant promotes itself as providing an opportunity for consumers to purchase luxury items at significant discounts compared to pricing at retail stores and E-Bay. Defendant claims that its customers typically save 80%-95% compared to retail prices. At any given time, defendant conducts auctions on dozens of high-ticket items. Auctions "typically last many hours and each item draws numerous bids, with high-ticket items drawing hundreds or thousands of bids." FAC, ¶ 1. Defendant has operated its website since at least October 2009.

Before a customer can place bids on defendant's website, the customer must register an account on the website. Only one account per customer is permitted. Once the account has been confirmed, the next step for the customer is to buy bids, which

are sold in "packs" of varying number.  There are five different sizes of bid packs to buy from defendant, and for all of them, the cost per bid is $.60.  However, customers may also obtain bids by participating in auctions for bid packs called "Vouchers" and the price per "Voucher" bid for customers winning such auctions may be less than $.60 per bid.  What the customer is purchasing is the right to place bids on particular auction items.  The purchase of bids is not a guarantee that the customer will win any auction.

The website's home page provides an "Ending Auctions" section that lists the auctions closest to ending.  A link is provided to numerous additional auctions which are not as close to ending.  Each of these auctions "has a time, a price, a bidder name, a picture of the product, and a colored banner with a cent number displayed in the upper right corner."  FAC, ¶ 16.

Whenever a customer bids during the last 20 seconds of an auction, additional time is added to the auction.  Initially, another 20 seconds is added.  At some point, defendant may reduce the amount of time added by an additional bid to 15 seconds.  After that, defendant may add only an additional 10 seconds for each additional bid.  Ten seconds will be added for every additional bid made until, finally, no more bids are made in the last 10 seconds.  The last bidder "wins" the auction and the right to purchase the item.

Each auction has a specified amount by which the purchase price of the item increases when a bid is placed.  In a one-cent auction, the purchase price will increase by $.01 each time a $.60 bid is placed by a consumer.  Each $1.00 increase in the purchase price of an item results in $60.00 additional revenue to defendant.  In a two-cent auction, the purchase price will increase by $.02 each time a bid is placed.  Each $1.00 increase in the purchase price of the item in the two-cent auction results in

4

$30.00 additional revenue to defendant.  The purchase price represents what the consumer who wins the auction will have to pay to obtain the product if the auction ends at that point.  An auction winner ultimately pays the cost of all the bids the consumer placed on the item, the purchase price of the item and shipping costs.

For a losing bidder, defendant offers a "Buy It Now" feature pursuant to which the product can be purchased at the "Value Price" stated on the website after the end of the auction.  The losing bidder gets a credit toward the purchase price for the cost of his losing bids.  The website represents that the "Value Price" reflects the price that the item would be found at other retailers.  That price is typically higher than the best price for which the item could be purchased on the internet or in retail stores.  For Apple products, plaintiff asserts that the "Value Price" is always higher than the price shown for the item on Apple's website.

Unlike traditional auctions, when one of defendant's customers bids on an item, the customer pays $.60 for each bid, regardless of whether or not the customer actually wins the item.  In a traditional auction, a consumer who bids $1.00 on an item but loses the auction does not pay the $1.00 losing bid.  In defendant's auction, however, a consumer may bid multiple times on an item and ultimately lose both the auction and the price paid to bid.

The most savvy of defendant's customers wait until the final 20 seconds to bid on high-ticket items.  However, auctions of high-ticket items open with many hours to bid, and many customers purchase and place bids in the hours before the final 20 seconds.  The website also offers customers the option on virtually all high-ticket items to have the website bid automatically for them pursuant to pre-set parameters by using the "Bid-O-Matic" feature.  Recognizing that bids made in the final 20 seconds it originally set for bidding in an auction of a high-ticket item are the only

bids with any chance of winning, defendant has designed the "Bid-O-Matic" feature so that it will only place bids within the final 20 seconds.

For the overwhelming majority of customers who use QuiBids, the money they will spend to purchase bids and pay for any items which they win will greatly exceed the retail value of any items they win and purchase. The existence of the "Buy It Now" feature does not change this fact. Even customers who regularly use that feature will end up paying more than the inflated "Value Prices," as stated on QuiBids.com, for the merchandise they receive.

When a prospective customer first visits defendant's website, the customer is shown a large number of auctions occurring, including a variety of highly desirable high-ticket items. However, once the customer registers with defendant, cookies are placed by the website on the customer's computer. When the customer goes back to the website, the cookies direct the customer to a portion of the website that offers fewer auction items to bid upon than the portion of the website seen by unregistered potential customers. If the registered user clears the cookie from the computer, the customer is directed to the main site seen by the unregistered potential customers. However, if the customer logs in, the customer is directed to a portion of the website that offers fewer auction items than are shown on the portion of the website seen by unregistered potential customers.

Plaintiff learned about defendant's website by reading publicly available news and magazine features in early-to-mid 2010. These sources emphasized that consumers could save an average of 80%, and up to 95%, on consumer products on defendant's website compared to the fair retail prices of those consumer products. Plaintiff first visited defendant's website on July 18, 2010. Plaintiff purchased the "Beginner Bid Pack" for $45.00. In return, he received 75 bids. Plaintiff also bid on

three bid packs called "25-bid Vouchers."  Plaintiff won two of the three vouchers he bid on and he paid a total of $6.11 for them.  All told, plaintiff spent $51.11 to purchase 125 bids, or $.41 per bid.

Plaintiff bid for several consumer products advertised on the website on July 18, 2010 and July 19, 2010, but he won none of the products despite using all of his bids.  Specifically, on July 18, 2010, plaintiff placed losing bids for consumer products as follows:

> 9 bids on a Nikon camera (high-ticket item), and
>
> 6 bids on an external hard drive.

On July 19, 2010, plaintiff placed losing bids for consumer products as follows:

> 1 bid on a HDMI cable;
>
> 10 bids on an HP Printer (high-ticket item);
>
> 64 bids on a LG 55" HDTV (high-ticket item); and
>
> 1 bid on a Nikon camera (high-ticket item).

Plaintiff made a number of bids on the high-ticket items before the final 20 seconds originally set for bidding.

Plaintiff's Claims

According to plaintiff, defendant failed to disclose material facts on its website, giving rise to claims for common law fraud and for violations of the OCPA. Specifically, plaintiff alleges that defendant failed to inform its customers (1) that the overwhelming majority of customers will lose money by using the website; (2) of the percentage of money spent by its customers that is returned to the customers in the form of merchandise; (3) that with respect to auctions of high-ticket items, bids placed for those items before the last 20 seconds originally set for bidding will inevitably be unsuccessful, and thus, a complete waste of money; and (4) that registered customers

will be directed to a part of the website that offers fewer auction items than the number of auction items shown to unregistered customers.  Plaintiff contends that these failures to disclose constitute violations of the OCPA because they constitute "deceptive trade practices" and "unfair trade practices" as defined by Section 752 of the OCPA.  For the asserted OCPA violations, plaintiff seeks to recover actual damages and reasonable costs and attorneys' fees.  He also seeks an injunction requiring defendant to disclose the omitted information on its website.  *See*, Count I and Count II of the First Amended Class Action Complaint.  As to the common law fraud claim, plaintiff alleges that the referenced omitted facts were material, that they were omitted by defendant with the intent that its customers would use the website and that they were reasonably relied upon by plaintiff in using the website.  Plaintiff alleges that the omitted facts proximately caused him to sustain actual damages, which he seeks to recover in this action.  *See*, Count III of the First Amended Class Action Complaint.

In addition, plaintiff alleges that the money he lost is money in defendant's possession, which in equity and good conscience should be returned to plaintiff and that the money spent by plaintiff constitutes a benefit conferred upon defendant, which as a matter of equity unjustly enriched defendant and should be returned to plaintiff.  *See*, Count IV and Count V of the First Amended Class Action Complaint.

As previously stated, plaintiff brings this action individually as well as on behalf of similarly situated persons who lost money using defendant's website.  Neither party has moved for a determination whether the action may be certified as a class action.  The court will not address the issue *sua sponte* in this order.  The court may rule on defendant's motion before deciding class certification.  *See*, David F.

Herr, Annotated Manual for Complex Litigation, Fourth, § 21.133 (2011); 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, § 7.15 (4th ed. 2002).

Grounds for Dismissal

Defendant seeks dismissal of the First Amended Class Action Complaint on the following grounds: (1) by participating in the website's auctions, plaintiff agreed to the "Terms & Conditions" published on the website, many of which directly contradict the alleged omissions; (2) in addition to the disclosures in the Terms & Conditions, the website at "OuiBids 101" and "Frequently Asked Questions" ("FAQ") repeatedly educates customers and discloses the type of information that plaintiff claims is missing; (3) plaintiff has not alleged and is unable to show that defendant was under a duty to disclose the alleged omitted information; (4) injunctive relief is not available to plaintiff under the OCPA as a matter of law; (5) the claims for money had and received and unjust enrichment are derivative of the OCPA and fraud claims and should be dismissed if those claims are dismissed; and (6) plaintiff cannot state a claim for money had and received or unjust enrichment because plaintiff received the benefit of his bargain and has not alleged facts to show that defendant has been unjustly enriched.

Discussion

A.  Injunctive Relief

In Count I and Count II of the First Amended Class Action Complaint (alleging violations of the OCPA), plaintiff "seeks an injunction requiring [defendant] to disclose the omitted information on the Site." *See*, First Amended Class Action Complaint, ¶¶ 46, 51. Defendant contends that a private litigant, such as plaintiff, is not entitled to seek injunctive relief under the OCPA. Such relief, defendant asserts, is reserved to the Attorney General of the State of Oklahoma and the district attorneys.

9

Plaintiff does not address defendant's arguments with respect to his claims for injunctive relief.  Pursuant to Rule 7.1(g) of the Local Civil Rules, the court deems defendant's motion confessed on this point.  And the court, upon independent review, concludes that plaintiff's request for injunctive relief for the alleged violations of the OCPA, Count I and Count II of the First Amended Class Action Complaint, is subject to dismissal.

## B.   Omissions

As stated, plaintiff relies upon four omissions to support his OCPA claims[1] and his fraud claim.[2]   The first omission is that the overwhelming majority of customers will lose money by using the website.  Defendant argues that three different sections of its website (Terms & Conditions, QuiBids 101 and FAQ)[3] set forth statements which disprove this alleged omission by disclosing that users may lose money in bidding on auctions and by disclosing that the price at which a customer may exercise

---

[1]  "Deceptive trade practice" is defined in the OCPA as a "misrepresentation, omission, or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."  "Unfair trade practice" is defined as "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  15 O.S. § 752 (13) and § 752 (14).

[2]  Fraud may be established by showing concealment of material facts which one is bound under the circumstances to disclose.  Thrifty Rent-A-Car Systems, Inc. v. Brown Flight, 24 F.3d 1190, 1195 (10th Cir. 1994).

[3]  With its motion, defendant submits as exhibits copies of the Terms & Conditions, QuiBids 101 and the FAQ.  Defendant requests the court to consider the exhibits in adjudicating the dismissal motion.  Plaintiff does not challenge the court's consideration of the exhibits or their authenticity.  The court concludes that it may consider the exhibits without converting defendant's motion into one for summary judgment.  "It is accepted practice that, "'if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claims, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.'"  Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 961 (10th Cir. 2001) (quoting GFF Corp. v. Associated Wholesale Grocers, 130 F.3d 1381, 1384 (10th Cir. 1997)).

the "Buy it Now" feature may be higher than the item could be purchased elsewhere. The subject statements are as follows:

> - Placing bids online at [the website] frequently or repeatedly can incur high costs. We would like to advise all users to monitor their bidding practices. Therefore, users should pay attention to their bidding practices and check their charges regularly.

Ex. 1-A to defendant's motion, Terms & Conditions, p. 6.

> - maryuofs Says:
>
> So you lo[se] the money even if you don't win?
>
> Jill@QuiBids Says:
>
> Correct. However, you only lose those bids if you do not exercise the Buy it Now. So, if you lose an auction, we advise to go ahead and purchase the item (retail value minus the cost of your bids placed).

Ex. 1-B to defendant's motion, QuiBids 101, comment 17 in Comments portion of "The 3 Biggest Mistakes Beginners Make," p. 140.

> - jmvenn Says:
>
> As suggested, I've done my homework and now have a question. It appears that your "retail market value" prices on a large number of products are typically higher than can be found if the identical item is purchased from a "retail" (not discount or auction) e-store. Please explain how QuiBids arrives at the retail market value. . . .
>
> Erin@QuiBids Says:

> The retail value of our items is determined by the cost of obtaining these products.   We do not purchase our products wholesale or in bulk.  All of our items are ordered through vendors (such as Amazon); because of this there are times when we have to apply a slight markup in order to cover ordering costs.  In larger auction[s] (auctions for pricier items) many users choose to use the Buy It Now option so that their bids do not go to waste.  We do not profit from 'Buy it Nows,' as our profit is earned through bid revenue.  This markup, therefore, helps to cover these ordering costs.  If we did not do this we would not be able to maintain our operations, or provide such amazing deals on products.

Ex. 1-B to defendant's motion, QuiBids 101, comment 55 of the Comments portion of "Does QuiBids Make Excessive Profit on their Auctions", p. 23.

> • Remember, when purchasing bids you are buying the right to place bids and each bid is worth $0.60.  Purchasing bids doesn't guarantee you'll win, but of course we have the "Buy it Now" feature.

Ex. 1-B to defendant's motion, QuiBids 101, "How Does QuiBids Work?", p. 89.

> • First, go into an auction with realistic expectations.  It is important to understand that the most expensive items also have the most competition.  Items that are over $1,000 in cost will often generate a lot of interest and bidding.  It is not uncommon for these items to have over 100 people bid on them during the life of the auction.   These auctions are high risk/high reward and they should be treated that way.  Winning these auctions with a small number of bids is possible and happens every day.  Recently, user SHILE06 won a Nikon D90 12.3MP DSLR Camera + Lenses with only 4 bids placed!  This is not the norm however.  Most users that win more expensive

items have placed a significant number of bids before winning.  Feel free to try your hand at winning with only a few bids placed, but do so with the knowledge that the odds are small of successfully winning.

Ex. 1-B to defendant's motion, QuiBids 101, "Going After the 'Big One,'" p. 28.

- Can Everyone be a Winner?

    Yes! If you don't win the auction, you will never have to go away empty handed.  Any time after you've placed your first bid in an auction, you can choose to buy the product for a discount using the Buy It Now.  This will help limit your losses so you don't have to leave with nothing.  You'll never have to pay more than the Value Price for any products on QuiBids.  Not everyone, however, will win the auction at a large bargain.

Ex. 1-B to defendant's motion, QuiBids 101, "FAQ," p. 64.

Plaintiff, in response, contends that defendant's tactic of parceling out nuggets of information in widely-spread out locations on its voluminous website, which theoretically could have been tracked down by a "dogged user," cannot prevent defendant's failure to plainly, directly and simply disclose the material facts from constituting deceptive and unfair trade practices.  Additionally, plaintiff asserts that even if the disclosures had all been found and read by a "dogged user," the disclosures do not disclose the material fact that the overwhelming majority of customers will lose money using defendant's website.  Plaintiff contends that knowing that a user "may" lose money is a far cry from knowing that the user almost certainly will lose money.

In reply, defendant asserts that it does not include on the website that the overwhelming majority of customers will lose money as that would be false.  But it

13

contends that it has disclosed the facts as to how a consumer may lose money on the site. And according to defendant, that disclosure is sufficient to disprove the alleged omission.

The court concludes that the alleged omission - that the overwhelming majority of defendant's customers will lose money using the website - is not disclosed by the statements cited by defendant. Read singularly or in combination, the statements cited by defendant do not reveal that the overwhelming majority of defendant's customers will lose money on defendant's website. Although defendant contends that the alleged omission is false, the court, taking the factual allegations of the First Amended Class Action Complaint as true, cannot conclude the website disproves the alleged omission.[4]

The second omission alleged by plaintiff is that defendant failed to inform its customers of the percentage of money spent by its customers that is returned to the customers in the form of merchandise. Plaintiff contends that if defendant were to disclose the percentage of money spent by customers on the website that is returned in the form of merchandise, this would bring home the realization that use of the website is a losing proposition for customers. In its motion, defendant admits that the website does not state the percentage of money spent by customers versus the money returned to customers in merchandise. However, defendant contends that the Terms & Conditions directly disclose that no one can calculate the odds of winning an auction and that defendant makes no warranty as to the results that may be obtained from the use of the website. While defendant is unable to calculate the odds of

---

[4] As will be seen, issues with respect to the existence of a duty to disclose are discussed separately in Part C, below. At this point, the court addresses only the question of whether – aside from issues as to duty to disclose – the plaintiff may proceed on the basis of the omissions he has pleaded.

winning, defendant states that the website reveals that "about 30% of our new customers get a win within the first few days of using the site.  That number changes often, but we're striving to keep that percentage as high as possible."  Ex. 1-B to defendant's motion, QuiBids 101, "How Does QuiBids Differ From Other Online Auctions," p. 82.  Defendant also contends that as to high-ticket items, it discloses that "the odds are small of successfully winning" with only a few bids placed and that it is "highly unlikely" for someone to win the Apple Macbook with $20 in bids.  Ex. 1-B at defendant's motion, QuiBids 101, "Going After the Big One," p. 28 and "How Do I Win More Auctions," p. 72.

In response, plaintiff contends that the cited statements by defendant do not disprove the alleged omission.  Plaintiff asserts that from those statements, the user would not gather that defendant takes in far more money from users than the value of merchandise delivered.

The court agrees with plaintiff that the cited statements by defendant are not sufficient to disprove the alleged omission.  Plaintiff may therefore proceed with respect to this alleged omission.

The third omission alleged by plaintiff is that, with respect to auctions of high-ticket items, bids placed for those items before the last 20 seconds originally set for bidding will inevitably be unsuccessful – and thus a complete waste of money.  Defendant contends that the website discloses that it is best to bid in the last 20 seconds of an auction.  Specifically, it asserts that QuiBids 101 discloses that it is good strategy to wait until "the last couple of seconds" or until the "last 5 seconds" to bid on the item and details how the timer works.  Ex. 1-B, QuiBids 101, comment 21 of the Comments portion of "Does QuiBids Make Excessive Profit," at p. 18  and comment 74 of the Comments portion of "How Does QuiBids Work?" at p. 103 and

"How Does QuiBids Work?" at p. 89.  It also asserts that the FAQ section discloses that the best way to win an auction is to "[p]lace your bid within the last 15 seconds." Ex. 1-B to defendant's motion, FAQ, p. 55.  In addition, defendant contends that the Terms & Conditions state that the customer "accept[s] . . . the manner QuiBids operates" and that "QuiBids makes no warranty as to the results that may be obtained from the use of QuiBids."  Ex. 1-A to defendant's motion, Term & Conditions, pp. 1 and 4.

Plaintiff, in response, contends that the referenced statements at most state that the  "best strategy" for wining an auction is to place a bid within the last 15 seconds. Plaintiff asserts that saying that it is the "best strategy" to place a bid in the last 15 seconds is not the same as saying that bids placed before that time will inevitably be unsuccessful and thus a waste of money.  According to plaintiff, the failure to disclose the futility of placing a bid prior to 20 seconds could be found by a reasonable finder of fact to be deceptive and unfair.

The court concludes that the cited statements on the website are not sufficient to disprove the alleged third omission.  Although the statements indicate that placing bids within the last 15 seconds is the best way to win the auction, it does not reveal that placing bids prior to 20 seconds will be unsuccessful and a waste of money for the participant.

The fourth and final omission is that registered customers will be directed to a part of the website that offers fewer auction items than the number of auction items shown to unregistered customers.  Defendant contends that the Terms & Conditions disclose that defendant reserves the right to show additional auctions to the user at its sole discretion and that it reserves the right to limit the number of user accounts per

16

household and the number of won auctions per user account.  Ex. 1-A to defendant's motion, Terms & Conditions, pp. 1 and 3.

Plaintiff counters that these statements do not disclose that the registered user will receive a different and smaller set of auctions to bid in than those shown to the user before he registered.

The court concludes that the website disclosures do not disprove the fourth alleged omission that registered customers will be directed to a part of the website that offers fewer auction items than the number of auction items shown to unregistered customers.

Based upon the foregoing, the court concludes that plaintiff may proceed with respect to these alleged omissions.  However, the court also notes that plaintiff also argues, in briefing, that even if the court were to find defendant actually disclosed the alleged omitted facts in spread-out locations on its website, the court cannot conclude that defendant can avoid liability under the OCPA based upon the "net impression" doctrine.  According to plaintiff, the Home Page and the Registration Page create the overwhelming and false impression that a typical user will routinely win the right to buy valuable merchandise at significant discounts and that the overwhelming majority of users will benefit financially from using QuiBids.  Plaintiff contends that the Home Page and the Registration Page are deemed incorporated in the First Amended Class Action Complaint as a matter of law.  Plaintiff points out that the Home Page and the Registration Page do not suggest that the user should read QuiBids 101 or the FAQ before registering or beginning to bid.  And the Registration Page does not require the user to read the Terms & Conditions in order to register.  Plaintiff asserts that defendant's website is specifically designed to channel customers to bidding without reading QuiBids 101, the FAQ and the Terms & Conditions.  Moreover, plaintiff

asserts that the website requires extensive clicking and scrolling in order to find defendant's purported disclosures of the alleged material omissions. Given that the Home Page and the Registration Page are designed to lead to the impression that any user is highly likely to win the right to purchase valuable merchandise, plaintiff contends that a net impression is falsely created that the overwhelming majority of customers will financially benefit from using QuiBids, despite defendant's purported disclosures in other parts of the website. In light of these circumstances and based upon the authority of <u>Donaldson v. Read Magazine, Inc.</u>, 333 U.S. 178 (1948), plaintiff contends that defendant cannot avoid liability under the OCPA by arguing that a user could have figured out the truth from statements buried in defendant's website.

Plaintiff also contends that defendant's purported disclosures do not save it from common law fraud liability under the "buried facts" doctrine. According to plaintiff, courts, in the context of securities fraud statutes, have applied the "buried facts" doctrine to hold that disclosures made in a fragmented fashion and buried in a voluminous document do not suffice to avoid liability for fraud by omission. Plaintiff contends that the "buried facts" doctrine should be applied in this case and that the court should accordingly conclude that defendant cannot avoid common law fraud liability by burying information in numerous different places on its website (i.e. QuiBids 101, FAQ and Terms & Conditions) when a net impression is left by the Home Page and Registration Page that is false, i.e. that a typical user can expect to easily win multiple auctions and purchase valuable merchandise at huge discounts and thereby derive financial benefit from using the website.

The court concludes that plaintiff cannot rely upon the "net impression" and "buried facts" doctrines to support liability against defendant for the alleged OCPA

violations and common law fraud.  Plaintiff has not alleged sufficient facts in the First Amended Class Action Complaint to support these doctrines.  Even if plaintiff could rely upon the Home Page and the Registration Page without the necessity of any allegations in the First Amended Class Action Complaint, which the court questions, plaintiff has not identified any language from these pages that falsely creates the impression that a typical user can expect to easily win multiple auctions and purchase valuable merchandise at huge discounts and derive financial benefit from the website. Therefore, the court concludes that the "net impression" and "buried facts" doctrines do not provide a basis for liability for plaintiff's claims asserted in the First Amended Class Action Complaint.

C.  Duty to Disclose

        Defendant contends that even if it failed to disclose any of the allegedly omitted matters, plaintiff cannot succeed on his OCPA and common law fraud claims because defendant had no duty to disclose the alleged missing information.  Defendant contends that a common law claim based upon fraud by omission requires that a defendant be under a duty to disclose the information allegedly omitted.  According to defendant, plaintiff has not alleged and is unable to show that defendant was under any affirmative duty to disclose the omitted matters.  Although the Oklahoma courts have not addressed whether an OCPA claim based upon an omission must affirmatively plead a duty to disclose, defendant maintains that courts in other jurisdictions have held under comparable consumer protection acts that a plaintiff must show an affirmative duty to disclose.  Because the First Amended Class Action Complaint does not allege any facts to support a finding that an affirmative duty to disclose the alleged omissions exist, defendant contends that dismissal is warranted. Further, defendant contends that dismissal is warranted because the First Amended

Class Action Complaint fails to allege facts to support the conclusory statements that defendant's omissions "offend public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to customers" or that defendant's omissions "deceived Plaintiff and members of the Class or that could be reasonably expected to deceive or mislead a person to the detriment of that person." *See*, First Amended Class Action Complaint, ¶¶ 49, 44.

Plaintiff contends that the OCPA's wording, its liberal construction by the Oklahoma Supreme Court, and the court's ruling in Parks v. AT&T Mobility, LLC, No. CIV-09-212-D, 2011 WL 102543 (W.D. Okla. Jan. 12, 2011) ("Parks II"), support a finding that an omission is actionable under the OCPA without a showing of a common law duty to disclose.  In addition, plaintiff asserts that other courts in other jurisdictions have concluded that omissions can constitute deceptive or unfair acts without regard to the existence of a common law duty of disclosure.  In any event, plaintiff contends that he has alleged sufficient facts supporting a common law duty to disclose based upon the incorporation of the Home Page and the Registration Page in the First Amended Class Action Complaint, which show representations by defendant which create a false impression and which establish "peculiar circumstances" between the parties.

As to the common law fraud claim, the court concludes that plaintiff has failed to allege sufficient facts to establish a duty to disclose on the part of defendant.  Even if the Home Page and Registration Page were incorporated without the necessity of any specific allegations, plaintiff has not identified any statements on these pages which create a false impression as suggested by plaintiff and which establish "peculiar circumstances" giving rise to a common law duty to disclose.  Because plaintiff has not alleged sufficient facts to give rise to a common law duty to disclose, the court

finds that plaintiff cannot succeed on his common law fraud claim based upon the alleged omissions. Thrifty Rent-A-Car Systems, Inc., 24 F.3d at 1195.

As to the OCPA claim based upon a deceptive trade practice, the court concludes that this claim also fails because there are insufficient facts giving rise to a duty to disclose the alleged omitted facts. The OCPA defines a deceptive trade practice as a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person." 15 O.S. § 752(13). Although the OCPA is remedial and must be liberally construed, see, Patterson v. Beall, 19 P.3d 839, 846 (Okla. 2000), the court concludes that an omission can "deceive" or "reasonably be expected to deceive" only, if in light of all the circumstances, there is a duty to disclose the omitted matter. See, Normand Josef Enterprises, Inc. V. Conn. Nat'l Bank, 230 Conn. 486, 523, 646 A.2d 1289, 1307 (1994) (addressing the Connecticut Unfair Trade Practices Act, which is remedial and so construed, and stating that "[a] failure to disclose can be deceptive only if, in the light of all the circumstances, there is a duty to disclose.") The court rejects plaintiff's argument that the Parks II decision supports a finding that a duty to disclose is not required for an omission to be actionable under the OCPA's definition of a deceptive trade practice. In concluding that the plaintiff in Parks II had stated a claim under the OCPA based upon a deceptive trade practice, the court found that the plaintiff had stated a common law fraud claim and further found that plaintiff had incorporated the facts supporting the common law fraud claim in the OCPA claim. Parks, 2011 WL 102543 at *3 and *4. Therefore, plaintiff had included factual allegations supporting a duty to disclose for the OCPA claim.[5] Because the First Amended Class Action

---

[5] In his briefing, plaintiff has cited cases from other jurisdictions which have concluded that a duty to disclose is not required for an omission to be a deceptive act. The court finds those

Complaint fails to allege sufficient facts to give rise to a duty to disclose on the part of defendant, the court concludes that dismissal of the OCPA based upon deceptive trade practice is appropriate.

As for the OCPA claim based upon an unfair trade practice, the court also concludes that dismissal is appropriate. The court concludes that the facts alleged in the First Amended Class Action Complaint are not sufficient to demonstrate "any practice which offends established public policy" or a practice which is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." 15 O.S. § 752(14). Therefore, the court concludes that dismissal of Count 1, Count II and Count III is appropriate under Rule 12(b)(6) and Rule 8(a).

D. Money Had and Received and Unjust Enrichment Claims

Defendant contends that plaintiff's money had and received and unjust enrichment claims are derivative of Count I, Count II and Count III in that the "inequitable" element for those claims is based on the omissions asserted in those counts. Plaintiff disagrees. Plaintiff argues that an innocent non-disclosure is sufficient to support a claim for unjust enrichment.

The court agrees with defendant that these claims are pled so as to make them derivative of the other claims. Because the dismissal of those claims is appropriate, the court likewise concludes that dismissal of the money had and received and unjust enrichment claims are appropriate. Therefore, the court finds that Counts IV and V should be dismissed under Rule 12(b)(6) and Rule 8(a).

Motion to Strike

Defendant seeks, pursuant to Rule 12(f), Fed. R. Civ. P., to strike allegations from the First Amended Class Action Complaint which it contends are immaterial and

decisions to be unpersuasive.

impertinent to plaintiff's claims and are inflammatory and potentially prejudicial to defendant. These allegations include allegations that the auctions on the website constitute gambling and that counterclaims have been brought against defendant by a competitor. In light of the fact that the court has concluded that all of the claims in the First Amended Class Action Complaint are subject to dismissal under Rule 12(b)(6) and Rule 8(a), the court concludes that defendant's motion should be denied as moot.

<u>Plaintiff's Motion for Leave to File Second Amended Complaint</u>

Plaintiff seeks leave, pursuant to Rule 15, Fed. R. Civ. P., to file a second amended class action complaint. Specifically, plaintiff seeks leave to file a second amended class action complaint to assert that defendant engages in "commercial gambling" in violation of Oklahoma law, which is actionable by plaintiff and the proposed class as a violation of the OCPA. Plaintiff also desires to allege partial, misleading representations on the Home Page and the Registration Page and "peculiar circumstances" to show the existence of a common law duty to disclose for purposes of establishing the common law fraud claim and the OCPA claims.

Defendant objects to the proposed second amended class action complaint on the basis of prejudice and futility. Defendant contends that the proposed amended complaint does not cure the pleading defects of the First Amended Class Action Complaint and that it ineffectively attempts to state a new highly prejudicial claim. As to the former, defendant asserts that the new allegations that attempt to create a factual basis for the "net impression" doctrine are futile. Defendant contends that plaintiff does not explain why the court would be permitted to look only to the Home Page and the Registration Page, and not to the entirety of the website, in evaluating the overall net impression of the website. Defendant asserts that asking the court to

23

look only to two links from the entire website is facially contrary to the overall net impression standard.   In addition, defendant contends that the "net impression" doctrine arises out of the Federal Trade Commission Act to apply to mail and print solicitations.   Defendant points out that the doctrine has not been adopted by Oklahoma to apply to the OCPA.   Further, defendant contends that the website does not describe a service different from that actually offered.   Defendant maintains that the disclosures on its website are conspicuous, obvious and clear.   Finally, it contends that the statements relied upon by plaintiff in the Home and Registration Pages are merely puffing, which are not actionable as misrepresentations, and are not false.

Defendant contends that the purported new claim in the second amended class action complaint, based upon allegations that defendant's auction constitutes illegal gambling or a lottery, is also futile for three reasons.   First, defendant asserts that Oklahoma's anti-gambling statute is found in the penal code, specifically, 21 O.S. § 982, and includes no private right of action for its violation.   In contrast, defendant points out that the Consumers Disclosure of Prizes and Gifts Act, 21 O.S. § 996.3, which is found within the same series of statutes as § 982, provides that any violation of the Act shall constitute an unlawful practice pursuant to the provisions of the OCPA.   Because the Oklahoma legislature specified that a claim exists under the OCPA for violation of § 996.3 and not § 982, defendant contends that the legislature did not intend, in enacting § 982, to give rise to a claim under the OCPA.   Second, defendant contends that participation in one of defendant's auctions is dominated by the exercise of skill, not of chance, and thus, does not constitute commercial gambling as a matter of law.   Third, defendant asserts that plaintiff's gambling claim is barred by the doctrine of *in pari delicto*.   According to defendant, by placing a "bet" with

defendant, plaintiff violated the Oklahoma gambling statutes and he thus cannot maintain a claim based upon defendant's alleged violation of the gambling statutes.

Plaintiff, in reply, argues that his reliance upon the Home and Registration Pages is fair in that a visitor to defendant's website initially reaches the Home Page and the Home and Registration Pages are designed to funnel customers directly into bidding without reviewing the other voluminous materials on defendant's website. Plaintiff contends that his primary, but not exclusive, focus on the Home and Registration Pages for the "net impression" created by the website is appropriate. As for the gambling allegations, plaintiff contends that, as to Count II (deceptive trade practices under the OCPA) and Count III (common law fraud), he only complains of failure to disclose – *viz.*, failure to disclose that the website constitutes a lottery or other form of commercial gambling – and not that defendant is conducting illegal gambling. Thus, plaintiff contends that defendant's argument that illegal gambling is not actionable under the OCPA, and its assertion of the *in pari delicto* defense, do not preclude plaintiff's claims under Count II and Count III. As to Count II (unfair trade practice), plaintiff contends that defendant's auctions involve "chance" and therefore, defendant is engaged in commercial gambling, for which reason his allegations of violation of the OCPA and common law fraud are not futile.

The court concludes that plaintiff should be permitted to amend his complaint. The court, in ruling on the motion to dismiss challenging the First Amended Class Action Complaint, has concluded that defendant's website does not disprove the four omissions alleged by plaintiff. While the court concluded that plaintiff has not alleged sufficient facts to establish a duty to disclose the omissions and, therefore, that the omissions were not actionable under common law fraud or the OCPA, the court concludes that plaintiff should be given an opportunity to set forth facts which allege

partial, misleading representations on the Home Page and the Registration Page or other "peculiar circumstances" which establish a duty to disclose on the part of defendant for purposes of establishing the common law fraud claim and the OCPA claims. The court is not convinced at this point that it would be futile for plaintiff to file a second amended class action complaint in order to establish a duty of disclosure on the part of defendant with respect to the alleged omissions.

As to the OCPA claim and common law fraud claim predicated upon a failure to disclose that defendant is engaged in illegal gambling, the court cannot say that the addition of these claims would be futile. Defendant has not shown that the alleged omission is disproved by the website. The court concludes that plaintiff should be given the opportunity to allege facts to show a duty to disclose the alleged omission. The court is also not convinced that defendant has shown as a matter of law that chance is not a material element of defendant's auctions.

The court also cannot say that the addition of plaintiff's OCPA claim predicated upon defendant engaging in illegal gambling would be futile. The OCPA defines an unfair trade practice as "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." 15 O.S. § 752(14). As pointed out by plaintiff, the prohibition against commercial gambling, 21 O.S. § 982, is contained in Title 21, Part IV, "Crimes Against Public Decency and Morality." The court concludes that a violation of § 982 can fall within the definition of an unfair trade practice. The court rejects defendant's argument that inclusion of 21 O.S. § 996.3 as a basis for assertion of a violation of the OCPA, and not § 982, requires a finding that a violation of § 982 cannot be actionable under the OCPA. The court simply cannot conclude that the legislature intended, by including private-right-of-action language in § 996.3, to preclude violations of other

26

statutes, including criminal statutes, from constituting unlawful practices under the OCPA. As pointed out by plaintiff, other courts have concluded that a violation of a criminal statute can constitute a violation of a consumer protection act. *See*, *e.g.*, Schwartz v. Upper Deck Co., 967 F. Supp. 405, 415-416 (S.D. Cal. 1997); In Re Tavares, 298 B.R. 195, 202-203 (Bank. R. D. Mass. 2003); Johnson v. Collins Entertainment Co., Inc., 564 S.E.2d 653, 665-666 (S.C. 2009); *see also*, Kewaunee Scientific Corp. v. Pegram, 503 S.E.2d 417, 420 (N.C. App. 1998). The definition of "unfair trade practice" is very broad and the court rejects defendant's argument that a violation of § 982 cannot constitute an "unfair trade practice." The court also concludes that defendant has not shown as a matter of law that the defense of *in pari delicto*, based upon an alleged violation of 21 O.S. § 942,[6] would apply to this case. Further, the court concludes that defendant has not shown that chance is not a material element of participation in its auctions.

Therefore, the court concludes that plaintiff should be permitted to file a second amended class action complaint to cure the deficiencies of his First Amended Class Action Complaint as set forth in this order. The court is not convinced that defendant is any way prejudiced by the filing of the second amended class action complaint at this juncture. This case is still in its infancy. The court, in granting plaintiff leave to amend, will allow plaintiff to include additional allegations to support his claims,

---

[6] Section 942 provides in pertinent part:

> Any person who bets or plays at any of said prohibited games, or who shall bet or play at any games whatsoever, for money, property, checks, credits or other representatives of value with cards, dice or any other device which may be adapted to or used in playing any game of chance or in which chance is a material element, shall be guilty of a misdemeanor . . . ."

including his new claims, not currently set forth in his proposed second amended class action complaint, now that he has the benefit of the court's rulings in this order.

Conclusion

Based upon the foregoing, Defendant's Motion to Dismiss (doc. no. 20) is **GRANTED**.  Defendant's Motion to Strike (doc. no. 21) is **DENIED** as **MOOT**. Plaintiff's Motion for Leave to File Second Amended Complaint is **GRANTED**. Plaintiff shall file his Second Amended Class Action Complaint within 25 days from the date of this order.

DATED December 29, 2011.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

10-1277p009.wpd