# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LAWRENCE A. LOCKE, MATTHEW BROWN and CHRISTOPHER LLOYD, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | CIVIL NO: **5:10-CV-01277-W** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| QUIBIDS, LLC, and QUIBIDS, HOLDINGS, LLC, | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT

TO THE HONORABLE COURT:

Plaintiffs Lawrence A. Locke, Matthew Brown and Christopher Lloyd, on behalf of themselves and all other persons similarly situated, by the undersigned attorneys, allege the following against Defendants QuiBids, LLC, and QuiBids Holdings, LLC (collectively referred to herein as "QuiBids"), based on their personal knowledge as to themselves and their own acts and on information and belief as to all other matters.

## NATURE OF ACTION

1.      Plaintiffs bring a class action arising from QuiBids' operation of QuiBids.com (the "Site"), an interactive website on which consumers are enticed to buy 'bids' for use in on-line "auctions" of consumer products with the promise of obtaining those consumer products at significant discounts from retail prices. The Site offers consumers the chance to bid on a variety of consumer products, including high-ticket items (items with a value stated by QuiBids as $100 or more) such as high-definition televisions, laptop computers, other electronic equipment, and even automobiles. At any given time, the Site is conducting hundreds of auctions, including dozens of these high-ticket items. The auctions typically last many hours, sometimes even days, and each item on average draws close to approximately 300 bids, with high-ticket items on average drawing close to approximately 1,700 bids and items with a stated value of $1,000 or more on average drawing approximately 14,900 bids. There are an average of approximately 55 bidders per auction, with high-ticket items on average drawing

approximately 124 bidders and items with a stated value of $1,000 or more drawing on average approximately 779 bidders.  Each bid purchased from QuiBids costs $0.60.  In the auctions, each $0.60 bid placed by a consumer raises the purchase price of the item by either $.01 or $.02, depending on the format of the auction.

2.      QuiBids promotes itself (on the Site, through widespread internet and television advertising and emails) as providing an opportunity for consumers to purchase luxury items at significant discounts compared to retail stores and E-Bay, and it claims that its customers typically save 80%-95% compared to retail prices.  In one e-mail promotion, QuiBids cited a customer purchasing a $20,000 Honda Civic automobile for $1,740.78 in a two-cent QuiBids auction.  That price means QuiBids sold 87,039 bids which were used in that auction.  At $0.60 per bid, QuiBids grossed $52,233.40 from the bids alone, an amount that dwarfs not only any savings realized by the winning bidder individually, but the retail cost of the car.  This illustrates the critical difference between QuiBids and E-Bay – losing bidders on E-Bay do not pay anything.

3.      That critical difference means that QuiBids is receiving bets under Oklahoma law and makes QuiBids' "auctions" into a lottery under Oklahoma law, such that QuiBids is violating Oklahoma law by engaging in commercial gambling.  Simply put, because each bid costs $.60, consumers spend money to place bets with QuiBids in the hopes of winning a prize – a consumer product at a significant discount – based upon chance.  QuiBids is distributing property by chance among numerous persons who have paid valuable consideration for the chance of obtaining such property.  Under the system set up by QuiBids, most consumers using the Site will not win a significant percentage of

the auctions for low-ticket items on which they bid and will rarely, if ever, win auctions of high-ticket items.   Thus, as is true with traditional gambling, the overwhelming majority of customers who use the Site will lose money doing so; that is, the total amount they spend between purchasing bids, paying for any merchandise from auctions they win and paying for any merchandise they purchase using the "Buy It Now" feature (explained below) will exceed the "Value Prices" as stated on the Site of the merchandise they receive, if any.

4.   Unlike a traditional gambling website, a traditional lottery, or a casino, however, the Site does not disclose its true nature as gambling.   It also does not disclose the very low probability of a customer receiving a financially positive outcome from using the Site.   In contrast, the odds of winning a lottery are calculable and publicized. Likewise, the payback percentages of various casino games are calculable and widely available.   Indeed, slot machines are regulated as to the percentage of money put into them that they will pay back.   Nowhere on the Site, however, does QuiBids provide information on what percentage of the money spent by its customers is returned to the customers as merchandise, nor does QuiBids provide any basis for calculating same.

5.   QuiBids' failures to disclose that its operation constitutes commercial gambling, including a lottery, that the overwhelming majority of customers will lose money by using the Site, and the percentage of money returned to customers as merchandise constitute violations of the Oklahoma Consumer Protection Act and common law fraud under Oklahoma law.   Furthermore, regardless of disclosure, QuiBids' conduct of commercial gambling, including a lottery, violates the Oklahoma

Consumer Protection Act.  Plaintiffs seek to represent a class of all persons who lost money using the Site; that is, a class of all customers for whom the total amount spent between purchasing bids, paying for any auction items won and paying for items purchased using the "Buy It Now" feature exceeded the "Value Prices" as stated on the Site of the items they received, if any.

6.    QuiBids additionally fails to disclose material facts about bidding on high-ticket items (items with a retail value of $100 or more).  In the bidding on any high-ticket item, multiple bids will always be made during the last 20 seconds of the time originally set for bidding by QuiBids.  This is true for two reasons: (1) because it is a wise bidding strategy adopted by many bidders, and (2) because the Site has a "Bid-O-Matic" feature whereby customers can have the Site automatically bid for them on virtually all auctions of high-ticket items, and the Bid-O-Matic feature only bids when there are 20 seconds or less left in the auction.  As a consequence, on a high-ticket item, any bid placed before the last 20 seconds originally set for bidding by QuiBids will never succeed in winning the auction and is a complete and utter waste of money.  Notably, the Site does not disclose that any bid placed on a high-ticket item prior to the last 20 seconds originally set for bidding by QuiBids is inevitably a waste of money.  This failure to disclose is a violation of the Oklahoma Consumer Protection Act and constitutes common law fraud under Oklahoma law.  On behalf of the proposed class, Plaintiffs asserts this additional claim.

7.    When a potential new customer of QuiBids visits the Site, the customer sees a large number of attractive auction items.  When a customer registers with the Site,

it places cookies on the customer's computer.  When the customer goes back to the Site, the cookies direct the customer to a different part of the Site that offers less auction items than the Site shows to persons visiting the Site who have not registered with the Site and, thus, do not have the cookies on their computer.  If a customer clears the cookies before going to the Site, the customer sees the Site as seen by an unregistered potential customer.  However, even then, if the customer logs into the Site, he or she is directed to a portion of the Site that offers less auction items than the number of auction items shown to persons without cookies on their computer who have not logged in.  Nowhere on its Site does QuiBids disclose that registered customers will be directed to a part of the Site that offers less auction items than the number of auction items shown to potential customers who are not registered with QuiBids, a classic "bait and switch" tactic.  This failure to disclose is a violation of the Oklahoma Consumer Protection Act and constitutes common law fraud under Oklahoma law.  On behalf of the proposed class, Plaintiffs assert this additional claim.

8.     QuiBids had the obligation to disclose to its customers the omitted facts for two reasons.  First, it had the obligation based upon the partial disclosures made by it on its Site which conveyed the false impressions that (i) users of the Site would routinely win merchandise at significant discounts and, thereby, financially benefit from using the Site, (ii) bidding on high-ticket items before the last 20 seconds could win auctions, (iii) the "Value Prices" of merchandise shown on the Site were the prices at which the merchandise could be purchased from retailers, and (iv) users of the Site would be able to bid on all of the auctions shown to a non-registered visitor to the Site.  Disclosure of the

omitted facts was necessary correct those false impressions.   Second, QuiBids had a duty

to disclosure the omitted facts because it is a highly sophisticated entity regarding its Site

and its auction practices with knowledge of (i) exactly what percentage of users will win

auctions and, particularly, what percentage will win high-ticket items, (ii) the percentage

of money spent by customers returned to them in the form of merchandise, (iii) the fact

that bidding on high-ticket items before the last twenty seconds of an auction originally

set by QuiBids is a complete waste of money, (iv) that the "Value Prices" shown on the

Site actually typically exceed the prices for which the merchandise can be purchased

from retailers, and (v) the placement of users in different parts of the Site with less

available auctions than are shown on the Home Page.   QuiBids' customers, in contrast,

have no way of knowing these particular facts which would be so relevant to their

decisions as to whether to use the Site at all, and, if so, how.   This inequality in

sophistication and in knowledge constitutes "peculiar circumstances" which imposed a

duty to disclose on the part of QuiBids.

## JURISDICTION AND VENUE

9.   Pursuant to 28 U.S.C. § 1332(d)(2)(A), this Court has jurisdiction over this

action because it is filed as a class action, the amount in controversy exceeds the sum of

$5,000,000, exclusive of interest and costs, and members of the Class are citizens of

states other than QuiBids' state of citizenship.   Pursuant to 28 U.S.C. § 1332(d)(2)(A), if

any member of a putative class of plaintiffs is a citizen of a State different from any

defendant, jurisdiction exists.   The Site states that it has in excess of 1,600,000

"registered users" and that it provides service in the 50 states, Washington, D.C., Guam,

the U.S. Virgin Islands and Puerto Rico.  Upon information and belief, class members are citizens of all 54 jurisdictions.  All of the members of both QuiBids, LLC, and QuiBids Holdings, LLC, are Oklahoma citizens.  Defendants do not, therefore, have citizenship in every state in which members of the Class have citizenship.

10.     QuiBids provides in the "Terms & Conditions" posted on the Site that any legal action or proceeding related to the Site shall be brought exclusively in a federal or state court sitting in Oklahoma and that a consumer's use of the Site shall be governed by the laws of the United States of America and the State of Oklahoma without regard to Oklahoma's conflicts of law principles.  Venue also lies in this District pursuant to 28 U.S.C. § 1391, because QuiBids resides in this Judicial District and a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

## PARTIES

11.     Plaintiffs Lawrence A. Locke ("Locke") is and was at all relevant times domiciled in Tigard, Oregon, and is and was at all relevant times a citizen of Oregon.

12.     Plaintiff Matthew Brown ("Brown") is and was at all relevant times domiciled in Fairview Heights, Illinois, and is and was at all relevant times a citizen of Illinois.

13.     Plaintiff Christopher Lloyd ("Lloyd") is and was at all relevant times domiciled in Edmond, Oklahoma, and is and was at all relevant times a citizen of Oklahoma.

14.     Defendant QuiBids, LLC, is an Oklahoma limited liability company which has its principal place of business in Oklahoma City, Oklahoma.  QuiBids, LLC, operated the Site during part of the relevant time period.

15.     Defendant QuiBids Holdings, LLC, is an Oklahoma limited liability company which has its principal place of business in Oklahoma City, Oklahoma. QuiBids Holdings, LLC, operated the Site during part of the relevant time period.

## FACTUAL ALLEGATIONS.

16.     QuiBids purports to be an online auction company.  At the Site, QuiBids offers an interactive service through which customers purchase bids and attempt to win various consumer goods, including items such as iPods, Macbooks, PS3s, and other high-ticket items.  QuiBids has operated the Site since at least October 2009.

17.     The Site is carefully designed to create for the typical consumer the false impression that users of the Site will routinely win the right to buy valuable merchandise at very significant discounts and, thus, that the overwhelming majority of users will financially benefit from using the Site while at the same time providing widely fragmented disclosures which it can use to defend lawsuits such as this one.  The Site is huge, with dozens of links on the Home Page alone and thousands of links from there.  If printed out on paper, the total contents of the Site would certainly amount to thousands of pages.  Crucially, the Home Page and the Registration Pages are designed to encourage consumers to begin bidding under a false impression without ever visiting the other portions of the Site which might allow a consumer willing to spend a significant amount of time to read a voluminous amount of material to reach the conclusion that the

impression created by the Home Page and Registration Pages is not entirely accurate. Even a consumer reading every word of the Site could not, however, discover the true facts regarding QuiBids which would cause the overwhelming majority of consumers to avoid the Site like the plague.

18.     A consumer clicking on an advertisement by QuiBids somewhere else on the Internet or conducting a search on a search engine in which QuiBids comes up as a result or typing in QuiBids' web address is directed to the Home Page.  There are five different versions of the Home Page because, as a consumer views it, QuiBids rotates different content in a rectangular box at the top every 15-30 seconds, each of which corresponds to one of the five topics listed at the right of that box.  The large, colorful Home Page is designed to and does create the impression that, and collectively represents that, users of the Site will routinely win the right to purchase valuable merchandise at significant discounts, such that the overwhelming majority of users will benefit financially from using the Site.

19.     More specifically, on the right side of the box at the top of the Home Page containing the rotating ads, it states "BBB Accredited Business" in an attempt to associate QuiBids with the Better Business Bureau and achieve credibility in that manner. It also states "Thousands of Winners Daily" to suggest users routinely win and that the overwhelming majority of users will win.

20.     Attached hereto as Exhibit 1-5 are screenshots of the Home Page as it existed in March 2011.  The first of the rotating ads was entitled "How QuiBids Works?" which gave three steps:  (1) "Signup and Buy Bids"; (2) "Choose Products"; and (3)

"Place Bids and Win." *See* Exhibit 1. This was intended to and did create the impression and represented that it was simple and routine to simply register, begin bidding and win and that typical users would routinely win the right to buy valuable merchandise at significant discounts such that the overwhelming majority of users would benefit financially from doing so. At the bottom, this ad stated "Sign up and Start Winning Today!" and had a link to "Register Now!" This was intended to induce customers to register and begin bidding immediately. Notably, this ad did not suggest that a wise consumer would read other materials on the Site about bidding before beginning the bidding process. Rather, it encouraged consumers to simply register and begin bidding.

21.     The next rotating ad (Exhibit 2) was a more detailed statement of the fact that QuiBids is supposedly a "BBB Accredited Business," an attempt to clothe QuiBids in the aura of the Better Business Bureau, and it constituted an express or implied representation that QuiBids is an honest legal business that would be financially beneficial to those who used it. The third rotating ad (Exhibit 3) stated that "There are over 1,000 winners every day on QuiBids.com", "Bid on Brand New Products," "Save Up to 95% Off the Hottest Electronics," and "Never Pay Retail Again!" This was intended to and did create the impression and constituted a representation that, given the number of winners every day, and given the ability to save up to 95% and to "never" pay retail, users of the Site would routinely win the right to purchase valuable merchandise at significant discounts and, thus, that users would overwhelmingly financially benefit from using the Site. It also provided a link to "Signup Today!" which lured consumers to

register and begin bidding without any mention of the advisability of reading materials on the Site.

22.     As of March 2012, while the main body of the Home Page remained the same, QuiBids had changed the five rotating banner ads at the top.   True and correct copies of the five different versions of the top of the Home Page as of March 2012 are attached hereto as Exhibits 6-10.

23.     The first of the rotating ads is still the "How QuiBids Works?" as it was in March 2011.   *See* Exhibit 6.   The second rotating ad has now added to the more detailed information about the supposed Better Business Bureau Accreditation.   It now includes the logo for and the name of "Grant Thornton" and reads "Independent Examination Report.   Grant Thornton, LLP examined or assertions about bidding and shipping controls.   Review the report below."   *See* Exhibit 7.   Now, not only does the Home Page attempt to cloak QuiBids in the aura of the Better Business Bureau, it also seeks to cloak it in the aura of an independent accounting firm, Grant Thornton.   This constitutes an express or implied representation that QuiBids is an honest legal business that will be financially beneficial to those who use it.

24.     The third rotating ad is the same as it formerly was, except that instead of stating that "There Are Over 1,000 Winners Everyday on QuiBids.com," it now states that "There Are Over 8,000 Winners Everyday on QuiBids.com."   *See* Exhibit 8.   This is intended to and does create the impression and constitutes a representation that, given the number of winners every day, and given the recitation that up to 95% can be saved off of the hottest electronics, and given the representation that users will "never" pay retail, that

users of the Site will routinely win the right to purchase valuable merchandise at significant discounts and, thus, that users will overwhelmingly financially benefit from using the site. The staggering increase from March 2011 to March 2012 from over 1,000 "winners" daily to over 8,000 "winners" daily shows the exponential growth of QuiBids and the exponential growth in the number of persons who are being harmed. Attached as Exhibits 11and 12 are screenshots showing that the remainder of the Home Page as it existed in March 2011 and March 2012, respectively. It remained essentially unchanged.

25.     Immediately below the rotating ads on the Home Page is a lengthy section entitled "Ending Auctions." *See* Exhibits 11 and 12. This is a list of approximately 50 auctions that are purportedly the closest to ending. Each of these auctions shows only a few seconds to the end of the auction, a price, a bidder name, a picture of the product and a colored banner with a cent number displayed in the upper right corner. All of these auctions shows valuable merchandise, including high-ticket items like HDTVs and Apple iPads, apparently about to be sold within seconds for incredibly low prices. The number of these auctions shown, the time left and their prices are intended to and do create the impression and constitute representations that users of the Site will routinely win the right to purchase valuable merchandise at significant discounts and that the overwhelming majority of users will financially benefit from using the Site. The display of these auctions, without more information, is incredibly misleading, because (as described in more detail below) each bid in a QuiBids auction adds more time to the auction, such that these auctions which are supposedly about to end will likely go on for many more hours or even days with the products being sold at significantly higher prices than those shown.

26.     Below the "Ending Auctions" is a section entitled "Live Auctions" which shows an additional group of auctions which are minutes (rather than seconds) away from ending, including auctions of many high-ticket items.  *See* Exhibits 11 and 12.  These auctions show items with either no bids or very, very low prices.  At the bottom of that section is a link to "View All Live Auctions" which links to 20-25 more pages of auction items totaling 500-1,000 auctions supposedly going on at one time, most of which have no bids yet and all apparently set to end in less than one hour.  This is all designed to create and does create the impression and equals representations that so many auctions are going on which are drawing so little bidding that users of the Site will routinely win the right to purchase valuable merchandise at significant discounts and that the overwhelming majority of users will benefit financially from using the Site.  The display of these auctions, without more information, is incredibly misleading, because the overwhelming majority of those auctions will draw a significant number of bidders and bids and because (as described in more detail below) each bid in a QuiBids auction adds more time to the auction, such that these auctions which are supposedly about to end will likely go on for many more hours or even days with the products actually being sold at significantly higher prices.

27.     At the very top of the Home Page is a thin gray bar which has several small links in white letters, including "QuiBids 101."  *See* Exhibits 1-10.  Nothing on the Home Page explains what is in "QuiBids 101" or suggests that it should be reviewed before a user registers and begins bidding.  If a user scrolls significantly down the Home Page past all of the auctions in the Ending Auctions and the Live Auctions, he or she will see at the

very bottom a black box which contains several links in very small print in white lettering. Among those are "FAQ & Help" and "Terms & Conditions." Nothing on the Home Page suggests or encourages users to click on either link and review the materials there before registering and beginning bidding.

28. In summary, by the Home Page's multiple references to merely registering, beginning bidding and winning, its multiple references to thousands of winners, its multiple references to buying merchandise at significant savings, including savings of up to 85-95%, its promise that users will "never" pay retail, its showing of multiple auctions supposedly just seconds away from ending with merchandise being sold at tremendously low prices, and its showing of hundreds of auctions which appear as if they will be ending within minutes with merchandise being sold at incredibly low prices, QuiBids intends to, and does, create the false impression that users of the Site will routinely win the right to buy valuable merchandise at significant discounts, and, thus, that the overwhelming majority of users will financially benefit from using the Site. It also give the false impression that bidding on high-ticket items before the last 20 seconds can win such auctions and that users will have the same set of auctions available to bid on as those shown to them when they were only visitors to the Site. Because these partial disclosures create false impressions, they also create a duty to disclose the omitted material facts necessary to correct the false impressions, leaving the partial disclosures misleading without the disclosure of the omitted material facts.

29. Before a customer can place bids on the Site, he or she must first register an account on the Site, which is a two-step process. When a customer clicks on "Register

Now" on the Home Page, he or she is brought to a page where basic information such as name, date of birth, gender, email address and user name and password are entered. A screenshot of the First Registration Page as it existed in March 2011 is attached hereto as Exhibit 13. This page was replete with representations that were intended to and did create the impression that users of the Site would routinely win auctions and obtain valuable merchandise at huge discounts and, consequently, that the overwhelming majority of users would financially benefit from using the Site. These representations included, but were not limited to, from the top of the First Registration Page to the bottom: (1) "BLOWOUT AUCTIONS SAVE YOU UP TO 95%"; (2) a link to a purported news video showing the benefits of using QuiBids; (3) pictures of electronics, including TVs, an X-Box, an iPad, an iPhone and a camera with price tags on them ranging from $16.92 to $31.13 next to statements of "ROCK BOTTOM PRICES!!" and "PRODUCTS SAVINGS $30 MILLION PLUS"; (4) three supposed customer testimonials regarding valuable merchandise won, including someone who supposedly won a Visio 32" HDTV for $2.60; (5) a comparison between QuiBids and EBay explaining why QuiBids is supposedly better; (6) display of five recent auctions in which valuable electronic products were sold at extremely low prices and a collection of 15 auctions supposedly within seconds of ending showing products supposedly about to be sold for incredibly low prices; (7) a statement that "1000s of Satisfied Customers Can't Be Wrong! Sign Up in Less Than 3 Minutes"; (8) showing of 35% savings on overstock surplus, 50% savings on government auctions, 70% savings on company liquidations and then a statement that "QuiBids' savings are more than typical overstock surpluses,

warehouse closeouts, and even liquidations!"; and (9) a box showing one user who supposedly paid $68.22 for a $1,349.88 laptop (a 95% savings) and one customer who supposedly paid $45.58 for a brand new MacBook Pro worth $1,154.41 (a 97% savings).

30.    The blue registration box did require a user to check off a box agreeing that the user had read and agreed to QuiBids' "Terms & Conditions," but it did not require the user to actually click on the link for Terms & Conditions.  Nor does anything on the First Registration Page suggest that a user should review the Terms & Conditions, QuiBids 101 or Frequently Asked Questions ("FAQ") before registration or before beginning bidding.  In fact, this page was designed to and did encourage persons to proceed with registration and bidding without reviewing any other materials.  *See* Exhibit 18 hereto.

31.    The First Registration Page as of March 2012 retains essentially the same format as the March 2011 version, although some changes have been made which serve to make it even more misleading and deceptive.  A true and correct copy of the First Registration Page as of March 2012 is attached hereto as Exhibit 14.  Now, in (1), it refers to "ENTERTAINMENT AUCTIONS" rather than "BLOWOUT AUCTIONS." Further, in between (2) the link to the purported news video and (3) the pictures of electronics with price tags, it now states "Accredited by the Better Business Bureau." Also, the three supposed customer testimonials regarding valuable merchandise won now shows persons who each supposedly and coincidentally won six high dollar value products at supposed savings ranging from a low of 57% to a high of 98.1% with most of the savings above 90% and a total savings for one of $3,000, for another of $4,112 and a savings of $8,800 for the third.  Very interestingly, in (6) the display of five auctions

under the heading "CHECK OUT SOME OF OUR RECENTLY SOLD AUCTIONS,"
QuiBids displays the same exact five auctions in March 2012 that it displayed in March
2011.  *Compare* Exhibit 13 and Exhibit 14.  Obviously, therefore, these "recently sold
auctions" are anything but, making this not just deceptive or misleading, but a boldfaced
lie!  In addition, in March 2012, in between (6) the display of the five supposedly
recently completed auctions and (8) the comparison to savings in other discount
purchasing areas, the First Registration Page now shows a picture of an Apple iMac with
a legend saying "Up To 91% SAVINGS!"

32.    Filling in the necessary information and clicking on "I'm Ready to Start
Winning!" takes the user to the Second Registration Page, screenshots of which are
attached hereto as Exhibit 15 (March 2011) and Exhibit 16 (March 2012).  The two
different versions are virtually identical.  There is a blue box in which a user must sign up
to purchase a "Starter Bid Pack" for $60.00, 100 bids at $.60 each, and provide shipping
information and credit card information.  This Second Registration Page is also designed
to and does create the impression and represents that users will routinely win the right to
buy valuable merchandise at huge discounts and, thus, that the overwhelming majority of
users will financially benefit from the Site.  These representations include, but are not
limited to, from top to bottom:  (1) the heading "You're Almost Ready to Start Winning!
Step 2 of 2:  Congratulations, final step! Scroll down to start bidding," which is placed
above pictures of valuable merchandise; (2) the same three customer testimonials as on
the March 2011 First Registration Page; (3) the same comparison between QuiBids and
EBay as on the First Registration Page; and (4) under the heading "QuiBids Users have

saved $1,000's!", a box showing supposed results for three different users who supposedly each won three different big ticket items, including cameras, i-Pods, laptops and golf clubs at prices ranging from $.76 to $148.58 and savings ranging from 86% to 95%.

33.     Nothing on the Second Registration Page suggests that a user should review the Terms & Conditions, QuiBids 101, or FAQ before purchasing the "Starter Bid Pack" or actually beginning to bid.   Quite the contrary, like the Home Page and First Registration Page, the Second Registration Page is actually designed to and does encourage registration and beginning of bidding without any review of any of the other materials on the Site.  Notably, nothing on the Second Registration Page suggests that the 60 bids in the Starter Bid Pack will not be a sufficient number of bids to win the overwhelming majority of high-ticket items ($100 and above), which on average take approximately 105 bids to win, with items $500 to $999 taking approximately 275 bids on average to win and items $1,000 and above taking approximately 613 bids on average to win.  Nor does that page reveal that there may not be time to buy additional bids near the end of an auction if a user runs out, which is also the case.  Indeed, it is extremely common for customers to run out of bids near the end of bidding on a particular item and, thus, lose the opportunity to win that auction.  Notably, nowhere on the Site, does QuiBids provide information on the average number of bids it takes to win different types of merchandise.

34.     In summary, the Registration Pages, by their repeated statements regarding huge discounts supposedly being achieved by thousands of users, just as would be the

case with other types of discount shopping, and the showing of multiple auctions which would apparently allow merchandise to be purchased at huge discounts, also create the false impression that customers of the Site will routinely win valuable merchandise at huge discounts, and, thus, that the overwhelming majority of customers will benefit financially from using the Site. The Registration Pages also convey the false impressions that the auctions shown on the Site when one is a visitor will be available to registered users and that bidding on auctions of high-ticket items before the last 20 seconds can be a successful endeavor. The Registration Page also conveys the false impressions that 60 bids will be a sufficient number of bids to win auctions of high-ticket items. On the Registration Pages, QuiBids concealed material facts which would have served to correct the false impressions left by the Registration Pages.

35. Only one account per customer is permitted. Upon information and belief, QuiBids keeps electronic records of all activity within each account, including all purchases of bids, all auctions in which bids were placed, all auction items won and purchased and all items purchased using the "Buy It Now" feature. Once an account has been opened, customers can buy additional bids, which are sold in "packs" of varying number. There are five different sizes of bid packs to buy from QuiBids, and for all of them, the cost per bid is $.60.[1]

36. Whenever a customer bids during the last 20 seconds of an auction, additional time is added to the auction by QuiBids. Initially, another 20 seconds is added.

---

[1] Customers may also obtain bids by participating in auctions of bid packs called "Vouchers" and the price per "Voucher" bid for customers winning such auctions may be less than $.60 per bid.

At some point, QuiBids may decide to reduce the amount of time added by an additional bid to 15 seconds. After that, QuiBids may decide to add only an additional 10 seconds for each additional bid. Ten seconds will be added for every additional bid made until, finally, no more bids are made in the last 10 seconds. Because of this feature, auctions very frequently last hours, including the substantial majority of auctions on high-ticket items, and some auctions even last days. The last bidder "wins" the auction and the right to purchase the item.

37.     Each auction has a specific amount by which the purchase price of the item increases when a bid is placed. In a one-cent auction, the purchase price will increase by $0.01 each time a bid is placed. Each $1.00 increase in price in a one-cent auction results in $60.00 additional revenue to QuiBids. In a two-cent auction, the purchase price will increase by $0.02 each time a bid is placed. Each $1.00 increase in price in a two-cent auction results in $30.00 additional revenue to QuiBids. The purchase price represents what the consumer who wins the auction will have to pay to obtain the product if the auction were to end at that point. An auction winner ends up paying the cost of all the bids he or she placed on the item, plus the purchase price of the item, plus shipping costs.

38.     For a losing bidder, QuiBids offers a "Buy It Now" feature pursuant to which the product can be purchased at the "Value Price" stated on the Site for up to two hours after the end of the auction. The losing bidder gets a credit towards the purchase price for the cost of the losing bids he or she expended.[2] The Site falsely represents on

---

[2] Credit is not given for "Voucher" bids won in auctions.

the page for each auction that "The 'Value Price' reflects the price you would find the item at other retailers." In truth, that price is typically higher than the price for which the item could routinely be purchased on the internet or in retail stores. In fact, for Apple products, which are probably the most popular and common high-ticket items, the "Value Price" is always higher than the price for the item on Apple's website. In a question and answer buried within QuiBids 101, QuiBids does not admit that the "Value Price" is typically higher than the price which can be found at other retailers, but it does qualify its false representation on all of the auction pages by saying that because it purchases merchandise from other retailers, it may "apply a slight markup in order to cover ordering costs." Even with this statement, QuiBids does not truthfully disclose the nature of "the Value Price" and thus of the "Buy It Now" feature. QuiBids' affirmative misrepresentations that the "Value Price" reflects the price a customer would find at other retailers and its failure to disclose that, in fact, the "Value Price" is higher than the price typically found at other retailers is unfair, deceptive and fraudulent.

39.     Unlike traditional auctions, when a QuiBids consumer bids on an item, the consumer pays $0.60 for each bid, regardless of whether or not the consumer actually wins the item. For example, in a traditional auction, a consumer who bids $1.00 on an item but loses the auction does not pay the $1.00 losing bid. Under QuiBids' scheme, however, a consumer may bid multiple times on an item and ultimately lose the auction but will have lost the price of the losing bids. For example, QuiBids may be in the process of conducting a one-cent auction for an item which stands at $10.00 with 60 seconds left on the timer. If a customer A places one $0.60 bid on the item, the price will

be raised to $10.01, and customer A will have paid $0.60.  A dozen subsequent bids could be made on the item by customers B-M, which will raise the price to $10.13 and eliminate customers A-L as high bidders, but customers A-L will each have paid the amount of their bids, and QuiBids will have collected an additional $7.80.

40.    For this reason, each bid by a QuiBids consumer constitutes a bet received by QuiBids that no one else will bid within the remaining time and, thus, that this particular bid will win the auction.  Whether the bet is won depends upon chance, in that the consumer does not have control over the result, which depends upon uncertain conditions, including how many other people are bidding on the item, what prices those persons are willing to pay, and whether the other persons have sufficient bids left to enable them to pay more, if they choose, then the consumer.  Given that on an average approximately 55 persons bid in a QuiBids auction and that the average number of persons bidding on high-ticket items is approximately 124 persons, the level of uncertainty and lack of control for a consumer is extremely high no matter how wisely the consumer bids.  And, because the average user has been guided by QuiBids into registering and bidding without perusal of the voluminous materials on the Site, winning an auction becomes for the average user a matter almost entirely of luck.  Thus, QuiBids is distributing property by chance among persons who have paid a valuable consideration for the chance of obtaining such property upon an agreement that the property is to be distributed by chance.  In other words, QuiBids is running a disguised lottery.

41.    As with traditional lotteries and other types of gambling, QuiBids exploits a number of common decision-making flaws.  Most notably, many people struggle with the

concept of *sunk costs*, meaning they do not realize that all of their previous bids on an item have already been lost and do not make them any more likely to win the auction. In other words, many people struggle to understand that each 60-cent bid is a brand new chance to win and, once another bid follows it, that prior bid will play no role in who wins the auction going forward and should not affect a decision as to whether to bid again. QuiBids' auctions also exploit the difficulty consumers have in making snap decisions, especially regarding small amounts of money, and take advantage of fallacies such as (a) *loss aversion*, where one's urge to avoid a loss is typically much more powerful than one's urge to seek a gain, (b) *anchoring* – where one focuses on a particular number and loses track of the larger picture, and (c) the irrational impulse to believe there is always a strategy to beat the system. It is, in part, these factors that make the Site deceptive and likely to deceive.

42.     The most savvy QuiBids customers wait until the final 20 seconds originally set for bidding by QuiBids to bid on high-ticket items (items with a stated value of $100 or more). Auctions of high-ticket items typically open with one hour to bid, and many customers purchase and place bids before the final 20 seconds originally set for bidding by QuiBids, completely unaware that these bids have no chance of winning and that the money spent on those bids is an utter waste. The Site offers consumers the option on virtually all high-ticket items to have the Site bid automatically for them pursuant to pre-set parameters by using the Bid-O-Matic feature. Recognizing that bids made in the final 20 seconds it originally set for bidding of an auction of a high-ticket item are the only bids with any chance of winning, QuiBids has designed this

feature so that it will only place bids within that time frame.  Thus, the Site itself, through the Bid-O-Matic feature, is designed so as to make bidding on high-ticket items before the final 20 seconds originally set for bidding by QuiBids a complete waste of time and money.  Yet, this fact is nowhere disclosed on the Site.[3]  The failure to disclose this fact is unfair, deceptive and fraudulent.

43.     Unfortunately, the unfairness, deception and fraudulent nature of the Site goes far beyond wasted bids placed on auctions of high-ticket items before the last 20 seconds originally set for bidding by QuiBids.  The true nature of the Site as a form of gambling and as a lottery is not disclosed, much to the detriment of the overwhelming majority of its users.  QuiBids offers nothing more to its customers than the opportunity to make a very low probability bet that they will be able to purchase merchandise at a discount.  Those customers will not win the majority of the auctions in which they participate and will win very few, if any, auctions on high-ticket items (items with a stated value of $100 or greater).  Consequently, for the overwhelming majority of customers who play QuiBids' game, the money they will spend to purchase bids and pay for any items which they are lucky enough to win will greatly exceed the retail value of any items they win and purchase.

44.     The existence of the "Buy It Now" feature does not change this fact.  Even customers who regularly use the feature will end up paying more between the cost of the bids, the purchase prices and shipping costs of any merchandise won in auctions and the

---

[3] Buried in QuiBids 101, where most users will never see it, QuiBids does state that the "best strategy" for winning auctions is to wait until the last 20 seconds, but that is not the same as disclosing that bidding before the last 20

purchase prices and shipping costs of any merchandise purchased using the "Buy It Now" feature than even the inflated "Value Prices" as stated on the Site of the merchandise they receive. If it is assumed that shipping costs paid by winning customers averages $10 an item, then a reasonable estimate of the percentage of money paid to QuiBids by customers returned to those customers as merchandise using the inflated "Value Prices" stated by QuiBids is only 33%. Crucially, unlike games of chance played in a casino, which may only be operated under specific statutory authority, QuiBids provides no information to its customers of their odds of winning or what percentage the "house" keeps. In truth, QuiBids is offering a lottery or raffle or some other type of gambling, despite purporting to operate an "auction." Nowhere on the Site does QuiBids disclose that it is actually offering a form of gambling or the very low probability of benefitting financially from using the Site as revealed by the low percentage of money spent on the Site returned in the form of merchandise. Its failure to do so is unfair, deceptive and fraudulent. And, QuiBids' conduct of a lottery or other form of gambling under Oklahoma law is certainly unfair.[4]

---

seconds is futile.

[4] It may even be worse. The gambling may be rigged. Shill bidding is bidding with no intention of actually purchasing the item by a person associated with the auctioneer or by a computer program run by the auctioneer which has as its purpose stimulating additional and higher bids by genuine auction participants. The Site runs on commercially available software that comes with a feature that allows automated shill bidding. There are numerous indications that QuiBids is engaged in shill bidding, including, but not limited to, the ease of implementation given the software, QuiBids' encryption of requests for auction data that prevents access to historical auction information and makes the ongoing tracking of auctions highly difficult and computationally intensive, the prevalence of bidders who have been members of QuiBids for well over the maximum lifetime of their purchased bids without having ever won even a single auction (highly irrational and unlikely behavior), and the fact that the percentage of auctions with profitable outcomes for QuiBids is highly skewed towards high-ticket items which should have the most risk of loss. Discovery of QuiBids' live source code and live auction results in this case can definitively demonstrate whether or not QuiBids is engaging in shill bidding. Plaintiff intends to conduct such discovery and to amend to add shill bidding claims if the discovery demonstrates its existence.

45.    As described in detail above, when a prospective QuiBids customer first visits the Site, he or she is shown a large number of auctions occurring, including auctions of a variety of highly desirable high-ticket items.  However, once a customer registers with QuiBids, cookies are placed by the Site on the customer's computer.  When the customer goes back to the Site, the cookies direct the customer to a portion of the Site that offers less auction items to bid upon than the portion of the Site seen by unregistered potential customers.  If a registered user clears the cookie from the computer, he or she is directed to the main site seen by unregistered potential customers.  However, if the registered customer then logs in, he or she is directed to a portion of the Site that offers less auction items than are shown on the portion of the Site seen by unregistered potential customers.  Nowhere on the Site does QuiBids disclose that registered users will be directed to a portion of the Site that offers less auction items to bid upon than the portion of the Site seen by unregistered potential customers.  Its failure to do so is unfair, deceptive and fraudulent.

46.    As set forth above, on the Home Page and on the Registration Pages, QuiBids conveyed several false impressions by the disclosure of some facts and the concealment of others, placing a duty upon it to disclose the whole truth.  In addition, "peculiar circumstances" existed between QuiBids and its customers that placed an additional duty of disclosures upon QuiBids.  Specifically, QuiBids obviously has very sophisticated knowledge about the operations of the Site, including the average number of bidders in different value auctions, the average number of bids required to win various value auctions, the percentage of the money taken in by it returned in the form of

merchandise and the percentage of customers who are net winners from using the Site. They also have knowledge about how their "Value Prices" compare to actual retail prices and on the utility of bidding on high-ticket items before the last 20 seconds of the time originally set for the auction by QuiBids. All of these facts would be highly relevant to customers in deciding whether to use Site at all and, if so, how to use it. Customers have no ability whatsoever to ascertain most of these facts. Accordingly, there is a significant imbalance in technical knowledge between QuiBids and its customers. This knowledge imbalance constitutes "peculiar circumstances" creating a duty of disclosure under Oklahoma law upon QuiBids.

## FACTS SPECIFIC TO NAMED PLAINTIFFS

47.     Locke is an Oregon citizen who learned about the Site by clicking on a headline-like ad on AOL which took him to a QuiBids advertisement that appeared to be a news article in a publication entitled "CONSUMER TIPS DIGEST." These sources emphasized that consumers could save 75% to 95% on consumer products on the Site compared to the fair retail prices of those consumer products.

48.     Locke first visited the Site on July 18, 2010. What stood out to Locke while on the Site was its statements emphasizing that all items would be sold at extremely low prices, with huge savings compared to retail prices.

49.     On the same day, Locke purchased the "Beginner Bid Pack" for $45.00. In return, he received 75 bids. Locke also bid on three bid packs called "25-bid Vouchers." Locke won two of the three Vouchers he bid on, and he paid a total of $6.11 for them. All told, Locke spent $51.11 to purchase 125 bids or $.41 per bid.

50.    Locke bid for several consumer products advertised on the Site on July 18, 2010, and July 19, 2010, but he won none of them despite using all his bids.  Locke's $51.11 was spent on nothing more than a chance to win—he received nothing of value in return.    That is gambling, not a traditional auction in which the losing bidders pay nothing.

51.    More specifically, on July 18, 2010, Locke placed losing bids for consumer products on the Site as follows:

> 9 bids on a Nikon camera (high-ticket item), and

> 6 bids on an external hard drive.

52.    On July 19, 2010, Locke placed losing bids for consumer products on the Site as follows:

> 1 bid on an HDMI cable;

> 10 bids on an HP Printer (high-ticket item);

> 64 bids on an LG 55" HDTV (high-ticket item); and

> 1 bid on a Nikon camera (high-ticket item).

53.    Locke made at least one bid on a high-ticket item before the final 20 seconds originally set for bidding by QuiBids.

54.    In the one-cent LG 55" HDTV auction, the TV sold for $228.99, which means ultimately 22,859 bids were placed, 64 by Locke personally.  Plaintiffs cannot tell whether the winning bidder received a significant discount, or any discount at all, from the retail price, which was probably at least $1,500.00.  If the winning bidder placed more than 2,500 of the 22,859 bids at $.60 each, then the winning bidder may have

actually lost money by "winning" the auction. However, the amount paid to QuiBids for the bids placed on the Site is staggering in comparison -- 22,859 bids at $0.60 each amounts to $13,715.40. If QuiBids in fact paid the retail cost to acquire the television, QuiBids grossed over $12,000.00 on that one auction. Even so, since one consumer purchased the television at $228.59 (not including, the cost of bids), QuiBids brags that the consumer saved 85% compared to the retail price, never mentioning whether the winning bidder actually saved any money when the costs of his bids are factored in or that the rest of its customers spent close to $14,000 on that auction and received nothing in return.

55.     Brown spent a total of $3,679.74 on the Site between purchasing bids, the purchase prices he paid for Voucher Bids he won in auctions, the purchase prices he paid for Voucher Bids he purchased using the "Buy It Now" feature and the purchase prices (including shipping charges) of merchandise he won in auctions from December 8, 2010, to February 15, 2011, inclusive. During that time period, he bid in 436 auctions, winning merchandise in only 18 of them, but only one high-ticket item, with "Value Prices" totaling $694.82. His net losses thus total approximately $2,984.92. Brown bid at least one time on a high-ticket item before the final 20 seconds originally set for bidding by QuiBids.

56.     Lloyd purchased a total of 1,135 bids at a total cost of $640.29 between March 24, 2010, and July 13, 2010, inclusive, as shown on his Purchase History attached hereto as Exhibit 17. Between March 24, 2010, and July 14, 2010, inclusive, he bid on

sixteen (16) different items, winning only one (a 25 Bids Voucher), as evidenced by the Bidding History attached hereto as Exhibit 18.

57.    Lloyd did purchase one item on July 13, 2010, using the "Buy It Now" feature.  Specifically, after having unsuccessfully used a total of 944 bids at a cost of $566.40, he purchased an Apple iPad 32 GB Wi-Fi for $268.06, such that he spent a total of $834.46 on an item listed by QuiBids as having a "Value Price" of $695.00, which Apple sold at the time for $599.00.  Using QuiBids' "Value Price," Lloyd lost a total of $139.46 in purchasing the iPad.  Using the true retail price of $599.00, Lloyd lost $235.46 on the iPad.  Using QuiBids' "Value Price" for the iPad, Lloyd's total losses from using the Site were approximately $213.35.  Lloyd bid on at least one high-ticket item before the last 20 seconds originally set for bidding by QuiBids.

## CLASS ACTION ALLEGATIONS

58.    Plaintiffs seek to represent the following Class:

> All persons in the United States (the 50 states, Washington, D.C., Guam, the U.S. Virgin Islands and Puerto Rico) who spent more money on QuiBids.com than the value of the goods they received, if any – persons for whom the total amount spent on purchasing bids, on paying for any auction items they won (including shipping costs) and paying for items using the "Buy It Now" feature (including shipping costs) exceeded the "Value Prices" as listed on QuiBids.com of the goods they received (the "Class").

59.    This action has been brought and may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).

60.    The members of the Class are so numerous that joinder of all members is impracticable.  The exact number of members in the Class is unknown to Plaintiff at this

time and can only be ascertained through appropriate discovery.  However, QuiBids claims on the Site that it has in excess of 1,600,000 "registered users."  Because customers of the Site have to provide email addresses in order to register and have to provide mailing addresses in order to purchase bids and merchandise using credit cards, Plaintiffs believe that QuiBids has the information necessary to allow notice to be sent individually to each member of the Class.

61.    Common questions of law and fact exist as to all members of the Class. Among others, these common questions include, but are not limited to:

a.    whether QuiBids' conduct constituted violations of the Oklahoma Consumer Protection Act;

b.    whether QuiBids' conduct constituted common law fraud under Oklahoma law;

c.    whether QuiBids should, in equity and good conscience, refund to the members of the Class their losses pursuant to Oklahoma's cause of action for money had and received;

d.    whether QuiBids should refund the losses of the members of the Class pursuant to the Oklahoma cause of action for unjust enrichment; and

e.    whether, as a result of violations of the Oklahoma Consumer Protection Act herein, Plaintiff and the members of the Class are entitled to recover civil penalties or other penalties, in addition to damages, and, if so, the amount and nature of such penalties.

62.     These common questions predominate over any questions affecting only individual members of the Class.

63.     Plaintiffs' claims are typical of the claims of the members of the Class, as they and all the members of the Class were similarly affected by QuiBids' wrongful uniform conduct and assert the same legal theories.   Plaintiffs have no interests antagonistic to the interests of the other members of the Class.  Plaintiffs and all members of the Class have sustained similar economic injuries arising out of QuiBids' violations of common and statutory law as alleged herein.

64.     Plaintiffs are adequate representatives of the Class because their interests and those of their counsel do not conflict with the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and they intend to prosecute this action vigorously.  Plaintiffs and their counsel will fairly and adequately protect the interests of all of the members of the Class.

65.     A class action is superior to all other available methods for the fair and efficient adjudication of these controversies since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members will be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this class action, whereas individualized litigation presents the potential for inconsistent or contradictory judgments.  A class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of

scale, comprehensive supervision by a single court and the conservation of scarce judicial resources.

## COUNT I

### VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT BY UNFAIR TRADE PRACTICES

66.     Plaintiffs incorporate all of the preceding and subsequent allegations into Count I as if they were fully set forth here verbatim.

67.     QuiBids is a "person" within the meaning of the Oklahoma Consumer Protection Act ("Act").  15 OKLA. STAT. § 752(1).  Plaintiffs and all the members of the Class are "consumers" as that term is used in 15 OKLA. STAT. § 761.1(A).  Plaintiffs and the other members of the Class and QuiBids were engaged in "consumer transactions" within the meaning of the Act.  15 OKLA. STAT. § 752(2).

68.     QuiBids is engaged in commercial gambling in violation of 21 OKLA. STAT. § 982 because it is "receiving … bets" and "conducting a lottery …."  21 OKLA. STAT. § 981 defines a bet as "… a bargain in which the parties agree that, dependent upon chance, or in which one of the parties to the transaction has valid reason to believe it is dependent upon chance, one stands to win or lose something of value specified in the agreement."  As set forth above, every time a customer on QuiBids places a bid, he and QuiBids are agreeing that the customer will win the right to purchase valuable merchandise at a significant discount based upon chance.  Whether each bid will win the auction is based upon chance because the customer does not have control over the result

and because the outcome of whether the bid will win the auction depends upon uncertain conditions – the actions and decisions of many other auction participants.

69.     21 OKLA. STAT. § 1051 provides that "[a] lottery is any scheme for the disposal or distribution of property by chance among persons who have paid … any valuable consideration for the chance of obtaining such property … upon any agreement, understanding or expectation that it is to be distributed or disposed of by a lot or chance. …"  Since each bid costs $.60, customers are paying consideration for the distribution of property by chance among a group of people who have paid consideration, and the property is distributed by chance amongst them because none of them have control over the result and it is distributed based upon uncertain conditions in the form of the actions and decisions of the many auction participants.

70.     QuiBids' conduct of commercial gambling under Oklahoma law constitutes the commission of acts or practices declared to be a violation of the Act pursuant to Section 753(20), in that they constitute unfair trade practices as defined in Section 752 of the Act.  15 OKLA. STAT. §§ 753(20) & 752(14).  Specifically, QuiBids' conduct of commercial gambling in violation of Oklahoma law constituted practices which offend public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to customers, because they are illegal and caused Plaintiffs and the other members of the Class to waste their money.

71.     On the Home Page and Registration Pages, QuiBids made numerous statements and provided a large volume of information that constituted representations that a typical user of that Site could routinely expect to win the right to buy valuable

merchandise at significant discounts and, thus, that the overwhelming majority of users would benefit financially from using the Site. The Home Page and Registration Pages were intended to and did convey this false impression without ever expressly stating those exact propositions. Without further disclosure of the material facts set forth above and below, that impression and those representations were false, imposing a duty upon QuiBids to disclose the other material facts necessary to disclose the whole truth.

72.   In addition, QuiBids' sophistication and experience with its Site give it knowledge of the material facts set forth above and below which its customers could not possibly figure out on their own. Thus, given the imbalance of knowledge, there existed "peculiar circumstances" which imposed a duty to disclose upon QuiBids.

73.   QuiBids failed to inform its customers, among other things: (a) that it is conducting a lottery or another form of commercial gambling under Oklahoma law; (b) that the overwhelming majority of customers using the Site will lose money by doing so; (c) of the percentage of the money spent by customers on the Site that is returned to customers in the form of merchandise; (d) that with respect to auctions of high-ticket items (items with a stated value of $100 or more), bids placed on the Site for those items before the last 20 seconds originally set for bidding by QuiBids will inevitably be unsuccessful and, thus, a waste of money; (e) that registered users of the Site will be directed to a part of the Site that offers less auction items to bid upon than the portion of the Site accessed by unregistered potential customers; and (f) that the "Value Prices" stated on the Site, which constitute the prices for the use of the "Buy It Now" feature, are typically higher than the prices for which those items can be obtained from other

retailers.   These failures to disclose constituted the commission of acts or practices declared to be a violation of the Act pursuant to Section 753(20), in that they constituted unfair trade practices as defined in Section 752 of the Act.  15 OKLA. STAT. §§ 753(20) & 752(14).   Specifically, QuiBids' omissions constituted practices which offend public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, because they caused Plaintiffs and the members of the Class to waste their money.

74.    As a result of QuiBids' violations, Plaintiffs and the other members of the Class have sustained actual damages equal to the amounts they have lost using the Site – the amount by which the total dollars they paid for bids, plus the total dollars they paid to purchase items won during auctions (including shipping costs), plus the total dollars they paid to purchase items using the "Buy It Now" feature (including shipping costs) exceeded the total "Value Prices" as stated on the Site of the items they received. Alternatively, as a result of QuiBids' violations, Plaintiffs and certain other members of the Class have sustained actual damages equal to the amounts they paid for the losing bids they made on high-ticket items on the Site before the last 20 seconds originally set for bidding by QuiBids.

75.    QuiBids is liable to Plaintiffs and the other members of the Class for those actual damages caused by QuiBids' violation of Act and for their reasonable costs and attorneys' fees.  *Id.* at § 761.1(A).   In addition, pursuant to Section 761.1(C) of the Act, Plaintiffs seek civil penalties of up to $10,000 per violation and such other penalties as the Court finds just.

## COUNT II

### VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT BY DECEPTIVE TRADE PRACTICES

76.     Plaintiffs incorporate all of the preceding and subsequent allegations into Count II as if they were fully set forth here verbatim.

77.     QuiBids is a "person" within the meaning of the Oklahoma Consumer Protection Act.  15 OKLA. STAT. § 752(1).  Plaintiffs and all the members of the Class are "consumers" as that term is used in 15 OKLA. STAT. § 761.1(A).  Plaintiffs and the other members of the Class and QuiBids were engaged in "consumer transactions" within the meaning of the Act.  15 OKLA. STAT § 752(2).

78.     On the Home Page and Registration Pages, QuiBids made numerous statements and provided a large volume of information that constituted representations that a typical user of the Site could routinely expect to win the right to buy valuable merchandise at significant discounts and, thus, that the overwhelming majority of users would benefit financially from using the Site.  The Home Page and Registration Pages were intended to and did convey this false impression without ever expressly stating those exact propositions.  Without further disclosure of the material facts set forth above and below, that impression and those representations were false, imposing a duty upon QuiBids to disclose the other material facts necessary to disclose the whole truth.

79.     In addition, QuiBids' sophistication and experience with its Site give it knowledge of the material facts set forth above and below which its customers could not

possibly figure out on their own.  Thus, given the imbalance of knowledge, there existed "peculiar circumstances" which imposed a duty to disclose upon QuiBids.

80.     QuiBids failed to inform its customers, among other things:  (a) that it is conducting a lottery or another form of commercial gambling under Oklahoma law; (b) that the overwhelming majority of customers using the Site will lose money by doing so; (c) of the percentage of the money spent by customers on the Site that is returned to customers in the form of merchandise; (d) that with respect to auctions of high-ticket items (items with a stated value of $100 or more), bids placed on the Site for those items before the last 20 seconds originally set for bidding by QuiBids will inevitably be unsuccessful and, thus, a waste of money; (e) that registered users of the Site will be directed to a part of the Site that offers less auction items to bid upon than the portion of the Site accessed by unregistered potential customers; and (f) that the "Value Prices" stated on the Site, which constitute the prices for the use of the "Buy It Now" feature, are typically higher than the prices for which those items can be obtained from other retailers.     These failures to disclose constituted the commission of acts or practices declared to be a violation of the Act pursuant to Section 753(20), in that they constituted deceptive trade practices as defined in Section 752 of the Act.   15 OKLA. STAT. §§ 753(20) & 752(13).  Specifically, QuiBids' omissions constituted omissions that deceived Plaintiffs and the members of the Class or that could reasonably be expected to deceive or mislead a person to the detriment of that person.  This is convincingly demonstrated by the comments about QuiBids posted on Answers.com in which the overwhelming consensus was that these Class members were lured into using the Site by the prospects

of obtaining valuable merchandise at significant discounts but found after actually using the Site that it was a "lottery" and a "scam."  A true and correct copy of these postings is attached hereto as Exhibit 24.

81.    As a result of QuiBids' violations, Plaintiffs and the other members of the Class have sustained actual damages equal to the amounts they have lost using the Site – the amount by which the total dollars they paid for bids, plus the total dollars they paid to purchase items won during auctions (including shipping costs), plus the total dollars they paid to purchase items using the "Buy It Now" feature (including shipping costs) exceeded the total "Value Prices" as stated on the Site of the items they received. Alternatively, as a result of QuiBids' violations, Plaintiffs and certain other members of the Class have sustained actual damages equal to the amounts they paid for the losing bids they made on high-ticket items on the Site before the last 20 seconds originally set for bidding by QuiBids.

82.    QuiBids is liable to Plaintiffs and the other members of the Class for those actual damages caused by QuiBids' violation of Act and for their reasonable costs and attorneys' fees.  *Id.* at § 761.1(A).  In addition, pursuant to Section 761.1(C) of the Act, Plaintiffs seek civil penalties of up to $10,000 per violation and such other penalties as the Court finds just.

## COUNT III

## COMMON LAW FRAUD

83.    Plaintiffs incorporate all of the preceding and subsequent allegations into Count III as if they were fully set forth here verbatim.

84.     On the Home Page and Registration Pages, QuiBids made numerous statements and provided a large volume of information that constituted representations that a typical user of the Site could routinely expect to win the right to buy valuable merchandise at significant discounts and, thus, that the overwhelming majority of users would benefit financially from using the Site.  The Home Page and Registration Pages were intended to and did convey this false impression without ever expressly stating those exact propositions.  Without further disclosure of the material facts set forth above and below, that impression and those representations were false, imposing a duty upon QuiBids to disclose the other material facts necessary to disclose the whole truth.

85.     In addition, QuiBids' sophistication and experience with its Site give it knowledge of the material facts set forth above and below which its customers could not possibly figure out on their own.  Thus, given the imbalance of knowledge, there existed "peculiar circumstances" which imposed a duty to disclose upon QuiBids.

86.     QuiBids omitted to disclose multiple material facts to its customers including among others:  (a) that it is conducting a lottery or another form of commercial gambling under Oklahoma law; (b) that the overwhelming majority of customers using the Site will lose money doing so; (c) the percentage of the money spent by customers that is returned to customers in the form of merchandise; (d) that with respect to auctions of high-ticket items (items with a stated value of $100 or more), bids placed on the Site for those items before the last 20 seconds originally set for bidding by QuiBids will inevitably be unsuccessful and, thus, a waste of money; (e) that registered users of the Site will be directed to a part of the Site that offers less auction items to bid upon than the

portion of the Site accessed by unregistered potential customers; and (f) that the "Value Prices" stated on the Site, which constitute the prices for the use of the "Buy It Now" feature, are typically higher than prices for which those items can be obtained from other retailers. Such facts are material in that a reasonable consumer would have considered them important in deciding whether and when to spend the money to use the Site. QuiBids omitted to disclose these facts with the intent that its customers would use the Site. Because QuiBids' omissions to disclose are material, it is presumed that Plaintiffs and all the other members of the Class reasonably relied upon the omissions.

87.     QuiBids' omissions proximately caused actual damages to Plaintiffs and the other members of the Class in the amount they lost using the Site – the amount by which the money they paid for the bids, plus the money they paid to purchase the items won in auctions (including shipping costs), plus the money they paid to purchase items using the "Buy It Now" feature (including shipping costs) exceeded the total retail "Value Prices" as stated on the Site of the items received.   Alternatively, QuiBids' omissions proximately caused actual damages to Plaintiffs and certain other members of the Class in the amount they paid for the losing bids they made on high-ticket items on the Site before the last 20 seconds originally set for bidding by QuiBids.

## COUNT IV

## MONEY HAD AND RECEIVED

88.     Plaintiffs incorporate all of the preceding and subsequent allegations into Count IV as if they were fully set forth here verbatim.

89.     The money lost by Plaintiffs and the members of the Class using the Site –
the amount by which the money they paid for the bids, plus the money they paid to
purchase the items won in auctions (including shipping costs), plus the money they paid
to purchase items using the "Buy-It-Now" feature (including shipping costs) exceeded
the total "Value Prices" as stated on the Site of the items they received – constitutes
money in QuiBids' possession which, in equity and good conscience, should be returned
by QuiBids to Plaintiffs and the members of the Class.

90.     Alternatively, the money spent by Plaintiffs and certain other members of
the Class on losing bids placed before the last 20 seconds originally set for bidding by
QuiBids in auctions of high-ticket items (items with a stated value of $100 or more)
constitutes money in QuiBids' possession which, in equity and good conscience, should
be returned to Plaintiffs and those members of the Class.

## COUNT V

## UNJUST ENRICHMENT

91.     Plaintiffs incorporate all of the proceeding and subsequent allegations into
Count V as if they were fully set forth here verbatim.

92.     The money lost by the Plaintiffs and members of the Class using the Site –
the amount by which the money they paid for the bids, plus the money they paid to
purchase the items won in auctions (including shipping costs), plus the money they paid
to purchase items using the "Buy-It-Now" feature (including shipping costs) exceeded
the total "Value Prices" as stated on the Site of the items received – constitutes a benefit
conferred upon QuiBids by Plaintiffs and the Class.  Under the circumstances, and as a

matter of equity, QuiBids was unjustly enriched by its receipt of that money and it should return that money to Plaintiffs and the members of the Class.

93.     Alternatively, the money spent by Plaintiffs and certain other members of the Class on losing bids placed before the last 20 seconds originally set for bidding by QuiBids in auctions of high-ticket items (items with a stated value of $100 or more) constitutes a benefit conferred by those members of the Class on QuiBids.   Under the circumstances, and as a matter of equity, QuiBids was unjustly enriched by its receipt of that money, and it should return that money to Plaintiffs and those members of the Class.

## <u>REQUEST FOR RELIEF</u>

Individually, and on behalf of the Class, Plaintiffs Lawrence A. Locke, Matthew Brown, and Christopher Lloyd, respectfully request the Court to award the following relief:

a.     An order certifying the proposed Class under FED. R. CIV. P. 23(b)(3) and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

b.     A judgment finding that QuiBids is liable for all claims asserted herein;

c.     A judgment awarding actual damages as set forth above;

d.     A judgment awarding civil penalties as set forth above;

e.     A judgment awarding attorneys' fees and litigation costs;

f.     A judgment awarding pre-judgment and post-judgment interest at the maximum rates allowable at law or in equity; and

g.     A judgment awarding all such other legal or equitable relief as justice requires.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  April 11, 2012.

/s/ Roger L. Mandel
Roger L. Mandel
State Bar N0. 12891750
LACKEY HERSHMAN, L.L.P.
3102 Oak Lawn, Suite 777
Dallas, Texas 75219
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
rlm@lhlaw.net

Edward L. White
ed@edwhitelaw.com
EDWARD L. WHITE, P.C.
13924 Quail Pointe Drive, Suite B
Oklahoma City, OK 75134
Telephone:  (405) 810-8188
Facsimile:   (405) 608-0971

Andrew Kierstead
kiersteadlaw@aol.com
LAW OFFICE OF ANDREW S. KIERSTEAD
1001 SW Fifth Ave., Suite 1100
Portland, OR 97204
Telephone:  (508) 224-6246
Facsimile:   (508) 224-4356

Attorneys for Plaintiff and the Class

## Certificate of Service

On the 11th day of April, 2012, the foregoing Second Amended Class Action Complaint was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

/s/ Roger L. Mandel
Roger L. Mandel