# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

LAWRENCE A. LOCKE, MATTHEW      )
BROWN and CHRISTOPHER LLOYD,    )
individually and on behalf of all others )
similarly situated,             )
                                )
                  Plaintiffs,   )
                                )
v.                              )          Case No. 5:10-cv-01277-F
                                )
QUIBIDS, LLC, and QUIBIDS,      )
HOLDINGS, LLC,                  )
                                )
                  Defendants.   )

---

## MOTION TO DISMISS CORRECTED SECOND AMENDED COMPLAINT
## AND BRIEF IN SUPPORT

---

DATED:  April 30, 2012

> Reid Robison, OBA #7692
> Michael D. McClintock, OBA #18105
> Jeb Boatman, OBA # 20160
> Daniel A. Loeffler, OBA # 22631
> McAfee & Taft A Professional Corporation
> 10th Floor, Two Leadership Square
> 211 North Robinson Avenue
> Oklahoma City, OK73102
> Telephone:    (405) 235-9621
> Facsimile:    (405) 235-0439
>
> **ATTORNEYS FOR DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... i

MOTION TO DISMISS ...................................................................................... 1

BRIEF IN SUPPORT OF MOTION TO DISMISS ................................................ 1

INTRODUCTION ................................................................................................ 1

ARGUMENT AND AUTHORITY .......................................................................... 3

    I.    THE CONSUMER PROTECTION CLAIMS LOCKE AND BROWN BROUGHT UNDER OKLAHOMA LAW SHOULD BE DISMISSED. ................... 3

    II.    PLAINTIFFS' "GAMBLING" THEORY OF RECOVERY DOES NOT STATE A CLAIM. ................................................................................ 9

        A.    Plaintiffs do not allege any actionable damages under the OCPA. ...................................................................... 9

        B.    Plaintiffs' "gambling" allegations show that they are *in pari delicto* with QuiBids. ................................................... 12

        C.    Plaintiffs have failed to allege facts to show that QuiBids conducts "commercial gambling." ...................... 12

            1.    Plaintiffs do not allege facts showing that QuiBids receives bets. ................................................ 13

            2.    Plaintiffs do not allege facts showing that QuiBids operates a lottery. ............................................ 16

    III.    PLAINTIFFS' "MISREPRESENTATION" THEORY OF RECOVERY DOES NOT STATE A CLAIM. ..................................... 20

        A.    As residents of other states, Locke and Brown cannot pursue a "misrepresentation" theory of recovery under Oklahoma law. ........................................... 21

        B.    Plaintiffs fail to plead essential elements of their "misrepresentation" theory. ................................................ 25

            1.    Oklahoma Common Law Fraud Requires Actual Reliance ...................................................... 25

**2.** **The OCPA requires reliance as an element of causation.**............................................................28

**C.** **Plaintiffs' SAC fails to establish a duty.**................................................31

**1.** **An "imbalance of knowledge" does not establish a duty of disclosure in Oklahoma.**.........................31

**2.** **Plaintiffs' contentions regarding alleged non-disclosure do not state a claim.**..............................................32

**IV.** **THE UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED CLAIMS ARE DERIVATIVE OF COUNTS I, II, AND III AND, ACCORDINGLY, SHOULD BE DISMISSED**.........................................................34

**CONCLUSION**...................................................................................................**35**

**CERTIFICATE OF SERVICE**.......................................................................**36**

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ....................................................................... 6

*Adell v. Macon County Greyhound Park, Inc.*,
785 F. Supp. 2d 1226 (M.D. Ala. 2011) ....................................................... 11

*Aetna Finance Co. v. Gaither*,
880 P.2d 857 (N.M. 1994) ............................................................................ 29

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) .............................................................................. 6

*Am. Target Advertising, Inc. v. Giani*, 1
99 F.3d 1241 (10th Cir. 2000) ......................................................................... 4

*Avery v. State Farm Mut. Aut. Ins. Co*,
835 N.E.2d 801 (Ill. 2005) ........................................................................... 28

*Benchmark Electronics, Inc. v. J.M. Huber Corp.*,
343 F.3d 719 (5th Cir. 2003) ........................................................................ 23

*Black Hawk Oil Co. v. Exxon Corp.*,
969 P.2d 337 (Okla. 1998) ............................................................................ 27

*BMW of North America, Inc. v. Gore*,
517 U.S. 559 (1996) .................................................................................... 4-7

*Bourke v. W. Bus. Products, Inc.*,
120 P.3d 876 (Okla. Civ. App. 2005) ........................................................... 26

*Boutwell v. State*,
659 P.2d 322 (Okla. Crim. App. 1983) ........................................................ 18

*Bowlan v. Lunsford*,
54 P.3d 666 (Okla. 1936) .............................................................................. 12

*Brannon v. Munn*,
68 P.3d 224 (Okla. Civ. App. 2002) ............................................................... 9

*Brill v. Walt Disney Co.*,
2010 WL 5011594 (Okla. Civ. App. Aug. 23, 2010) ................................... 34

*Brinley v. Williams,*
114 P.2d 463 (Okla. 1941) .................................................................. 12

*Buckland v. Threshold Enters., LTD.,*
66 Cal. Rptr. 3d 543 (Cal. Ct. App. 2007) ...................................... 29

*Bunch v. KMART Corp.,*
898 P.2d 170 (Okla. Civ. App. 1995) ............................................... 26

*Century 21 v. Hometown Real Estate Co.,*
890 S.W.2d 118 (Tex. Ct. App. 1994) .............................................. 29

*Chiarella v. United States,*
445 U.S. 222 (1980) ............................................................................ 31

*City of Tulsa v. State ex rel. Publ Employees Relations Bd.,*
967 P.2d 1214 (Okla. 1998) ............................................................... 18

*Cooper v. GGGR Inv., LLC,*
334 B.R. 179 (E.D. Va. 2005) ........................................................... 29

*Days Inns Worldwide v. Mandir, Inc.,*
393 F. Supp. 2d 1240 (W.D. Okla. 2005) ........................................ 21

*De Witt Motor Co. v. Bodnark,*
169 N.E.2d 660 (Ohio Ct. Com. Pl. 1960) ...................................... 19

*Dean Witter Reynolds, Inc. v. Shear,*
796 P.2d 296 (Okla. 1990) ................................................................. 24

*Edgar v. MITE Corp.,*
457 U.S. 624 (1982) .............................................................................. 6

*Feldman v. Pioneer Petroleum, Inc.,*
No. CIV. 77-0012-R, 1983 WL 1303 (W.D. Okla. Apr. 13, 1983)................. 27

*Finstad v. Washburn University of Topeka,*
845 P.2d 685 (Kan. 1993) .................................................................. 29

*Ginsberg v. Centennial Turf Club,*
251 P.2d 926 (Colo. 1952) ................................................................. 16

*Green v. Aztar Corp.,*
No. 02-C-3514, 2003 WL 22012205 (N.D. Ill. Aug. 22, 2003) ....................... 11

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968) ................................................................. 28

*Hardin v. NBC Universal, Inc.*,
  660 S.E.2d 374 (Ga. 2008) ................................................................. 15

*Harris v. Missouri Gaming Comm'n*,
  869 S.W.2d 58 (Mo. 1994) ................................................................. 17

*Harrison v. Leviton Mfg. Co., Inc.*,
  No. 05-CV-0491-CVE-FHM, 2006 WL 2990524 (N.D. Okla. Oct. 19, 2006) ................ 10

*Healy v. Beer Institute*,
  491 U.S. 324 (1989) ................................................................. 5

*Hovsepian v. Apple, Inc.*,
  No. 08-5788 JF (PVT), 2009 WL 5069144 (N.D. Cal. Dec. 17, 2009) ................ 31

*Humphrey v. Viacom, Inc.*,
  No. 06-2768, 2007 WL 1797648 (D. N.J. June 20, 2007) ................................ 15

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ................................................................. 2, 7

*In re Grand Theft Auto Video Game Consumer Litigation*,
  251 F.R.D. 139 (S.D.N.Y. 2008) ................................................................. 23

*Jacobson v. Mailboxes, Etc.*,
  646 N.E.2d 741 (Mass. 1995) ................................................................. 21

*Kelley v. Mid-Am. Racing Stables, Inc.*,
  139 F.R.D. 405 (W.D. Okla. 1990) ................................................................. 26

*KT & G v. Att'y Gen of the State of Okla.*,
  535 F.3d 1114 (10th Cir. 2008) ................................................................. 5

*Las Vegas Hacienda, Inc. v. Gibson*,
  359 P.2d 85 (Nev. 1961) ................................................................. 15

*Lloyd v. Gen. Motors Corp.*,
  916 A.2d 257 (Md. Ct. App. 2007) ................................................................. 29

*Lyon v. Caterpillar, Inc.*,
  194 F.R.D. 206 (E.D. Pa. 2000) ................................................................. 23

iii

*Maher v. Assoc. Milk Producers, Inc.*,
    No. 94-5035, 1995 WL 34847 (10th Cir. Jan. 30, 1995) ................................... 24

*Major League Baseball Props., Inc. v. Pirce*,
    105 F. Supp. 2d 46 (E.D.N.Y. 2000) ............................................................. 11

*Manning v. Creative Headquarters, LLC*,
    No. 11-C-2203 (N.D. Ill. Mar. 30, 2012)……………………………………………..14

*Mazza v. Am. Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir. 2012) ....................................................................... 7

*Mendelsohn v. BidCactus, LLC*,
    No. 3:11-CV-1500(JCH), 2012 WL 1059702 (D. Conn. Mar. 28, 2012)…………....….15

*Misner v. Knapp*,
    9 P. 65 (Ore. 1885) .................................................................................... 13

*Monus v. Colorado Baseball 1993, Inc.*,
    103 F.3d 145 (10th Cir. 1996) ..................................................................... 35

*Moore v. Subaru of Am.*,
    891 F.2d 1445 (10th Cir. 1989) ................................................................... 24

*Oliveira v. Amoco Oil Co.*,
    76 N.E.2d 151 (Ill. 2002) ........................................................................... 29

*Opinion of the Justices*,
    795 So.2d 630 (Ala. 2001)…………………………………………………………………19

*Ore. Waste Sys. v. Dep't of Envtl. Quality*,
    511 U.S. 93 (1994) .................................................................................... 4

*Patterson v. Beal*,
    19 P.3d 839 (Okla. 2000) ........................................................................ 9, 28

*Penn. Employee Ben. Trust Fund v. Zeneca*,
    710 F. Supp. 2d 458 (D. Del. 2010) .......................................................... 22, 23

*People v. Postman*,
    69 Cal. App. Supp. 2d 814 (Cal. Ct. App. 1945) .............................................. 16

*Pike v. Bruce Church Inc.*,
    397 U.S. 137 (1970) ................................................................................... 4

*Pilgrim v. Univ. Health Card, LLC,*
   660 F.3d 943 (6th Cir. 2011) ..................................................... 7

*PSINet, Inc. v. Chapman,*
   362 F.3d 227 (4th Cir. 2004) ..................................................... 6

*Ridley Packaging Co. v. Holiday,*
   467 P.2d 480 (Okla. 1970) ........................................................ 18

*Sanders v. Apple Inc.,*
   672 F. Supp. 2d 978 (N.D. Cal. 2009) ..................................... 31

*Simaan, Inc. v. BP Products N. Am., Inc.,*
   395 F. Supp. 2d 271 (M.D. N.C. 2005) .................................... 29

*State ex rel. Draper v. Lynch,*
   137 P.2d 949 (Okla. 1943) ........................................................ 16

*State ex rel. Kidwell v. Master Distributors, Inc.,*
   615 P.2d 116 (Idaho 1980) ....................................................... 30

*State v. Am. Holiday Ass'n, Inc.,*
   727 P.2d 807 (Ariz. 1986) ...................................................15-16

*State v. Duc Hong Pham Tran,*
   172 P.3d 199 (Okla. Crim. App. 2007) ................................... 18

*State v. Khalsa,*
   542 N.W.2d 263 (Iowa Ct. App. 1995) ................................... 16

*State v. Young,*
   989 P.2d 949 (Okla. Crim. App. 1999) ................................... 17

*Thomas v. Metro. Life Ins. Co.,*
   540 F. Supp. 2d 1212 (W.D. Okla. 2008) ............................... 22

*Tibbetts v. Sight 'N Sound Appliance,*
   77 P.3d 1042 (Okla. 2003) ........................................................ 10

*Tice v. Tice,*
   672 P.2d 1168 (Okla. 1983) ................................................25, 26

*Tillman v. Shofner,*
   90 P.3d 582 (Okla. Civ. App. 2004) ........................................ 12

*Toomey v. Penwell*,
    245 P. 943 (Mont. 1926) ......................................................................... 13


*Tuttle v. Lorillard Tobacco* Co.,
    377 F.3d 917 (8th Cir. 2004) ................................................................. 29


*U.S. Postal Serv. v. Amada*,
    200 F.3d 647 (9th Cir. 2000) ................................................................. 19

*Varacallo v. Massachusetts Mut. Life Ins. Co.*,
    752 A.2d 807 (N. J. App. Div. 2000) ................................................... 30

*Walls v. Am. Tobacco, Co.*,
    11 P.3d 626 (Okla. 2000) ....................................................................... 10

*Weber v. Mobil Oil Corp.*,
    243 P.3d 1 (Okla. 2010) ......................................................................... 21

*Western Telcon, Inc. v. Cal. State Lottery*,
    13 Cal. 4th 475 (Cal. 1996)..............................................................12, 16

*Weinberg v. Sun Co., Inc.*,
    777 A.2d 442 (Pa. 2001) .........................................................28, 29, 30

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*,
    No. CIV-08-1125-C, 2010 WL 2594828 (W.D. Okla. June 22, 2010) ............................ 23

*Whirlpool Corp. v. Henry*,
    110 P.3d 83 (Okla. Ct. Crim. App. 2005) ....................................... 18

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002) ................................................................. 8

*Whitlock v. Bob Moore Cadillac, Inc.*,
    938 P.2d 737 (Okla. 1997) ..................................................................... 10

*Wilson v. Johnson*,
    No. CIV-05-0921-F, 2006 WL 1555809 (W.D. Okla. June 5, 2006)................................ 23

*Ysbrand v. DaimlerChrrysler Corp.*,
    81 P.3d 618 (Okla. 2003) ..................................................................21-22

## Attorney General Opinions

1999 OK AG 5……………………………………………………………………....13-14

2009 OK AG 11……………………………………………………………………………17

## Statutes, Laws and Constitutional Provisions

U.S. Const. art. I, § 8, cl. 3.................................................................................4

15 U.S.C. § 45…………………………………………………………………..26

18 U.S.C. § 1961 .................................................................................................10

Ala. Code § 8-19-10……………………………………………………………..8

Ga. Code An.. § 10-1-399………………………………………………………..8

Okla. Stat. tit. 15, § 752................................................................................. 9, 18

Okla. Stat. tit. 15, § 753................................................................................. 9, 20

Okla. Stat. tit. 15, § 761.1....................................................................................18

Okla. Stat. tit. 21, § 942......................................................................................12

Okla. Stat. tit. 21, § 981......................................................................................13

Okla. Stat. tit. 21, § 982........................................................................................9

Okla. Stat. tit. 21, § 1051 ............................................................................. 16, 18

Ore. Rev. Stat. §§ 646.605 ..................................................................................23

Class Action Fairness Act of 2005
    Pub. L. No. 109-2, 199 Stat. 4……………………………………………………3

## Other Authorities

Chad DeVeaux, *Lost in the Dismal Swamp: Interestate Class Actions, False Federalism, and the Dormant Commerce Clause*, 79 GEO. WASH. L. REV. 995 (2011)……………………………8

BLACK'S LAW DICTIONARY 231 (6th ed. 1990) ...........................................................19

Restatement (Second) of Conflict of Laws § 148 ..................................................21-22

Restatement (Second) of Conflict of Laws § 187 ................................................. 23, 24

*Newburg on Class Actions* (3d) § 22:49 ........................................................................27-28

WEBSTER'S DICTIONARY 225 (9th ed. 1986)……………………………………………19

## Rules

Fed. R. Civ. P. 8 ................................................................................................................ 1, 35

Fed. R. Civ. P. 9 ............................................................................................................1, 26, 35

Fed. R. Civ. P. 12 .............................................................................................................. 1, 35

## MOTION TO DISMISS

Pursuant to Fed. R. of Civ. P. 8(a), 9(b) and 12(b)(6), Defendants QuiBids Holdings LLC and QuiBids LLC (together "QuiBids"), move to dismiss the Corrected Second Amended Complaint ("SAC") [Dkt. No. 55] filed by Plaintiffs, Lawrence A. Locke ("Locke"), Matthew Brown ("Brown"), and Christopher Lloyd ("Lloyd"). In support, QuiBids submits the following brief.

## BRIEF IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

QuiBids operates an interactive retail shopping website, www.quibids.com (the "Site"), that sells popular consumer products through two formats: (1) an auction format; and (2) a direct purchase format known as "Buy Now." To participate in QuiBids' auctions, users purchase groups of bids—known as "bid packs"—with each individual bid costing $0.60. Items are offered for auction with a certain time set and a typical starting price of $0.00. When a user bids on an item, the price of the item goes up by predetermined increments, generally one cent. If bids are placed in the waning seconds of an auction, additional seconds are added to the time remaining on the auction, akin to the "going once, going twice . . ." feature of live auctions. When the timer reaches 0:00, the auction ends, and the highest bidder has the right to purchase the item for the final price. If a user wishes to purchase an item for which he or she was not the final bidder, the user can utilize the Buy Now feature after the auction has ended. This feature allows the user to apply the value of purchased bids used in that particular auction (*i.e.*, $0.60 each) towards that item's purchase price. Because of QuiBids unused bid refund policy and its Buy Now feature, a $0.60 bid is

truly "lost" only if an unsuccessful user chooses not to use Buy Now, or a successful user chooses not to purchase the item.

In this action, Locke, Brown, and Lloyd seek to pursue various claims against QuiBids on behalf of a putative class consisting of all persons in the United States "who spent more money on QuiBids.com than the value of the goods they received, if any . . . ." SAC at ¶ 58.  Presently, Plaintiffs assert claims under the Oklahoma Consumer Protection Act ("OCPA"), 15 O.S. §§ 751-765, as well as claims for Oklahoma common law fraud. Plaintiffs also assert derivative claims of money had and received and unjust enrichment, both of which are directly contingent upon their OCPA and fraud claims.

Plaintiffs' claims are premised upon two theories: (1) QuiBids has, through various misrepresentations and/or omissions, deceived its users as to the true nature of its auctions, thereby causing the users to lose money; and (2) QuiBids' business constitutes illegal commercial gambling as defined by Oklahoma's Criminal Code, and consumers are therefore entitled to recoup their losses.  These allegations do not state a claim.[1]

First, non-Oklahoma resident Plaintiffs Locke and Brown have brought their consumer protection claims under Oklahoma law, which is improper and, therefore, these claims should be dismissed.  *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules."). As set forth in more detail below, the dormant Commerce Clause of the United States

---

[1] The arguments in this motion are presented, in part, by a wholly new defendant, relate to factual allegations that were not in the original Complaint and are, in part, directed at wholly new plaintiffs.

Constitution prohibits courts from allowing such claims under Oklahoma law because it would result in allowing Plaintiffs to utilize the laws of Oklahoma to "regulate" business activities that occurred in other states.

Second, Plaintiffs' "gambling" theory of liability is flawed because: (1) the OCPA does not permit consumers to recover damages based solely on the alleged illegality of a transaction in which they participated; (2) the doctrine of *in pari delicto* forecloses such recovery; and (3) Plaintiffs have failed to allege facts to show that QuiBids' auctions constitute "commercial gambling."

And third, Plaintiffs' "misrepresentation" or "fraud" theory of recovery does not state a claim because: (1) applicable choice-of-law principles demonstrate that, as Oregon and Illinois residents respectively, Locke and Brown cannot state either an Oklahoma common law fraud or misrepresentation-based OCPA claim against QuiBids; and (2) even if non-resident plaintiffs like Locke and Brown could state such a claim, all Plaintiffs have failed to allege facts showing the existence of either duty or causation, which are essential elements of both.

## ARGUMENT AND AUTHORITY

## I.   THE CONSUMER PROTECTION CLAIMS LOCKE AND BROWN BROUGHT UNDER OKLAHOMA LAW SHOULD BE DISMISSED.

As the United States Senate explained when it passed the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified at 28 U.S.C. §§ 1332(d), 1453(b) (2006)), nationwide consumer class actions certified under a single state's laws "undermin[e] basic federalism principles" by "invit[ing] one state court to dictate to 49 others what their laws should be on a particular issue." *See* S. Rep. No. 109-14, *reprinted in* 2005 U.S.C.C.A.N.

at 24.   Consistent with this statement, the Court should rely on the Dormant Commerce Clause of the Constitution to conclude that Locke and Brown, who are not Oklahoma residents, cannot state a consumer protection claim against QuiBids under Oklahoma law, but instead, must rely on the laws of the states in which they are domiciled.  *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573 (1996) (holding that although "Alabama may insist that BMW adhere to a particular disclosure policy in that State," it "does not have the power . . . to punish BMW for conduct . . . that had no impact on Alabama or its residents").

The Commerce Clause of the United States Constitution states, in relevant part, that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.   This clause not only grants Congress the affirmative power to regulate interstate commerce, it also restrains the states' authority to regulate the same.  *See, e.g.*, *Ore. Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994).   "This implied restraint upon the states is often referred to as the negative or 'dormant' aspect of the Commerce Clause."  *Am. Target Advertising, Inc. v. Giani*, 199 F.3d 1241, 1254 (10th Cir. 2000).

A state's laws, including the rulings of its judiciary, can violate the dormant commerce clause in three ways: (1) they can unjustifiably discriminate against interstate commerce in favor of intrastate commerce; (2) they can, pursuant to *Pike v. Bruce Church Inc.*, 397 U.S. 137 (1970), without discriminating against interstate commerce, impose a burden upon it that is incommensurate with the local benefits secured; and (3) as would be the case if Locke and Brown are permitted to move forward under Oklahoma law, they can have the practical effect of controlling commerce entirely outside of the boundaries of the state in question,

making their application *per se* invalid.  *KT & G v. Att'y Gen of the State of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008).

In *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 337 (1989) the Supreme Court discussed *per se* violations premised on extraterritorial regulation, noting that this rule "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Id.* at 337.  In other words, Justice Blackmun explained, "[t]he Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another." *Id.*

The Supreme Court revisited this issue in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).  In that case, the plaintiff was awarded millions of dollars in punitive damages based on hundreds of transactions that purportedly violated Alabama's consumer fraud statute.[2]  Because only fourteen of the allegedly offending transactions had occurred in Alabama, the Supreme Court granted certiorari to consider, *inter alia*, whether the Alabama judiciary's attempt to use a punitive damages award to coerce BMW into complying with Alabama law in all of its American transactions "infring[ed] on the policy choices of other States." *Id.* at 572.

Ultimately, the Court concluded that the acts of the Alabama judiciary did unconstitutionally constrain the policy choices available to other states, writing:

> No one doubts that a State may protect its citizens by prohibiting deceptive trade practices . . . .  But the States need not, and in fact do not, provide such protection in a uniform manner.  . . . The result is a patchwork of rules representing the diverse policy judgments of lawmakers in 50 States.

---

[2] The plaintiff had been awarded a nominal amount of actual damages under the Alabama statute based on his own dealings with BMW in Alabama.

*        *        *        *

    [W]hile we do not doubt that Congress has ample authority to enact . . . a [uniform] policy for the entire Nation, it is clear that no single State could do so, or even impose its own policy choice on neighboring States.  Similarly, one State's power to impose burdens on the interstate market for automobiles is not only subordinate to the federal power over interstate commerce, but is also constrained by the need to respect the interests of other States, *see, e. g., Healy v. Beer Institute*, 491 U. S. 324, 335-336 (1989) (the Constitution has a "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres" (footnote omitted)); *Edgar v. MITE Corp.*, 457 U. S. 624, 643 (1982).

    We think it follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States. . . . [B]y attempting to alter BMW's nationwide policy, Alabama would be infringing on the policy choices of other States.  To avoid such encroachment, the economic penalties that a State such as Alabama inflicts on those who transgress its laws, whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages, must be supported by the State's interest in protecting its own consumers and its own economy.  Alabama may insist that BMW adhere to a particular disclosure policy in that State.  Alabama does not have the power, however, to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents.  Nor may Alabama impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions

*Id.* at 568-73 (footnotes and citation omitted).[3]

---

    [3] Applying these concepts, the Second Circuit recently observed that "[b]ecause the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without projecting its legislation into other States."  *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (quotations omitted).  This, the *Dean* court explained, means that "the internet will soon be seen as falling within the class of subjects that are protected from State regulation because they imperatively demand a single uniform rule."  *Id.* at 104 (quotation omitted).  Other courts, including the Tenth Circuit, agree.  *See, e.g., PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004) ("Given the broad reach of the Internet, it is difficult to see how a blank regulation of Internet material . . . can be construed to have only a local effect."); *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999) ("[C]ertain types of commerce have been recognized as requiring national regulation.  The Internet is surely such a medium.") (quotation and citation omitted).

By asking the Court to apply Oklahoma law to their consumer protection claims, Locke and Brown, like Gore before them, attempt to use the courts to hold a business that operates on a nationwide basis to a single state's standard of consumer conduct.[4]  As *Gore* teaches, this is not permissible.  When it solicits customers like Locke and Brown in Oregon and Illinois, QuiBids should not be held to the standards set forth by the Oklahoma legislature and judiciary.  Rather, QuiBids must comply only with those standards enunciated by Oregon and Illinois.  *See In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1018 ("State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules."); *cf. See Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 593-94 (9th Cir. 2012) (overturning certification of a putative nationwide class under California law; holding that "each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place" because "each foreign state has an interest in applying its law to transactions within its borders . . . if [one state's] law were applied to the entire class, foreign states would be impaired in their ability to calibrate liability to foster commerce."); *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) ("No doubt, States have an independent interest in preventing deceptive or fraudulent practices by companies operating within their borders.  But the State with the strongest interest in regulating such

---

[4] As set forth in § III(A), *infra*, Locke and Brown allegedly received and relied upon the allegedly misleading statements of QuiBids outside of Oklahoma and there are no allegations in the SAC to the contrary.

conduct is the State where the consumers—the residents protected by its consumer-protection laws—are harmed by it.") (emphasis omitted).[5]

The fact that QuiBids is based in Oklahoma does not change this analysis. As one commentator has explained, the notion that a company that operates on a nationwide basis must always comport with the consumer protection laws of the state in which its headquarters is located, if "[t]aken to its logical conclusion, . . . would necessarily frustrate the sovereign capacity of states wishing to impose more consumer-friendly standards than the defendant's home state."[6] Chad DeVeaux, *Lost in the Dismal Swamp: Interstate Class Actions, False Federalism, and the Dormant Commerce Clause*, 79 GEO. WASH. L. REV. 995, 1057 (2011). This would, in turn, "lead to a race to the bottom—driving many corporations to move their headquarters to states with the least consumer protections." *Id.* There is no need for this. "[A] corporation making marketing choices should be expected to conform its conduct to the specific requirements of each state in which it actually markets its wares—regardless of where its corporate headquarters might be." *Id.* at 1059. Locke and Brown must bring their claims pursuant to the laws of their home states. Accordingly, their claims under OCPA should be dismissed.

---

[5] Of note, it is not only the substantive differences in states' laws that implicate the dormant commerce clause, but also, for example, the differences among their attendant remedies, *see, e.g.*, *White v. Ford Motor Co.*, 312 F.3d 998, 1018 (9th Cir. 2002) ("Even though . . . [Nevada and Alaska] treat distribution of defectively designed products and failure to warn of dangerous defects as toritous, the difference in how they penalize the toritous conduct expresses significantly different policy choices."), and certain key procedural differences, *see, e.g.*, Ala. Code § 8-19-10(f) (expressly prohibiting class actions under the Alabama Deceptive Trade Practices Act); Ga. Code Ann. § 10-1-399(a) (expressly prohibiting class actions under the Georgia Fair Business Practices Act).

[6] DeVeaux, indeed, provides a hypothetical which explains why, had the *Gore* court certified a nationwide class action under New Jersey law—the location of the defendant's headquarters—this "would have precluded Alabama from applying its *own* consumer protection law to Dr. Gore's purchase . . . ." DeVeaux, *supra*, at 1056-57.

## II.  PLAINTIFFS' "GAMBLING" THEORY OF RECOVERY DOES NOT STATE A CLAIM.

Plaintiffs' say that by conducting "commercial gambling"—as defined by Okla. Stat. tit. 21, § 982—QuiBids has engaged in an "unfair trade practice," something that Okla. Stat. tit. 15, § 753(20) declares as "unlawful" for the purposes of the OCPA.[7]  Plaintiffs are wrong because: (1) the OCPA does not permit consumers to recover damages based solely on the alleged illegality of a transaction in which they participate; (2) the doctrine of *in pari delicto* forecloses such recovery; and (3) Plaintiffs have failed to allege facts to show that QuiBids' auctions constitute "commercial gambling."[8]

### A.  Plaintiffs do not allege any actionable damages under the OCPA.

"[T]he four elements of a consumer's private right of action under the OCPA are: (1) that the defendant engaged in an unlawful practice as defined in 15 Okla. Stat. § 753; (2) that the challenged practice occurred in the course of defendant's business; (3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury."  *Patterson v. Beal*, 19 P.3d 839, 846 (Okla. 2000); *accord Brannon v. Munn*, 68 P.3d 224, 227 (Okla. Civ. App. 2002).  In discussing the latter two elements, the Oklahoma Supreme Court has explained that a private plaintiff cannot successfully maintain an OCPA

---

[7] Under the OCPA, the term "unfair trade practice" means "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Okla. Stat. tit. 15, § 752(14).

[8] In the First Amended Complaint, Locke, who was the sole Plaintiff, did not seek to recover damages based exclusively on an allegation that QuiBids' auctions constitute commercial gambling. Rather, as the Court noted in its ruling on Defendants' Motion to Dismiss the First Amended Complaint, "he only complain[ed] of failure to disclose—*viz.*, failure to disclose that the website constitutes a lottery or other form of commercial gambling—and *not* that [QuiBids] is conducting illegal gambling."  Order [Dkt. No. 41] at 25 (emphasis added).  The SAC added a claim that seeks damages based exclusively on the allegation that QuiBids' auctions constitute commercial gambling.

claim "merely [by] pro[ving] that [she] was a consumer in an unlawful transaction" because "[a]cutal damages are . . . necessary." *Walls v. Am. Tobacco, Co.*, 11 P.3d 626, 629 (Okla. 2000).[9]   Put differently, a private plaintiff cannot recover damages under the OCPA if she "received precisely what [she] . . . bargained for" in what is an otherwise allegedly illegal transaction. *Id.* at 629.[10]

By asserting an OCPA claim based solely on an allegation that QuiBids conducts illegal commercial gambling, each Plaintiff attempts to do exactly that which the Oklahoma Supreme Court has explained he cannot: recover damages "merely [by] pro[ving] that [he] was a consumer in an unlawful transaction." *Id.*  Each Plaintiff fails to allege or even suggest that he did not "receive[] precisely what [he] bargained for."  Each plaintiff received the opportunity to participate in an auction with no guarantee to win.  Thus, this claim should be dismissed. *See Whitlock v. Bob Moore Cadillac, Inc.*, 938 P.2d 737, 738 (Okla. 1997) (affirming the grant of summary judgment to defendant on an OCPA claim because "the buyers received precisely that for which they had bargained, and had [thus] incurred no monetary damages").

The same principle applies under the analogous RICO statutes, 18 U.S.C. § 1961, *et seq.*, and an examination of its application in that context is enlightening.  For example, in

---

[9] *See also Harrison v. Leviton Mfg. Co., Inc.*, No. 05-CV-0491-CVE-FHM, 2006 WL 2990524, at *5 (N.D. Okla. Oct. 19, 2006) ("[P]laintiff must allege actual damages to qualify as an 'aggrieved consumer' under the [OCPA]."); *Tibbetts v. Sight 'N Sound Appliance*, 77 P.3d 1042, 1051 (Okla. 2003) ("*Walls* made it abundantly clear that . . . the OCPA[] requires the consumer to show something more than a violation of the Act; instead for a viable private claim under the OCPA the consumer must show actual damages as a necessary element of a claim..").

[10] The only party that is aggrieved by the mere illegality of a transaction is the state, and the Oklahoma Supreme Court has squarely rejected the notion "that the OCPA is a 'private attorney general' statutory scheme . . . ." *Tibbetts*, 77 P.3d at 1052.

*Adell v. Macon County Greyhound Park, Inc.*, 785 F. Supp. 2d 1226 (M.D. Ala. 2011), plaintiffs sought, *inter alia*, to use RICO "to get back . . . wagers" they lost "playing electronic bingo machines" at a Greyhound Park located in Alabama. *Id.* at 1230. In dismissing this RICO claim, the *Adell* court first observed that "a number of courts have rejected [the] argument[] . . . that the alleged illegality of [a] gambling transaction under state law translate[s] into a[n] . . . injury to property." *Id.* at 1239 (collecting cases). The *Adell* court explained that "even if the chance to win that Plaintiffs paid for was illegal under state law, such illegality in and of itself would not transform Plaintiffs' gambling losses in to civil . . . property losses" because the plaintiffs "got exactly what they bargained for, . . . a chance to be a winner . . ." *Id.* (quotation omitted); *see also Major League Baseball Props., Inc. v. Pirce*, 105 F. Supp. 2d 46, 51-52 (E.D.N.Y. 2000) ("The illegality and voidness of the gambling transaction [under state law] does not change th[e] fact that the trading card purchaser paid for a bona fide chance to win a prize and thus, suffered no property injury."); *Green v. Aztar Corp.*, No. 02-C-3514, 2003 WL 22012205, at *2 (N.D. Ill. Aug. 22, 2003) ("Green's disappointment at not winning his bets does not constitute an 'injury to property' sufficient to confer RICO standing.").

In each of these RICO cases the "product" for which the consumers sought a refund was the "chance" to win a prize, not the prize itself. This characterization demonstrated that each consumer "got exactly what they bargained for," "a *chance* to be a winner." *Adell*, 785 F. Supp. 2d at 1239 (emphasis added). While QuiBids' auctions do not constitute gambling, Plaintiffs in the instant case request exactly that which the unsuccessful RICO plaintiffs did; a refund for each failed "chance" that they took to win a QuiBids auction. *See, e.g.*, SAC at ¶

50 (noting that Locke's money was "spent on . . . a chance to win").   Like the RICO plaintiffs, Plaintiffs have failed to allege that they suffered any actionable damages.

### B.   Plaintiffs' "gambling" allegations show that they are *in pari delicto* with QuiBids.

The doctrine of *in pari delicto* also precludes Plaintiffs' gambling related claims. Pursuant to this doctrine, "no one knowingly participating in a transaction intended to accomplish a purpose forbidden by law can bring an action for *any cause* directly connected with that illegality." *Brinley v. Williams*, 114 P.2d 463, 464-65 (Okla. 1941) (emphasis added). This means that "parties to an immoral or illegal transaction are . . . estopped, as to the other, to take advantage of [their] own moral turpitude, illegal act, or criminal conduct for purposes of recovering damages for injuries sustained as a consequence of their joint wrong.'" *Tillman v. Shofner*, 90 P.3d 582, 584 (Okla. Civ. App. 2004) (quoting *Bowlan v. Lunsford*, 54 P.3d 666, 668 (Okla. 1936)).

Plaintiffs attempt to do exactly that which cases such as *Brinley* and *Tillman* teach is prohibited under Oklahoma law: "bring an action" "for purposes of recovering damages for injuries sustained as a consequence of [their alleged] joint wrong" with QuiBids.   Plaintiffs' claims based on the "gambling" theory should be dismissed.

### C.   Plaintiffs have failed to allege facts to show that QuiBids conducts "commercial gambling."

Plaintiffs allege that QuiBids conducts commercial gambling on the Site "because it is 'receiving bets' *and* conducting a lottery.'"   SAC at ¶ 68 (citation and alteration omitted) (emphasis added).   Although a transaction cannot be both a "bet" *and* a "lottery," *see, e.g.*, *W. Telcon, Inc. v. Cal.State Lottery*, 13 Cal. 4th 475, 484-88 (Cal. 1996) (explaining that "[t]hese two

categories of gambling are . . . exclusive of one another"), it does not matter.  Plaintiffs do not allege facts to show that QuiBids does either.

### 1. Plaintiffs do not allege facts showing that QuiBids receives bets.

Oklahoma's commercial gambling statutes—Okla. Stat. tit. 21, §§ 981-988—define "[a] 'bet' [a]s a bargain in which the parties agree that, dependent upon chance, or in which one of the parties to the transaction has valid reason to believe that it is dependent upon chance, one stands to win or lose something of value specified in the agreement."  Okla. Stat. tit. 21, § 981(1).  The Oklahoma Attorney General has explained that, under § 981, there is no bet when there has merely been an "offer[] of 'prizes . . .' to . . . participants in public or semipublic events" "contributed solely by associations or other persons that *do not compete* for the 'purses, prizes or premiums.'"  1999 OK AG 5, ¶¶ 10-11 (quoting Okla. Stat. tit. 21, § 981(1)(c)) (emphasis added).  "In other words, in the case of a bet, the money belongs to those who post it, every one of whom has a chance to win it back from the entity or person to which she posts it."  *Id.* at ¶ 10.[11]

For example, if two people each "post" $50.00 before playing a round of golf against one another, the player with the lower score for the round of golf will get the other player's $50.00 *and* receive back the $50.00 he posts.  Because the winner receives back the $50.00 he originally posted, each has placed a "bet."  Likewise, when a person puts $50.00 down on a

---

[11] *Accord Toomey v. Penwell*, 245 P. 943, 945 (Mont. 1926) (distinguishing between a bet, which can be won back by the person posting it, and a prize which, under all circumstances, must be awarded by its offeror); *Misner v. Knapp*, 9 P.65, 66 (Ore. 1885) ("[A]ccording to the definition of 'wager,' there must be two or more contracting parties, having mutual rights in respect to the money or other thing wagered or, as sometimes said, 'staked,' and each of the parties necessarily risks something, and has a chance to make something upon the happening or not happening of an uncertain event.").

blackjack table, that person is placing a "bet" because either the player or the dealer will "win" back the $50.00 each has "posted." *See, e.g.*, 1999 OK AG 5 (declaring a 'money hunt' to involve bets because, given that "pooled entrance fees . . . [were] distributed to winning contestants," participants could "win" their money back).

Plaintiffs do not allege that QuiBids' users have a chance to "win" back from QuiBids the money that Plaintiffs allege the users "post" in the form of bids.  Rather, in the paradigm described by Plaintiffs, each time a QuiBids' user places a bid, the user unequivocally relinquishes to QuiBids a $0.60 fee that the user can never get back, even if the user wins the auction in which the bid is placed.[12]  *See, e.g.*, SAC at ¶ 39 ("[W]hen a QuiBids consumer bids on an item, the consumer pays $0.60 for each bid, regardless of whether or not the consumer actually wins the item.").  Accordingly, Plaintiffs have not alleged that QuiBids conducts "commercial gambling" by receiving "bets," because they do not allege that users "risk" losing the $0.60 associated with each bid.

Based on this reasoning, the court in *Manning v. Creative Headquarters, LLC*, No. 11-C-2203 (N.D. Ill. Mar. 30, 2012), held that auctions like those conducted by QuiBids are not gambling.  More specifically, the court dismissed a Complaint pursuant to which the plaintiffs' attempted to recover what they alleged were monies they lost gambling on penny auction websites, explaining that:

> Because all participants' entry and bidding fees are certain to be lost to Vesuvius and the other [penny auction] defendants, such fees never hang in the balance because at no point do the penny auction participants pay anything to the defendants that is in any way dependent on the outcome of

---

[12] As Plaintiffs allege, "[t]he last bidder 'wins' the auction and the *right to purchase* the item," not the item itself.  *See* SAC at ¶ 36 (emphasis added).  The cost of the bids used to win are not credited toward the purchase price the winner is given the opportunity to pay.

any auction.   Defendants do not compete for the merchandise being auctioned.   *Absolutely nothing is undetermined or contingent about the participants' payment of fees to defendants, and thus, the participants do not "risk" losing their entry or bidding fees.*

*See* Ex. "1" attached hereto at p.3 (emphasis added).[13]

Other courts agree.   For example, in *Hardin v. NBC Universal, Inc.*, 660 S.E.2d 374, 375-76 (Ga. 2008), the Georgia Supreme Court held that, even though NBC required a $0.99 text messaging fee be paid for each entrance a viewer made in a game it conducted, NBC had not accepted "bets" or "wagers" from its viewers because "the $[0].99 . . . never h[ung] in the balance."   (quotation omitted).   Likewise, in *Humphrey v. Viacom, Inc.*, No. 06-2768, 2007 WL 1797648, at *7 (D. N.J. June 20, 2007), the United States District Court for the District of New Jersey held that participation fees paid by online fantasy football players did "not constitute bets or wagers" because they were "paid unconditionally for the privilege of participating in a contest . . . that is guaranteed to be won by one of the contestants (but not the entity offering the prize)"; *see also State v. Am. Holiday Ass'n, Inc.*, 727 P.2d 807, 809 (Ariz. 1986) (holding that, where "[t]he prize offered is paid only to participants and the participants themselves determine the outcome, . . . . such contests do not involve bets"); *Las Vegas Hacienda, Inc. v. Gibson*, 359 P.2d 85, 86-87 (Nev. 1961) ("[A] purse or prize offered by a party . . . in a contest in which such party does not engage . . . is without the element of chance or gain or a risk of loss which characterizes the wager agreement.").

Finally, even if, as Plaintiffs allege, QuiBids makes a profit on the majority of its auctions—*i.e.*, the amount of bid revenue generated during an auction exceeds the difference

---

[13] *But see Mendelsohn v. BidCactus, LLC*, No. 3:11-CV-1500(JCH), 2012 WL 1059702 (D. Conn. Mar. 28, 2012).

between the wholesale price for which QuiBids obtains the item and the price at which the

winner of the auction may purchase the item at retail—that does not mean that it receives

"bets."  The Arizona Supreme Court succinctly explained this:

> American funds its prize accounts from its general account without regard to
> the amount of entrance fees received.   If the entrance fees exceed the
> operating costs (including prize money), American makes a profit; if not, it
> takes a loss. In either event, the prize guaranteed to contestants remains
> unchanged . . . .   We can discern no reason . . . why the profitability of a
> business should impact on whether entrance fees are characterized as bets or
> wagers.

*Am. Holiday Ass'n*, 727 P.2d at 810.

## 2.    Plaintiffs do not allege facts showing that QuiBids operates a lottery.

In Oklahoma, "a lottery is any gambling scheme which contains elements of (1) prize,

(2) chance, [and] (3) consideration."  *State ex rel. Draper v. Lynch*, 137 P.2d 949, 953 (Okla.

1943); *see also* Okla. Stat. tit. 21, § 1051.  Plaintiffs suggest that QuiBids conducts a lottery

because the $0.60 a user pays QuiBids for a bid is, when that bid is offered, consideration

paid for a chance to win a prize defined as the opportunity to purchase merchandise at a

steep discount.  Plaintiffs are incorrect.

"[B]etting[] and lotteries are separate and distinct things in law and fact . . . ."[14]  *People

v. Postman*, 69 Cal. App. Supp. 2d 814, 819 (Cal. Ct. App. 1945); *see also Ginsberg v. Centennial

Turf Club*, 251 P.2d 926, 929 (Colo. 1952) ("[N]ot . . . all gambling is a 'lottery' . . . as th[at]

term[] [is] defined in law.").  "Betting may be defined as promises to give money or money's

worth upon the determination of an uncertain or unascertained event in a particular way, *and*

---

[14] This reality is evidenced by the fact that the Oklahoma Legislature defines "bets" and
"lottery" in two wholly separate statutes.

*(unlike a lottery)* may involve skill or judgment." *W. Telcon*, 13 Cal. 4th at 485 (quotation and alteration omitted) (emphasis added).  In other words, if a game's outcome is dependent in any way upon skill, it is not a lottery, though it may still be proscribed because it involves "betting."

The Missouri Supreme Court has cogently articulated this point:

> From an individual player's perspective, a lottery is a form of gambling in which consideration is paid for an opportunity at a prize, where skill is absent or only nominally present. No player's choice or will has any part in the lottery's result, nor can human reason, foresight, sagacity, or design enable a player to affect the game. Skill does not affect the probability of 'winning.' **No one can be a better lottery player than anyone else** (though players may buy more opportunities).

*Harris v. Missouri Gaming Comm'n*, 869 S.W.2d 58, 62 (Mo. 1994) (footnote omitted) (emphasis added); *see also State v. Khalsa*, 542 N.W.2d 263, 266 (Iowa Ct. App. 1995) (explaining that "[t]he chance element [of Iowa's lottery statute] refers to the *absence of skill* or design.") (emphasis added).

Plaintiffs allege that there exist "wise bidding strateg[ies]" that QuiBids' users may implement, *see* SAC at ¶ 6, and that, as a result, some QuiBids' users are more "savvy" than others, *see id.* at ¶ 42; *see also id.* at ¶ 40 (alleging that only "*for the average [QuiBids'] user* [winning is] almost entirely [a matter] of luck") (emphasis added).  Thus, Plaintiffs readily admit what is otherwise obvious:  through the implementation of a strategy learned over time, it is possible for one individual to be a "better" or more successful QuiBids' user than another individual.  This could not be true if QuiBids operated a lottery because "no one can be a better lottery player than anyone else." *Harris*, 869 S.W.2d at 62.  As a result, Plaintiffs fail to allege that QuiBids operates a lottery.

17

QuiBids is aware that, in some jurisdictions, it is not the absence of skill that creates a lottery, but rather the fact chance predominates over any element of skill that is present. Oklahoma courts, however, have never indicated which of these two approaches applies here.  But they have repeatedly said that Oklahoma's criminal statutes, such as § 1051, must "be construed strictly against the State and liberally in favor of the accused."  *State v. Duc Hong Pham Tran*, 172 P.3d 199, 200 (Okla. Crim. App. 2007); *State v. Young*, 989 P.2d 949, 953 (Okla. Crim. App. 1999) ("[C]riminal statutes are to be construed strictly against the State and liberally in favor of the accused."); *accord Boutwell v. State*, 659 P.2d 322, 329 (Okla. Crim. App. 1983)[15]  Thus, between the two competing views, this Court should apply the former.

Finally, even if the "predominance" standard applied, the SAC nonetheless fails to allege facts showing that QuiBids' auctions constitute lotteries.  In Oklahoma, "where a statute contains a definition, that definition is binding on the courts." *City of Tulsa v. State ex rel. Publ Employees Relations Bd.*, 967 P.2d 1214, 1220 (Okla. 1998).  Section 1051 does not, however, define the word "chance," nor is the term defined elsewhere by the Oklahoma Legislature.  As a result, the Court must turn to the plain meaning of the word.  *See, e.g., Whirlpool Corp. v. Henry*, 110 P.3d 83, 84 (Okla. Ct. Crim. App. 2005) ("We look at the plain meaning of the statutory language."); *see also Ridley Packaging Co. v. Holiday*, 467 P.2d 480, 482 (Okla. 1970) ("The Supreme Court may not expand the plain meaning of the words [of a

---

[15] Not only is § 1051 a criminal statute that must be construed strictly against the State, the OCPA itself carries criminal penalties and thus, it too must be construed strictly against the State. *See* Okla. Stat. tit. 15, § 761.1(E) ("[A]ny person convicted in a criminal proceeding of violating the Oklahoma Consumer Protection Act shall be guilty of a misdemeanor."); *Question Submitted by: The Honorable Danny Morgan, State Representative, District 32*, 2009 OK AG 11, ¶ 11 ("Because violations of the prohibitions are misdemeanors, the statute is a criminal statute.").

statute] by construction.   The legislature has expressed its intention in the statute as enacted.") (citation omitted).

"Chance" means "[s]omething that happens unpredictably *without any discernible human intention* or direction and *in dissociation from any observable pattern*."   WEBSTER'S DICTIONARY 225 (9th ed. 1986) (emphasis added); *see also U.S. Postal Serv. v. Amada*, 200 F.3d 647, 652 (9th Cir. 2000) (adopting Webster's definition); *Opinion of the Justices*, 795 So.2d 630, 635 (Ala. 2001) (defining chance as "the absence of 'controllable causation'—'the opposition of intention'") (quoting BLACK'S LAW DICTIONARY 231 (6th ed. 1990)); *De Witt Motor Co. v. Bodnark*, 169 N.E.2d 660, 667 (Ohio Ct. Com. Pl. 1960) (defining chance as a "result in which human reason, or will or design is lacking").   Pursuant to this definition, the outcome of QuiBids' auctions is not so governed by chance as to classify them as lotteries.

First, taking the allegations in the SAC to be true, the results of QuiBids' auctions have, over time, formed an observable pattern.   *See* SAC at ¶ 1 (explaining the average number of bids in QuiBids' auctions directly corresponds to the stated value of the item).   If the results of QuiBids' auctions were determined predominately by chance, such a pattern would not exist.   Rather, if chance were to predominate, any bid placed at any time in any auction would be no more likely to be successful than any other bid.   Plaintiffs acknowledge this is not true.

Moreover, because a user can always continue bidding on an item, he or she always has complete control over whether he or she wins a particular auction.   When he or she chooses not to place one more bid, he or she chooses to lose the auction.   There is nothing out of his or her control.   The outcome is completely driven by human intention.

Moreover, Plaintiffs own proposed class definition is premised on a user's choice to "lose" money. Plaintiffs would like to certify a class of QuiBids users who have paid more to QuiBids than the value of the merchandise they have received back, with that value measured by QuiBids' "Value Price." *See* SAC at ¶ 58. If every user that lost an auction used the "Buy Now"—*i.e.*, paid $0.60/unsuccessful bid made during the auction and then paid any additional monies necessary to purchase the item for the "Value Price"—there would, by definition, be no members of this class. All unsuccessful users in any particular auction would pay the same amount, the "Value Price," for the same item.

## III.   PLAINTIFFS' "MISREPRESENTATION" THEORY OF RECOVERY DOES NOT STATE A CLAIM.

In addition to alleging that QuiBids conducts commercial gambling, Plaintiffs also allege that, by making certain misrepresentations and/or omissions, QuiBids has committed an unlawful practice under § 753(20) of the OCPA—defined either as an "unfair trade practice" or a "deceptive trade practice"[16]—and/or has committed common law Oklahoma fraud. Locke and Brown cannot, as a matter of law, succeed on this theory of recovery because, as residents of other states, neither has the ability to assert either an Oklahoma common law fraud or misrepresentation-based OCPA claim against QuiBids. Moreover, the claims of all Plaintiffs fail because none has plausibly alleged the existence of either duty or causation, which are essential elements of both their misrepresentation-based OCPA and fraud claims.

---

[16] The OCPA's definition of "unfair trade practice" is provided *supra*. For these purposes, the term "deceptive trade practice" "means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person." Okla. Stat. tit. 15, § 752(13).

### A.   As residents of other states, Locke and Brown cannot pursue a "misrepresentation" theory of recovery under Oklahoma law.

Because it sits in Oklahoma, the Court should apply Oklahoma's choice-of-law principles to Plaintiffs' misrepresentation theory of recovery.  *Days Inns Worldwide v. Mandir, Inc.*, 393 F. Supp. 2d 1240, 1247 (W.D. Okla. 2005).[17]  These principles require examination of § 148 of the Restatement (Second) of Conflict of Laws, which Oklahoma courts "appl[y] to actions to recover pecuniary damages for false representations whether fraudulent, negligent, or innocent."  *Ysbrand v. DaimlerChrysler Corp.*, 81 P.3d 618, 626 (Okla. 2003); *accord Weber v. Mobil Oil Corp.*, 243 P.3d 1, 6-7 (Okla. 2010).

Pursuant to subsection (2) of § 148,[18] "[w]hen[, as here,] the plaintiff's action in reliance took place in whole or in part in a state other than that where the [allegedly] false representations were made," the Court must determine which state "has the most significant relationship to the occurrence and the parties."  This determination is made by examining a

---

[17] Plaintiffs may argue that this assertion directly contradicts QuiBids' contention that the Oklahoma choice-of-law provision in QuiBids' terms and conditions ("T&C") governs the gambling recovery claims at issue in *Bryant v. QuiBids, LLC*, No. Civ.-12-134-F (W.D. Okla. Feb. 3, 2012). Plaintiffs would, however, be incorrect.  By its own terms, the choice-of-law provision governs claims that arise out of the "*use*" of the Site.  While the *Bryant* claims relate to such use, the misrepresentation-based claims at issue here relate only to the pre-use *inducement* of Plaintiffs.  Thus, the choice-of-law provision Plaintiffs agreed to is inapplicable.  *See, e.g., Jacobson v. Mailboxes, Etc.*, 646 N.E.2d 741, 745-46 (Mass. 1995) ("The forum selection clause by its terms relates only to actions to enforce the agreement and not to actions based on unlawful conduct that induced a franchisee to sign the agreement . . . .  An action for precontract misrepresentations and for fraud in the inducement . . . does not easily sound like an action to enforce an agreement . . . We, therefore, conclude that the forum selection clause does not apply to wrongs that Mailboxes allegedly committed before the parties entered into a contractual relationship, including allegations of precontract violations of G. L. c. 93A.") (emphasis omitted).

number of factors, including the plaintiff's state of domicile, the place where the plaintiff received the alleged misrepresentations, and the place where the plaintiff allegedly acted in reliance thereon.

In discussing the proper application of these factors, Comment (j) to § 148(2) explains that, "when the plaintiff acted in reliance upon the defendant's representations in a single state, this state will usually be the state of the applicable law . . . if (a) the defendant's representations were received by the plaintiff in this state, *or* (b) this state is the state of plaintiff's domicile." (emphasis added).

Here, Locke and Brown acted in reliance upon QuiBids' alleged misrepresentations in Oregon and Illinois, which also happen to be the states in which they received the alleged misrepresentations, *and* the states of their domiciles. *See* SAC at ¶¶ 11-12. Therefore, Oregon and Illinois law will govern any attempt by Locke and Brown to recover damages from QuiBids based upon a misrepresentation theory. *Ysbrand*, 81 P.3d at 627 ("[E]ach class member presumably received the representation in their home state, their place of domicile. Therefore, the contacts point to each class member's home state for the applicable law."); *see also Thomas v. Metro. Life Ins. Co.*, 540 F. Supp. 2d 1212, 1226 (W.D. Okla. 2008) (noting with regard to a proposed consumer protection class action that "the court's analysis require[d] dismissal of any state law claims alleged under the laws of any states where a particular

---

[18] Subsection (2), rather than subsection (1) of § 148 applies here. *See, e.g., Ysbrand*, 91 P.3d at 626 ("Subsection (2) applies to this dispute because the nationwide representations in DaimlerChrysler's advertising were made in states outside each class member's home state."); *see also Penn. Employee Ben. Trust Fund v. Zeneca*, 710 F. Supp. 2d 458, 470 (D. Del. 2010) ("The . . . appropriate view is that the alleged misrepresentations underlying Plaintiffs' claims were 'made' in Delaware because that is the place where the substance of the factual statements comprising the alleged misrepresentations emanated. In other words, the alleged misrepresentations at issue were made in Delaware and then repeated in the Plaintiffs' home states.").

named plaintiff is not a resident").[19]   The misrepresentation-based claims that Locke and Brown assert under Oklahoma law should be dismissed.[20]

To the extent that it could be said that by agreeing to QuiBids' T&C, Locke and Brown may have assented to the application of Oklahoma law to actions premised on pre-contract conduct, Oregon and Illinois law nonetheless remain applicable to their claims. "To determine whether such a contractual choice of law provision is enforceable, Oklahoma courts use the analysis set forth in the Restatement (Second) of Conflict of Laws § 187." *Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*, No. CIV-08-1125-C, 2010 WL 2594828 at *2 (W.D. Okla. June 22, 2010).[21]   Pursuant to § 187(2)(b) of the Restatement, when a contract contains a choice-of-law provision, that provision is not given effect if: (1) there is

---

[19] *Accord Zeneca*, 710 F. Supp. 2d at 472 (applying § 148(2) and concluding that "Pennsylvania law controls in that this is the forum where each Plaintiff relied upon the alleged misrepresentations . . . as well as the place where (a) the alleged misrepresentations were received *and* (b) each Plaintiff's residence or place of business is located.") (emphasis added); *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 728 (5th Cir. 2003) (ignoring a New York choice-of-law provision and applying Texas law because the "[t]he alleged injury occurred . . . in Texas, and it arose from misrepresentations made in or directed to th[at] state"); *In re Grand Theft Auto Video Game Consumer Litigation*, 251 F.R.D. 139, 151 (S.D.N.Y. 2008) ("[T]hough portions of the defendants' allegedly deceptive marketing may have been conceived at the defendants' principal places of business in New York, the actual deception occurred at the time that each plaintiff purchased a copy of [the video game]" and thus, "the interest analysis favors the application of the consumer-fraud law of the state wherein each Settlement Class member purchased his copy."); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 215 (E.D. Pa. 2000) (even though the alleged misrepresentations were disseminated from Illinois, the state of the defendant's principal place of business, application of § 148(2) dictated that "the ICFA (Illinois Consumer Fraud Act) [could] not be uniformly applied to all putative class members' claims").

[20] There are material differences between the OCPA and the Oregon Unfair Trade Practices Act ("OUTPA"), Ore. Rev. Stat. §§ 646.605, *et seq.*, that would make application of the OCPA, rather than the OUTPA, prejudicial to QuiBids.  These include: (1) unlike the OCPA, the OUTPA requires proof that the defendant's actions were willful, *id.* § 646.638(1); and (2) the OUTPA is subject to a one-year statute of limitations, *id.* § 646.638(6), while the OCPA is subject to a three-year statute of limitations, *see Wilson v. Johnson*, No. CIV-05-0921-F, 2006 WL 1555809, at *3 (W.D. Okla. June 5, 2006).

another state with a materially greater interest in the determination of the particular interest; (2) applying the laws of the chosen state would offend the public policy of the state with such a greater interest; and (3) the laws of the state with the greater interest would be applicable absent the choice of law provision. *Moore v. Subaru of Am.*, 891 F.2d 1445, 1449 n.3 (10th Cir. 1989).

Here, each of the elements set forth in § 187(2)(b) is satisfied because: (1) as § 148 of the Restatement shows, Oregon and Illinois have a materially greater interest in protecting their home state consumers than does Oklahoma; (2) applying Oklahoma law would offend the public policy of Oregon and Illinois, *see* note 19, *supra*; and (3) application of § 148 demonstrates that Oregon and Illinois law would apply absent the choice-of-law provision in QuiBids' T&C.

Thus, no matter how one chooses to analyze this issue, the result is the same. Locke and Brown cannot, as a matter of law, assert misrepresentation-based claims against QuiBids under Oklahoma law:

- If the Court determines that the Site's choice-of-law provision does not govern claims relating to inducement, but rather only to claims related to the "use" of the Site, it should apply the choice-of-law principles of the state in which it sits—*i.e.*, Oklahoma and its reliance on § 148 of the Restatement—and should determine that Oregon and Illinois substantive law applies.

- If the Court determines that the Site's choice-of-law provision does govern claims relating to inducement, but notes that it does not exclude the application of Oklahoma's choice-of-law provisions, it should, again, apply § 148 and should determine that Oregon and Illinois substantive law applies.

---

[21] *See also Maher v. Assoc. Milk Producers, Inc.*, No. 94-5035, 1995 WL 34847, at *2 (10th Cir. Jan. 30, 1995) ("Oklahoma has adopted the analysis set forth in Restatement (Second) of Conflict of Laws 187 for determining the enforceability of such a clause under Oklahoma law."); *accord Dean Witter Reynolds, Inc. v. Shear*, 796 P.2d 296, 298-99 (Okla. 1990).

- And finally, if the Court determines that Locke, Brown and QuiBids have attempted to agree to the application of Oklahoma's substantive law to claims relating to inducement without respect to its choice-of-law principles, the Court should then determine that this agreement is not effective and that, pursuant to §§ 187(2)(b) and 148 of the Restatement, substantive Oregon and Illinois law applies.[22]

## B. Plaintiffs fail to plead essential elements of their "misrepresentation" theory.

Despite being over 40 pages in length, the SAC fails to allege facts to show that Plaintiffs relied on QuiBids' alleged misrepresentations or omissions or that the alleged misrepresentations or omissions otherwise directly caused them to suffer any damages. The closest Plaintiffs come is the conclusion that: "Because QuiBids' omissions to disclose are material, it is *presumed* that Plaintiffs and all the other members of the Class reasonably relied upon the omissions." SAC at ¶ 86 (emphasis added). Oklahoma law does not, however, recognize the concept of presumed reliance in these circumstances. As a result, Plaintiffs' fraud and misrepresentation-based OCPA claims warrant dismissal.

### 1. Oklahoma Common Law Fraud Requires Actual Reliance

Under Oklahoma law, "[a]ctionable fraud consists of a false material representation made as a positive assertion which is known either to be false, or made recklessly without knowledge of the truth, with the intention that it be acted upon, and *which is relied upon by a party to his/her detriment*." *Tice v. Tice,* 672 P.2d 1168, 1171 (Okla. 1983) (emphasis added). With regard to the last of these elements, "[t]he key is that without the representation the

---

[22] QuiBids does not mean to suggest that the choice-of-law provision in its T&C is never enforceable as between itself and users from states other than Oklahoma. When a user's home state does not have a materially greater interest in the claim—*i.e.*, when the claim relates to the use of the Site and not inducement—that user may agree to the application of Oklahoma law. However, where, as here, the user's home state has a materially greater interest, relevant choice-of-law principles render any attempt to choose the law of Oklahoma ineffectual.

party would not have acted." *Id.* Put otherwise, in Oklahoma "liability for misrepresentation depends upon whether the person relying thereon was *in fact deceived*, not upon whether an ordinarily prudent person should have been misled." *Id.* (emphases added); *see also Kelley v. Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 411 (W.D. Okla. 1990) ("[P]laintiff['s] claims of common law fraud will necessarily involve the element of individual reliance.").

Thus, common law fraud claims must include a particularized allegation[23] that a Plaintiff actually relied upon a misrepresentation or omission, and that such actual reliance caused him detriment. With the exception of an allegation that Locke was struck by "statements [on the Site] emphasizing that all items would be sold at extremely low prices, with huge savings compared to retail prices," SAC at ¶ 48, the SAC, however, lacks any such allegation; all allegations are made in the abstract and none ties a particular statement or omission to a particular Plaintiff.[24] Without pleading reliance with particularity, Plaintiffs have failed to state a common law fraud claim for which relief can be granted. This claim should be dismissed.

---

[23] "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

[24] The lack of an express allegation of facts showing reliance is of particular note given that "[f]raud is never presumed, but must be proven by clear and convincing evidence." *Tice*, 672 P.2d at 1171; *see also Bunch v. KMART Corp.*, 898 P.2d 170, 171-72 (Okla. Civ. App. 1995) (denying class certification in a class action raising common-law fraud claim, noting that "a basic element of proof is reliance, which must be proven for each plaintiff"); *In re Commercial Fin. Services, Inc.*, 268 B.R. 579, 605 (Bankr. N.D. Okla. 2001) ("Causation, in relation to losses incurred by reason of a misrepresentation, is a matter of the recipient's reliance in fact upon the misrepresentation in taking some action or in refraining from it."); *Bourke v. W. Bus. Products, Inc.*, 120 P.3d 876, 886-87 (Okla. Civ. App. 2005) ("Fraud is never presumed and each of the elements must be proved by clear and convincing evidence.").

In limited circumstances—namely for claims brought under § 10(b) of the Securities Exchange Act of 1934, and the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)— Oklahoma courts have allowed plaintiffs to premise fraud-based claims upon "presumed" reliance.  The notion of presumed reliance has not, however, been recognized in the context of a common law fraud claim.

Moreover, a presumption of reliance can only apply to a case involving *total* nondisclosure, and not to a case, such as this, involving both alleged misrepresentations and omissions.  *Feldman v. Pioneer Petroleum, Inc.*, CIV. 77-0012-R, 1983 WL 1303, at **2-4 (W.D. Okla. Apr. 13, 1983).  In *Feldman*, this Court, considering a § 10(b) action, explained:

> It is the view of the Court that reliance must be affirmatively proven by the Plaintiffs in this action. If a distinction is to be made between omissions cases and misrepresentations cases it is decided that the better view is that *Affiliated Ute* is <u>applicable only to cases involving total nondisclosure</u>. Where affirmative misrepresentations are a part of the foundation of the fraud claims each plaintiff must demonstrate that he or she relied on the misrepresentations. To allow recovery to a plaintiff who never read the Prospectus, much less relied upon it, eliminates the causal nexus between the acts of the defendant and the harm suffered by the plaintiff.

*Id.* at *3 (emphasis added).  Here, Plaintiffs' SAC is replete with allegations of affirmative representations that allegedly create false impressions.  It is certainly not a "total nondisclosure" complaint as is required by *Feldman*.

As a final matter, QuiBids is aware that the Oklahoma Supreme Court has stated that "[t]he need to show individual reliance has not precluded class treatment in cases where standardized written misrepresentations have been made to class members." *Black Hawk Oil Co. v. Exxon Corp.*, 969 P.2d 337, 345 (Okla. 1998) (quoting *Newburg on Class Actions* (3d) § 22:49).  In *Black Hawk*, the Oklahoma Supreme Court relied upon the *Newburg* treatise,

which explains that the fact that a class might be certifiable does not excuse the need to show individual reliance for each plaintiff therein.   Indeed, because such reliance cannot be presumed in, for example, a partial misrepresentation case, *Newburg* explains that:

> The trial of securities class actions based on standardized misrepresentations by the defendant or defendants to the plaintiff class is often conducted on a bifurcated, of split-trial, basis in which the fraud issue common to the class members is tried first, postponing if necessary, trial of the reliance issue *as to each individual plaintiff* to a subsequent stage should the common element of securities fraud be found.

*Newburg on Class Action* (4d) §22:56 (emphasis added); *see also Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968) ("We see no sound reason why the trial court, if it determines individual reliance is an essential element of the proof, cannot order separate trials on that particular issue, as on the question of damages, if necessary.").   In sum, specific proof of individual reliance Oklahoma remains necessary to the success of an Oklahoma common law fraud claim.   Plaintiffs' failure to plead facts to show this element is, therefore, fatal to their common law fraud claims.

## 2.     The OCPA requires reliance as an element of causation.

As explained above, the OCPA requires proof "that the challenged practice *caused* the plaintiff's injury."   *Patterson*, 19 P.3d at 846 (emphasis added).   As numerous courts have explained, when a consumer protection act statute requires "that a plaintiff suffer an ascertainable loss *as a result* of the defendant's prohibited action"—like the OCPA does— and a plaintiff premises his case upon a theory of misrepresentation—like Plaintiffs do— "[t]hat means . . . a plaintiff *must* allege reliance."   *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 446 (Pa. 2001) (emphasis added) (emphasis in original); *accord Avery v. State Farm Mut. Aut. Ins. Co*, 835 N.E.2d 801, 861 (Ill. 2005) ("[I]n a cause of action for fraudulent misrepresentation

brought under the Consumer Fraud Act, a plaintiff must prove that he or she was actually

deceived by the misrepresentation in order to establish the element of proximate

causation.").[25]

---

[25] *See also* **California**:  Like the OCPA, "[r]elief under the [California Consumers Legal Remedies Act] is specifically limited to those who suffer damage[,] . . . causation is a necessary element of proof" and therefore, "plaintiffs asserting CLRA claims sounding in fraud must establish that they actually relied on the relevant representations or omissions." *Buckland v. Threshold Enters., LTD.*, 66 Cal. Rptr. 3d 543, 550-51 (Cal. Ct. App. 2007).  **Illinois**:  Named plaintiff in a class action would have to show actual reliance on the allegedly deceptive advertising in order to state a claim under the state consumer fraud statute.  Merely alleging that the advertising for premium gasoline had artificially raised the price for all buyers was not considered sufficient to support the proximate causation element of a private cause of action under the statute.  *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151 (Ill. 2002).  **Kansas**:  Students conceded they had not relied on, and many were not aware of,  statements in a university catalogue about the accreditation of the school's reporting program and thus did not have a cause of action under the Kansas Consumer Protection Act.  The court held that it would "not interpret an aggrieved consumer to be one who is neither aware of nor damaged by a violation of the Act."  *Finstad v. Washburn University of Topeka*, 845 P.2d 685 (Kan. 1993).  **Maryland***:  "*[I]n order to articulate a cognizable injury under the Consumer Protection Act, the injury must be objectively identifiable.  In other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her *reliance* on the sellers' misrepresentation." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. Ct. App. 2007) (emphasis added).  **Minnesota**:  Plaintiff alleging failure to warn of the dangers of continuing use of smokeless tobacco would have to present some evidence of reliance on the alleged misrepresentations in order to state a case under the Minnesota Prevention of Consumer Fraud Act. *Tuttle v. Lorillard Tobacco* Co., 377 F.3d 917 (8th Cir. 2004).  **New Mexico**:  Home sellers failed to show that the finance company's misrepresentation to the buyers actually caused the sellers to lose their mortgage interest in a partially-seller-financed home sale.  Plaintiffs must prove that the alleged misrepresentation actually caused the harm in order to support liability under the state Unfair Practices Act. *Aetna Finance Co. v. Gaither*, 880 P.2d 857 (N.M. 1994).  **North Carolina**: To succeed on claim under North Carolina Unfair and Deceptive Trade Practices Act, plaintiff must prove that its actual injury occurred as result of defendant's unfair or deceptive activity; in a case involving alleged misrepresentation, plaintiff must show that he relied on misrepresentation to his detriment. *Simaan, Inc. v. BP Products N. Am., Inc.*, 395 F. Supp. 2d 271 (M.D. N.C. 2005).  **Pennsylvania**: "Nothing in the legislative history suggests that the legislature ever intended statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 443-44 (Pa. 2001).  **Texas**:  "A consumer is not required to prove reliance as an independent element to recover under the DTPA, but reliance may be a factor in deciding whether the defendant's conduct was a producing cause of damages to the plaintiff." *Century 21 v. Hometown Real Estate Co.*, 890 S.W.2d 118, 130 (Tex. Ct. App. 1994). **Virginia**:  To successfully pursue private cause of action under the Virginia Consumer Protection Act, claimant must show that he relied on alleged misrepresentations that are claimed to constitute the prohibited practice, and, thus, that his loss was caused by the prohibited practice.  *Cooper v. GGGR Inv., LLC*, 334 B.R. 179 (E.D. Va. 2005).

The need to allege reliance under the OCPA distinguishes the OCPA from the consumer protection laws of other states that deputize private attorneys general to enforce public rights.   This requirement also distinguishes the OCPA from consumer protection statutes that speak only of the need to prove a "tendency or capacity to deceive" or a "causal nexus."  *See, e.g., Varacallo v. Massachusetts Mut. Life Ins. Co.*, 752 A.2d 807, 813-14 (N. J. App. Div. 2000) (New Jersey's Consumer Fraud Act requires only a "causal nexus" between the deceptive practice and the consumer's "ascertainable loss."); *State ex rel. Kidwell v. Master Distributors, Inc.*, 615 P.2d 116, 123 (Idaho 1980) ("Actual damage to the public need not be shown to establish a trade practice as unfair or deceptive if it is shown that the practice possesses a tendency or capacity to deceive.").

The Pennsylvania Supreme Court has explained the differing standards of proof:

> While the attorney general may bring an action to restrain advertising which might "have a tendency to deceive a substantial segment" of the public and which is "likely to" influence purchasing decisions, private plaintiffs have no standing to bring actions in the public interest but must prove that they themselves were actually deceived and that the advertising actually influenced their purchasing decisions.

*Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 445 (Pa. 2001).  Oklahoma's statutory scheme requires allegations of facts to show causation, which, in turn, requires that Plaintiffs actually and materially relied on a misrepresentation or omission.

As set forth above, Plaintiffs' SAC fails specifically to allege any actual reliance, and thus fails to allege causation.  This warrants dismissal of Plaintiffs' misrepresentation-based OCPA claims.

### C.      Plaintiffs' SAC fails to establish a duty.

In the Order dismissing Locke's First Amended Complaint, the Court held that he failed to allege a recognizable duty for his common law fraud and OCPA claims.  Order filed December 29, 2011 [Dkt. No. 41] at 19-22.  In response, Plaintiffs allege: (1) that because QuiBids makes certain partial disclosures that create a false impression, it has "a duty to disclose [certain] material facts necessary to correct the false impressions," SAC at ¶ 28; and (2) QuiBids must fully disclose these facts based upon an allegation that they are uniquely known by QuiBids, *id.* at ¶ 8.  But an imbalance of knowledge does not establish a duty, and the disclosures QuiBids does make are not half-truths that create any false impression.

### 1.      An "imbalance of knowledge" does not establish a duty of disclosure in Oklahoma.

Plaintiffs' suggestion that an "imbalance of knowledge" imposes a duty to disclose is contrary to common sense and established law.  Every business that creates a product or provides a service in the ordinary course of commerce naturally knows its business better than the average consumer.  If an imbalance of knowledge by itself created a special duty, virtually every retailer and every commercial business would be subject to disclosure duties to their customers.  This is not the case.

In *Chiarella v. United States*, 445 U.S. 222, 232-33 (1980), the United States Supreme Court recognized that there can be no duty to disclose in a securities fraud action when, as here, it involves "a complete stranger who dealt with the sellers only through impersonal market transactions."  *Id.*  The Court held that a duty to disclose under § 10(b) "does not arise from the mere possession of nonpublic market information."  *Id.*  Similarly, in *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 986 (N.D. Cal. 2009), the plaintiff alleged that Apple had

exclusive knowledge of material facts and should have disclosed a defect in a computer's display components. *Id.* The court dismissed plaintiff's claim pursuant to the heightened pleading standard of Rule 9(b) because plaintiff failed specifically to plead a duty to disclose. *Id.*; *see also Hovsepian v. Apple, Inc.*, 08-5788 JF (PVT), 2009 WL 5069144 at *3, 5 (N.D. Cal. Dec. 17, 2009) (dismissing a complaint pursuant to Rule 9(b) despite plaintiff's allegation that Apple had a duty to disclose an LCD screen defect because it had exclusive knowledge and actually concealed the defect).

Here, Plaintiffs' generalized allegation of an "imbalance of knowledge" is insufficient to establish a recognizable duty to disclose. Should Wal-Mart disclose its pricing strategies to the public? Of course not.[26] A consumer is not entitled to a detailed roadmap that explains the pricing and profit structure of a retailer.

### 2. Plaintiffs' contentions regarding alleged non-disclosure do not state a claim.

Plaintiffs do not plausibly allege that the disclosures that they acknowledge QuiBids makes somehow create half-truths or false impressions that need to be more fully explained. For example, Plaintiffs allege that although bidding before the last 20 seconds is futile, QuiBids creates the false impression that "bidding on high-ticket items before the last 20 seconds could win auctions." SAC at ¶ 8. The fact is that a single bid can win an auction. Any disclosure to the contrary would be false. And what is more, Plaintiffs acknowledge that "QuiBids does state that the 'best strategy' for winning auctions is to wait until the last

---

[26] For example, if a consumer decides to purchase a television from Wal-Mart based on an advertisement that states the consumer will be getting a great deal, if true, is Wal-Mart under a duty to tell the consumer that if he waits another month to buy, the price will actually come down further? Of course not. Even though, due to an imbalance of knowledge, Wal-Mart may know this is true, it need not tell the consumer.

20 seconds," *id.* at ¶ 42 n.3.  This is not a half-truth, it is the whole truth.  Users can win

auctions with bids placed before the last 20 seconds, but it is not a wise strategy to assume

that this will happen.  This is the whole truth, and this is what QuiBids tells its users.

Similarly, there is no half-truth in QuiBids's disclosure that "the 'Value Prices' of

merchandise shown on the Site [are] the prices at which merchandise could be purchased

from retailers."  *Id.* at ¶ 8.  Plaintiffs' own allegations again concede this point.  Plaintiffs

allege that QuiBids informs its users "that because it purchases merchandise from other

retailers, it may 'apply a slight markup in order to cover ordering costs.'"  *Id.* at ¶ 38.  That is

to say, Plaintiffs again acknowledge that QuiBids' users are given the whole truth; QuiBids'

"Value Prices" are, like those of many other retailers, slightly higher than those of other

vendors, particularly those of some vendors who are manufacturers of the products they sell.

It is it not plausible to suggest that a consumer would not understand that the prices of

QuiBids, which is not a manufacturer of products, are likely to be higher than the

manufacturer's own prices.

Further, there is no merit to the disclosures that Plaintiffs suggest QuiBids must

make in order to correct the alleged misconception that "users of the Site w[ill] routinely win

merchandise at a significant discount and, thereby, financially benefit from using the Site."

*Id.* at ¶ 8.  QuiBids cannot disclose that which it does not know.

For example QuiBids is unable to disclose "exactly what percentage of users will win

an auction and, particularly, what percentage will win high-ticket items" or "the percentage

of money spent by customers returned to them in the form of merchandise."  *See id.*  These

percentages and returns on investment are undeterminable.  The question of whether a user

33

will win any particular auction can be answered only by examining his level of skill, the number of users on the Site at the time of the auction, the number of those users who choose to participate in the auction, the price of the item at the time user decides to place a bid, whether the user or others participating in the auction choose to utilize the "Bid-O-Matic", and other variables.   And moreover, the reality is that each user is in complete control of "the percentage of money spent [that is] returned to them in the form of merchandise."  As set forth above, if a user uses "Buy Now," he can never "lose" money.

## IV.   THE UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED CLAIMS ARE DERIVATIVE OF COUNTS I, II, AND III AND, ACCORDINGLY, SHOULD BE DISMISSED

As set forth in this Court's Order dismissing the Locke's First Complaint, Plaintiffs' unjust enrichment and money had and received claims are pleaded so as to make them derivative of other claims.[27]  Order [Dkt. No. 41] at 22; *see also Brill v. Walt Disney Co.,* 2010 WL 5011594, *5 (Okla. Civ. App. Aug. 23, 2010) (noting unjust enrichment claim was "merely derivative" of OCPA claim and "inasmuch as [plaintiff] cannot establish those claims as a matter of law, his derivative claims likewise fail").  Here, Counts IV (had and received) and V (unjust enrichment) are derivative of Counts I, II, and III, in that the alleged inequitable element is based on alleged omissions that were deceptive, unfair or fraudulent. *See* Order at 22.  As demonstrated above, there were:  (1) no damages; (2) no duty; (3) no causation; and (4) no reliance.  Thus, Counts IV and V likewise fail.

In addition, Plaintiffs knowingly entered into contracts with QuiBids by agreeing to the T&C explicitly stated on the Site, with full disclosure of how the auction process works.

Plaintiffs then participated in auctions, thereby receiving the benefit of their bargain. "Having received the benefit of the bargain he agreed to, plaintiff has made no showing that there are inequitable circumstances justifying his claim of unjust enrichment." *Monus v. Colorado Baseball 1993, Inc.,* 103 F.3d 145 (10th Cir. 1996) (table citation).  Thus, these claims should be dismissed.

<u>**CONCLUSION**</u>

For the foregoing reasons, QuiBids prays that the Second Amended Complaint be dismissed pursuant to Fed. R. Civ. P. 8(a), 9(b), and 12(b)(6).

Respectfully submitted,

*/s/ Michael D. McClintock*
Reid Robison, OBA #7692
Michael D. McClintock, OBA #18105
Jeb Boatman, OBA # 20160
Daniel A. Loeffler, OBA # 22631
McAfee & Taft A Professional
Corporation
10th Floor, Two Leadership Square
211 North Robinson Avenue
Oklahoma City, OK  73102
Telephone:    (405) 235-9621
Facsimile:    (405) 235-0439

**ATTORNEYS FOR DEFENDANTS**

---

[27] Plaintiffs did not substantively amend these claims after the Court dismissed them in the First Amended Complaint before refilling them in the SAC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30, 2012 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

**EDWARD L. WHITE, P.C.**
9301 Cedar Lake Ave., Suite 200
Oklahoma City, OK  73114
Telephone:     (405) 810-8188
Facsimile:      (405) 608-0971
Email:            ed@edwhitelaw.com


Roger L. Mandel
Blake L. Beckham
Jose M. Portela
Sarita A. Smithee
**BECKHAM & MANDEL**
3400 Carlisle Street, Suite 550
Dallas, TX  75204
rmandel@beckham-mandel.com
bbeckham@beckham-mandel.com
c2coast@aol.com
ssmithee@beckham-mandel.com



*s/ Michael D. McClintock*

36